# EXHIBIT (A)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life          )
Term Parole Consideration          )  CDC Number C-81713
Hearing of:                        )
                                   )
MORGAN TYSON                       )
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 25, 2006

PANEL PRESENT:

Mr. Archie Joe Biggers, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Morgan Tyson, Inmate
Mr. Charles Carbone, Attorney for Inmate
Ms. Jill Klinge, Deputy District Attorney
Mr. Nicholas Napolitan, Observer
Ms. Amy Lebens, Observer
Mr. Jesse Markham, Observer
Correctional Officers, Unidentified

INMATE COPY

---o0o---

|                                      | Page |
| ------------------------------------ | ---- |
| Proceedings.......................... | 11   |
| Case Factors......................... | 15   |
| Pre-Commitment Factors............... | 28   |
| Post-Commitment Factors.............. | 43   |
| Parole Plans......................... | 70   |
| Closing Statements................... | 92   |
| Recess............................... | 109  |
| Decision............................. | 110  |
| Adjournment.......................... | 119  |
| Transcriber Certification............ | 120  |

INDEX

ii

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No
_____  Yes    See Review of Hearing
               Transcript Memorandum

Tracy Richardson          Vine, McKinnon & Hall

1

P R O C E E D I N G S

        DEPUTY COMMISSIONER BLONIEN:

        PRESIDING COMMISSIONER BIGGERS:  Okay, this is a
Subsequent Parole Consideration Hearing for Morgan Tyson.
T-Y-S-O-N, CDC number C-81713.  Today's date is July the
25th, 2006.  We're located at San Quentin State Prison.
The inmate was received on February the 29th, 1984, from
Alameda County.  The life term began on September the
21st, 1985, and the minimum eligible parole date was
October 24th, 1994.  The controlling offense for which
the inmate has been committed for is Murder Second
Degree.  Case number is A-1-A, that's alpha, Lena, alpha,
75513.  One Count, actually, it says six -- well, Count
Six which is one Count.  And the violation of Penal Code
187.  The -- there was some additional Counts.  One was
Enhancement of a Firearm, which is a violation of
12022(b).  The Assault with a Deadly Weapon, which is a
violation of Penal Code 245(a)(1), same case number, one
Count was stayed.  The Attempted Robbery was a 211/664,
same case number, two Counts.  And the Use of a Weapon,
same case number, with a violation of 12022(b).  The
inmate received a term of 15 years to life plus five
years.  And, as I said before, the minimum eligible
parole date 10/24/94.  Okay, now, this hearing is being
tape-recorded.  Mr. Tyson, and for the purpose of voice
identification each of us will state our first and last
name, spelling out last name.  When it's your turn, after

---

2

spelling your last name, please give us your CDC number.
I will start and move to my left.  My name is Archie Joe
Biggers, B-I-G-G-E-R-S, and I'm a Commissioner with the
Board of Parole Hearings.

        DEPUTY COMMISSIONER BLONIEN:  I'm Noreen Blonien, B-
L-O-N-I-E-N.  I'm a Deputy Commissioner.

        DEPUTY DISTRICT ATTORNEY KLINGE:  Jill Klinge, K-L-
I-N-G-E, Alameda County Deputy DA.

        INMATE TYSON:  Oh, Morgan Tyson.

        PRESIDING COMMISSIONER BIGGERS:  Relax, relax.

        INMATE TYSON:  Yes, sir.

        PRESIDING COMMISSIONER BIGGERS:  Spell your last name.

        INMATE TYSON:  T -- excuse me.

        ATTORNEY CARBONE:  Take a moment.  It's no problem.

        DEPUTY COMMISSIONER BLONIEN:  Okay.

        PRESIDING COMMISSIONER BIGGERS:  Okay.

        DEPUTY COMMISSIONER BLONIEN:  Let's go off record.

        PRESIDING COMMISSIONER BIGGERS:  Let's go off record
and take him out and let him walk around for a second.

        ATTORNEY CARBONE:  You want to collect yourself?

        INMATE TYSON:  Yeah.

                (Off The Record)

        PRESIDING COMMISSIONER BIGGERS:  Does he have ADA --
ADA --

        DEPUTY COMMISSIONER BLONIEN:  We are back on record.

        PRESIDING COMMISSIONER BIGGERS:  Okay, there's an
ADA statement that's right there, too.  You have the ADA

3

1  statement? You moved the ADA statement. Where is it?
2  You didn't bring the ADA statement back in the room?
3  DEPUTY COMMISSIONER BLONIEN: The –
4  PRESIDING COMMISSIONER BIGGERS: The ADA statement
5  that we have in the room. Did you bring it back in?
6  MALE: The piece of paper, the Americans with
7  Disabilities Act statement? This one here?
8  PRESIDING COMMISSIONER BIGGERS: Yes. Okay, why
9  don't we -- that's right. We --
10 DEPUTY COMMISSIONER BLONIEN: She's got -- okay.
11 We're on.
12 PRESIDING COMMISSIONER BIGGERS: Okay, while they
13 bring in the ADA statement back, sir, in the event that
14 you start having some problems -- here's one right here.
15 You can read from mine. There's an ADA statement in
16 front of you there. Would you please read that for the
17 Panel?
18 ATTORNEY CARBONE: Did you still want the inmate to
19 identify himself on record?
20 PRESIDING COMMISSIONER BIGGERS: Yeah. Well, yeah,
21 I'm sorry. We should go back to that. Now you can
22 identify yourself.
23 ATTORNEY CARBONE: Say your name.
24 PRESIDING COMMISSIONER BIGGERS: Say your name. Say
25 your name and give us your –
26 ATTORNEY CARBONE: CDC number.
27 PRESIDING COMMISSIONER BIGGERS: -- CDC number.

4

1  INMATE TYSON: My name is Morgan -- Morgan Tyson.
2  My name is Morgan Tyson. My last name's spelled
3  T-Y-S-O-N. My CDC number is C-81713.
4  PRESIDING COMMISSIONER BIGGERS: All right, thank
5  you.
6  ATTORNEY CARBONE: Good morning, again,
7  Commissioner. It's Charles Carbone, C-A-R-B-O-N-E. I'm
8  counsel to Mr. Tyson.
9  PRESIDING COMMISSIONER BIGGERS: Okay. We have
10 three observers in here today. And they're from Morrison
11 and Forester. Please state your name for the record and
12 spell your last name.
13 MR. NAPOLIAN: Nicholas Napolitan, N-A-P-O-L-I-T-A-
14 N.
15 MS. LEBENS: Amy Lebens, L-E-B-E-N-S.
16 MR. MARKHAM: Jessie Markham, M-A-R-K-H-A-M.
17 PRESIDING COMMISSIONER BIGGERS: Thanks to all of
18 you. And for the record, note that there are two
19 correctional officers present who -- who will not be
20 participating in the hearing. They're here for security
21 purposes only. Now, before we begin there, Mr. Tyson,
22 there's an ADA statement in front of you. Would you
23 please read that out loud for us?
24 INMATE TYSON: Yes. "The Americans with
25 Disabilities Act, ADA, is a law to help
26 people with disabilities. Disabilities are
27 problems that make it harder for some people

5

1  to see, hear, breath, talk, walk, learn,
2  think, work, or take care of themselves than
3  it is for others. Nobody be -- excuse me,
4  nobody can be kept out of public places or
5  activities because of a disability. If you
6  have a disability you have the right to ask
7  for help to get ready for your BPT hearing,
8  get to the hearing, talk, read forms and
9  papers, and understand the hearing process.
10  BPT will look at what you ask for to make
11  sure that you have a disability that is
12  covered by the ADA and that you have asked
13  for the right kind of help. If you do not
14  get help or if you don't think you got the
15  kind of help you need ask for a BPT 1074
16  grievance form. You can also get help to
17  fill it out."
18  PRESIDING COMMISSIONER BIGGERS: Okay. Do you
19  understand what that means?
20  INMATE TYSON: Yes, sir.
21  PRESIDING COMMISSIONER BIGGERS: You tell me in your
22  own words what that means to you.
23  INMATE TYSON: If I have a learning disability or
24  speech disability or any type of disability of learning
25  or whatever I can ask for help.
26  PRESIDING COMMISSIONER BIGGERS: Okay. You signed a
27  1073, what's the date here, indicating that, I think,

6

1  that you had no disabilities. Is that correct?
2  INMATE TYSON: Yes, sir, I did.
3  PRESIDING COMMISSIONER BIGGERS: Okay. But you're
4  wearing glasses.
5  INMATE TYSON: Yes, well, my eyesight is
6  going.
7  PRESIDING COMMISSIONER BIGGERS: You signed this on
8  June the 23rd, 2006, indicating that there are no
9  disabilities identified in ADA, but you should also --
10  you should put down that you wear glasses so that in the
11  event you don't get a date today, the people will know if
12  you come here without your glasses on that there is a
13  problem.
14  INMATE TYSON: All right. I -- I didn't know that.
15  PRESIDING COMMISSIONER BIGGERS: All right. Just
16  making sure your rights are protected here. In addition
17  to that, too, do you have hearing impairments?
18  INMATE TYSON: No, sir. I don't have any
19  hearing --
20  PRESIDING COMMISSIONER BIGGERS: So did you have
21  those glasses on when you -- when you reviewed your C-
22  File?
23  INMATE TYSON: No, sir.
24  PRESIDING COMMISSIONER BIGGERS: You did not?
25  INMATE TYSON: No, I -- I -- I didn't review my C-
26  File.
27  PRESIDING COMMISSIONER BIGGERS: Why didn't you

1  review your C-File?

2  INMATE TYSON: I had gone over it before in --

3  PRESIDING COMMISSIONER BIGGERS: When was the last

4  time you reviewed your C-File?

5  INMATE TYSON: I can't remember.

6  PRESIDING COMMISSIONER BIGGERS: Well, the important

7  thing about that -- prior to every hearing, you should go

8  through and review your C-File. So you then know what --

9  something else could've even been added inadvertently or

10  the possibility exists that somebody sent some additional

11  information that you should be aware of.

12  INMATE TYSON: You may be right. I --

13  PRESIDING COMMISSIONER BIGGERS: Then why didn't you

14  do that?

15  INMATE TYSON: I just -- it just didn't dawn on me

16  that anyone --

17  PRESIDING COMMISSIONER BIGGERS: Didn't dawn on you?

18  INMATE TYSON: No, sir.

19  PRESIDING COMMISSIONER BIGGERS: You know, this is

20  your life we're talking about.

21  INMATE TYSON: I know.

22  PRESIDING COMMISSIONER BIGGERS: And you know you

23  want to get out of here.

24  INMATE TYSON: Yes, sir.

25  PRESIDING COMMISSIONER BIGGERS: Eventually. So --

26  but you got -- I can only make sure that your rights are

27  not violated. There's some other stuff that you got to

7

1  do.

2  INMATE TYSON: Yes, sir.

3  PRESIDING COMMISSIONER BIGGERS: And one of the

4  things is if you don't get a date today, you want to make

5  sure that you -- that your attorney encourages you to

6  look at your C-File. Okay?

7  INMATE TYSON: Yes, sir.

8  PRESIDING COMMISSIONER BIGGERS: All right. Let's

9  see what else now. Do you have any -- so the information

10  that you had on your 1073 is still correct?

11  INMATE TYSON: Yes, sir.

12  PRESIDING COMMISSIONER BIGGERS: With the exception

13  of the -- the glasses?

14  INMATE TYSON: Yes.

15  PRESIDING COMMISSIONER BIGGERS: Okay. You don't

16  have any hearing impairment?

17  INMATE TYSON: No, sir.

18  PRESIDING COMMISSIONER BIGGERS: Have you ever been

19  included in the Triple CMS or EOP program?

20  INMATE TYSON: No, sir.

21  PRESIDING COMMISSIONER BIGGERS: You know what those

22  are though, right?

23  PRESIDING COMMISSIONER BIGGERS: Emergency outpatient?

24  INMATE TYSON: When they ask you --

25  have to do with mental health issues.

26  INMATE TYSON: I didn't know but I -- I do now.

27  PRESIDING COMMISSIONER BIGGERS: You do now. Okay.

8

9

1  You haven't taken any psychotropic medication?
2  INMATE TYSON: No, sir.
3  PRESIDING COMMISSIONER BIGGERS: All right. You
4  suffer from any disabilities, other than the ones that I
5  mentioned, that would prevent you from participating in
6  today's hearing?
7  INMATE TYSON: No, sir, I don't.
8  PRESIDING COMMISSIONER BIGGERS: Okay, Mr. Carbone,
9  have you -- do you feel that your client's ADA rights
10 have been met?
11 DEPUTY COMMISSIONER BLONIEN: Commissioner, we're
12 not picking up the -- the inmate well enough on the
13 recorder. You're either going to have to speak louder -
14 INMATE TYSON: Oh, all right. I'm sorry.
15 DEPUTY COMMISSIONER BLONIEN: -- or we may have to
16 turn the fan off.
17 INMATE TYSON: I'm sorry.
18 DEPUTY COMMISSIONER BLONIEN: I don't know.
19 PRESIDING COMMISSIONER BIGGERS: Well, why don't we
20 turn the fan off? Make sure we're getting it here. We
21 just have to sweat it out.
22 INMATE TYSON: I'll try -- I'll --
23 ATTORNEY CARBONE: The rest of the nation is
24 sweltering, we may as well join them.
25 PRESIDING COMMISSIONER BIGGERS: That's right and I
26 think it's more important for us to pick him up than for
27 us to be comfortable with the fan, so do the best you can

10

1  to speak up though.
2  DEPUTY COMMISSIONER BLONIEN: That -- that -- that
3  really doesn't help you.
4  INMATE TYSON: Okay.
5  PRESIDING COMMISSIONER BIGGERS: Just speak up a
6  little bit more.
7  DEPUTY COMMISSIONER BLONIEN: It's pretty much for
8  show. I -- I can tell whether you're getting picked up
9  or not by this light.
10 INMATE TYSON: All right. Is -- is that good
11 enough?
12 PRESIDING COMMISSIONER BIGGERS: Yeah, is that
13 better?
14 DEPUTY COMMISSIONER BLONIEN: Well, he has to say
15 something.
16 INMATE TYSON: Is this loud enough?
17 DEPUTY COMMISSIONER BLONIEN: Yeah.
18 INMATE TYSON: Oh, I'll just lean forward and talk
19 from now on.
20 PRESIDING COMMISSIONER BIGGERS: All right. Well,
21 we don't want you to -- well, never mind. Let's -- we'll
22 go on. We'll cut the fan off. So going back to Mr.
23 Carbone, you say you didn't have any problems with his
24 ADA rights not being met?
25 ATTORNEY CARBONE: That's correct, thank you.
26 PRESIDING COMMISSIONER BIGGERS: Okay. This hearing
27 is being conducted pursuant to Penal Code section 3041

11

1   and 3042 and -- Mr. Carbone, go ahead and loosen your tie
2   up.  We'll both loosen our ties up.
3       ATTORNEY CARBONE:  Thank you, sir.
4       PRESIDING COMMISSIONER BIGGERS:  No problem.  No
5   need for us just sweating here.  Pursuant to Penal Code
6   Section 3041 and 3042 and the rules and regulations of
7   the Board of Prison Terms governing parole consideration
8   hearings for life inmates, the purpose of today's hearing
9   is to once again consider the number and the nature of
10  the crimes you were committed for, your prior criminal
11  and social history, and your behavior and programming
12  since your commitment.  We've had the opportunity to
13  review your Central File and your prior transcript and
14  you will be given the opportunity to correct or clarify
15  the record.  We will reach a decision today and inform
16  you whether or not we find you suitable for parole and
17  the reason for our decision.  If you are found suitable
18  for parole the length of your confinement will be
19  explained to you.  Nothing that happens here today will
20  change the findings of the court.  This Panel is not here
21  to re-try your case.  The Panel's here for the sole
22  purpose of determining your suitability for parole.  You
23  understand that?
24      INMATE TYSON:  Yes, sir.
25      PRESIDING COMMISSIONER BIGGERS:  The hearing will be
26  conducted in two phases.  I will talk to you -- discuss
27  with you the crime for which you were committed, your

12

1   prior criminal and social history.  The Deputy
2   Commissioner will then discuss with you your post-
3   conviction factors to include your counselor's report,
4   your psychological evaluation, your parole plans and any
5   letters of support or opposition that may be in your
6   file.  Once that is concluded both Commissioners, the
7   District Attorney, and your attorney will be given the
8   opportunity to ask you questions.  Questions from the
9   District Attorney shall be asked through the Chair and
10  you will direct your answers to the Board.  Once that is
11  concluded -- I'm sorry, the -- next, the District
12  Attorney, then your attorney and then you will be given
13  the opportunity to make a final statement regarding your
14  parole suitability.  Your statement should address why
15  you feel you are suitable for parole.  You understand
16  that?
17      INMATE TYSON:  Yes, sir.
18      PRESIDING COMMISSIONER BIGGERS:  The Panel will then
19  recess, clear the room, and deliberate.  Once the
20  deliberations are complete the Panel will resume the
21  hearing and announce its decision.  Now, the California
22  Code of Regulations states that regardless of time served
23  a life inmate shall be found unsuitable for and denied
24  parole if, in the judgment of the Panel, the inmate would
25  pose an unreasonable risk of danger to society if
26  released from prison.  You have certain rights.  Those
27  rights include the right to a timely notice of this

13

```
 1   hearing, the right to review your C-File, which you
 2   indicated to me that you had not done, but I'm going to
 3   encourage you to do that --
 4           INMATE TYSON:  Yes, sir.
 5           PRESIDING COMMISSIONER BIGGERS:  -- and the right to
 6   present relevant documents.  I'm going Mr. Carbone does
 7   he feel that your rights have been met?
 8           ATTORNEY CARBONE:  They have indeed.  Thank you.
 9           PRESIDING COMMISSIONER BIGGERS:  All right, thank you,
     Commissioner.
10           PRESIDING COMMISSIONER BIGGERS:  Okay.  You have an
11   additional right to be heard by an impartial panel.  Do
12   you have any objection to the Panel members?
13           INMATE TYSON:  No, sir, I don't have any objections.
14           PRESIDING COMMISSIONER BIGGERS:  Okay.  How about
15   you?
16           ATTORNEY CARBONE:  None whatsoever.
17           PRESIDING COMMISSIONER BIGGERS:  Okay.  I'm going to
18   ask the Deputy Commissioner if any confide --
19   confidential material will be used.
20           DEPUTY COMMISSIONER BLONIEN:  No confidential
21   information will be used.
22           PRESIDING COMMISSIONER BIGGERS:  Okay, thank you.
23   I'm going to pass to your attorney, as well as to the
24   District Attorney, what I'm going to mark as Exhibit 1
25   and make sure that we're all operating off the same set
26   of documents.
27           ATTORNEY CARBONE:  So stipulated, Commissioner.  We
```

14

```
 1   do, in fact, have received all these documents and had an
 2   opportunity to review them.  Thank you.
 3           PRESIDING COMMISSIONER BIGGERS:  Thank you.
 4           DEPUTY DISTRICT ATTORNEY KLING:  I've received all
 5   these documents.  I would also note that Board report and
 6   psych reports are not checked, but I did receive those
 7   this morning.
 8           PRESIDING COMMISSIONER BIGGERS:  All right, thank
 9   you very much.  Okay, are there any additional documents
10   to be submitted?
11           ATTORNEY CARBONE:  You did, in fact, receive our
12   parole supplemental packet, did you not, Commissioner?
13           PRESIDING COMMISSIONER BIGGERS:  It may be in that
14   package right there.  I know the District Attorney got
15   one.
16           ATTORNEY CARBONE:  I have an additional copy here.
17           PRESIDING COMMISSIONER BIGGERS:  Okay.  Why don't
18   you do that and we'll -- we'll go through that at the
19   appropriate time.
20           ATTORNEY CARBONE:  And then we have one final
21   document which is an indication of the inmate's parole
22   plans, which I'll provide two copies to the Commissioners
23   and one copy to the District Attorney.
24           PRESIDING COMMISSIONER BIGGERS:  Okay.
25           DEPUTY COMMISSIONER BLONIEN:  Thank you, Counsel.
26           PRESIDING COMMISSIONER BIGGERS:  Thank you very
27   much.
```

15

1  ATTORNEY CARBONE: Thank you, Commissioner. Are
2  there any additions?
3  ATTORNEY CARBONE: That's all, thank you.
4  PRESIDING COMMISSIONER BIGGERS: Okay, thank you.
5  Are there any preliminary objections?
6  ATTORNEY CARBONE: None whatsoever.
7  PRESIDING COMMISSIONER BIGGERS: Okay. Will the
8  inmate be speaking to the Panel?
9  ATTORNEY CARBONE: He will in all respects,
10  Commissioner.
11  PRESIDING COMMISSIONER BIGGERS: Okay, please raise
12  your right hand there, Mr. Tyson. Do you solemnly swear
13  or affirm that the testimony you give at this hearing
14  will be the truth and nothing but the truth?
15  INMATE TYSON: Yes, sir, I do.
16  PRESIDING COMMISSIONER BIGGERS: Okay. I'm going to
17  read the summary of the offense. I know there were
18  multiple victims, but I'm just going to read the
19  commitment offense summary.
20  "On July 10th, 1982, at approximately 3:30
21  a.m., Sharon King, that's K-I-N-G, who was
22  spending the night at the apartment of Gail
23  Williams, W-I-L-L-I-A-M-S, the victim, woke
24  up as the victim entered the apartment. Ms.
25  King referred the victim was fully clothed
26  and was bleeding, called for ambulance, and
27  helped her friend get to the sofa to sit

16

1  down, and asked what happened. Ms. Wilson
2  told -- Ms. Williams told her that a person
3  whom she did not know had stabbed her. Ms.
4  Williams described her assailant as a light-
5  skinned black man with a beard. Ms. -- Ms.
6  Williams was transported to the hospital
7  where she died the next morning. Died the
8  same morning, excuse me. On July the 13th,
9  1982, the Oakland Police Department received
10  a phone call from an anonymous informant who
11  indicated that -- that the inmate was
12  responsible for the recent attack of women
13  in the Highland Hospital area. The inmate
14  was arrested in National City on July the
15  27th. He was subsequently charged and
16  convicted for the incident offense."
17  Pretty much, Mr. –
18  DEPUTY COMMISSIONER BLONIEN: Commissioner, I'm
19  sorry to interrupt. I would just point out on page 2 of
20  the Board report, there were additional --
21  PRESIDING COMMISSIONER BIGGERS: Right. There were
22  some -- but I'm going to deal with the -- the commitment
23  offense first and then I'll go into the multiple victims
24  after that. You indicated in your version that you're
25  very sorry for what you did, but everything that in -- in
26  the trial transcript is considered fact --
27  INMATE TYSON: Yes, sir.

17

1 PRESIDING COMMISSIONER BIGGERS: -- so, in other
2 words, you're telling me that the commitment offense is,
3 in fact, correct?
4 INMATE TYSON: Yes, sir. The commitment effect,
5 excuse me, the commiting -
6 PRESIDING COMMISSIONER BIGGERS: Offense.
7 INMATE TYSON: -- offense is -- is a fact, but I
8 never really elaborated on it because I really was
9 disappointed in myself for what I had done.
10 PRESIDING COMMISSIONER BIGGERS: Okay, then you need
11 to tell me why you got involved with this first situation and
12 then we'll go into the multiples after that.
13 INMATE TYSON: Yes, sir.
14 PRESIDING COMMISSIONER BIGGERS: Tell me what
15 happened.
16 INMATE TYSON: Let me begin at the beginning,
17 Commissioner. When I got out of prison -- I had went to
18 prison in Georgia.
19 PRESIDING COMMISSIONER BIGGERS: In Georgia State
20 Prison for three years.
21 INMATE TYSON: Yes, sir.
22 PRESIDING COMMISSIONER BIGGERS: I'm aware of that.
23 We'll talk about that later.
24 INMATE TYSON: Oh, okay. Well, when I had gotten
25 out -- when I was released from prison, I had an
26 attitude. I figured that the world owed me something. I
27 had went to jail. I had never really amounted to much in

18

1 my life. My parents were very good parents and they
2 raised me the right way. It's just that I refused to --
3 to do what was right.
4 PRESIDING COMMISSIONER BIGGERS: Uh-huh.
5 INMATE TYSON: And I wanted to fit in in a world in
6 -- in the criminal world because those people accepted me
7 more and I had been rejected a lot in my life and I
8 didn't understand why. And rejection was one of the main
9 reasons that I committed these crimes. It's like when
10 you go to school and your peers don't like you --
11 PRESIDING COMMISSIONER BIGGERS: Uh-huh.
12 INMATE TYSON: -- and you just say well, you know,
13 the heck with it and I'll just do what I want to do. So
14 after I had got out of prison, I -- I did have good
15 intentions for when I did come to California. I did want
16 to change my life around and it just so happened that I
17 did -- when I got out here, all I ran into were a lot of
18 -- lot more obstacles, a lot more rejection, no
19 employment. But I didn't have any skills to get any
20 employment. If I -- if I had taken the time to learn a
21 trade when I was in prison, I would've come -
22 PRESIDING COMMISSIONER BIGGERS: How'd you pick the
23 victim, being there.
24 INMATE TYSON: Let me tell you how I picked my
25 victims out, Commissioner.
26 PRESIDING COMMISSIONER BIGGERS: I'm talking about
27 the one right now.

19

1  INMATE TYSON: I'll just give Ms. Williams. Are you
2  talking —
3  PRESIDING COMMISSIONER BIGGERS: Ms. Williams.
4  INMATE TYSON: All right. I picked my victim
5  because she was a woman and she was more — she was
6  vulnerable. And a woman, I felt, was less resistant than
7  a man.
8  PRESIDING COMMISSIONER BIGGERS: Okay.
9  INMATE TYSON: But the —
10 PRESIDING COMMISSIONER BIGGERS: How did you
11 determine — what — what are the factors that led up to
12 you attacking Ms. Williams? Was she walking —
13 INMATE TYSON: Being rejected.
14 PRESIDING COMMISSIONER BIGGERS: — the first time
15 you saw her?
16 INMATE TYSON: Yes — yes, sir, I did.
17 PRESIDING COMMISSIONER BIGGERS: Okay.
18 INMATE TYSON: Let — let me finish, Commissioner,
19 please.
20 PRESIDING COMMISSIONER BIGGERS: Well, I don't want
21 you to go —
22 INMATE TYSON: I — I'm not.
23 PRESIDING COMMISSIONER BIGGERS: — you know, down
24 the center-field lane. I want you to —
25 INMATE TYSON: I was.
26 ATTORNEY CARBONE: I think the Commissioner wants
27 you to deal with the — the basic facts first.

20

1  PRESIDING COMMISSIONER BIGGERS: Basic facts before
2  we go on. We'll get — we'll let you get a chance to —
3  INMATE TYSON: All right.
4  PRESIDING COMMISSIONER BIGGERS: — say your spiel,
5  but I want to know the facts that led you to do what you
6  did to Ms. Williams.
7  INMATE TYSON: She was a woman and she was — well,
8  not because she was a woman, but she was vulnerable and I
9  felt that she was —
10 PRESIDING COMMISSIONER BIGGERS: And how was she
11 vulnerable?
12 INMATE TYSON: Because she was a female.
13 PRESIDING COMMISSIONER BIGGERS: Yeah, but how did
14 you determine that, you know, some women —
15 INMATE TYSON: Well, she was by herself.
16 PRESIDING COMMISSIONER BIGGERS: Okay, that's —
17 that's —
18 INMATE TYSON: She was by her —
19 PRESIDING COMMISSIONER BIGGERS: Some women, though,
20 by themselves can handle a guy like you.
21 INMATE TYSON: Yes, sir.
22 PRESIDING COMMISSIONER BIGGERS: Okay, so there had
23 to be another reason as to why you picked her. Okay,
24 we'll say that she was by herself. Was she walking in an
25 area where —
26 INMATE TYSON: Yes, she was. She was walking along
27 the street by an apartment complex.

21

1   PRESIDING COMMISSIONER BIGGERS: Okay, was it dark?
2   Was it --
3   INMATE TYSON: It was lit.
4   PRESIDING COMMISSIONER BIGGERS: Okay.
5   INMATE TYSON: It was lit. It was in the dark --
6   PRESIDING COMMISSIONER BIGGERS: All right. Now,
7   tell me what happened after that. You -- you said okay,
8   this is the one I'm go after. Now, tell me what
9   happened.
10  INMATE TYSON: I walked up to Ms. Williams and I
11  asked her if I could speak with her and she said no.
12  Something like, you know, get away from me or something.
13  And -- and I felt like I was being rejected again in my
14  life.
15  PRESIDING COMMISSIONER BIGGERS: Okay.
16  INMATE TYSON: So I grabbed Ms. - Ms. Williams and
17  with the knife I -- I stabbed her three times.
18  PRESIDING COMMISSIONER BIGGERS: Okay. And then
19  what happened after you stabbed her?
20  INMATE TYSON: I started running. I -- I took off
21  running and I ran home.
22  PRESIDING COMMISSIONER BIGGERS: Okay. And then
23  after that you -- you committed the other crime. Is that
24  the --
25  INMATE TYSON: Yes, sir, I did. I committed the
26  other crimes also.
27  PRESIDING COMMISSIONER BIGGERS: Okay. Let's start

22

1   with the use of a deadly weapon in Count Two where the
2   victim was Janet Charles. And how long ago -- how long
3   ago did that particular attempted robbery go after you
4   stabbed the victim?
5   INMATE TYSON: It didn't go well because Ms.
6   Charles --
7   PRESIDING COMMISSIONER BIGGERS: How long?
8   DEPUTY DISTRICT ATTORNEY KLINGE: Actually --
9   INMATE: Excuse me, all --
10  ATTORNEY CARBONE: This was before. All the
11  others --
12  PRESIDING COMMISSIONER BIGGERS: This was before
13  then?
14  INMATE TYSON: Yes, sir.
15  PRESIDING COMMISSIONER BIGGERS: All the other ones
16  were prior to this?
17  INMATE TYSON: Yes, they were.
18  PRESIDING COMMISSIONER BIGGERS: Thank you. Where's
19  my head today here? Now, for the record, let's just say
20  that we're going to -- we have multiple victims. One is
21  attempted robbery with the use of a deadly weapon and the
22  victim was Janet Charles. The other one was assault with
23  a deadly weapon and that victim was also Janet Charles.
24  And there was another robbery, a PC-211, the use of a
25  deadly weapon and that victim was Tina Marie Boston.
26  Another robbery, 211, with use of a deadly weapon,
27  victim was Karen Kline, K-L-I-N-E. And assault with a

23

1  deadly weapon on Karen Kline. And these were all women.
2  INMATE TYSON: Yes, sir, they were all women.
3  PRESIDING COMMISSIONER BIGGERS: So you had a
4  problem with women?
5  INMATE TYSON: Yes, sir, I had a problem with women.
6  PRESIDING COMMISSIONER BIGGERS: Okay. What do you
7  feel was the underlying causes of you having a problem
8  with women?
9  INMATE TYSON: I think it was rejection my whole
10 life.
11 PRESIDING COMMISSIONER BIGGERS: But you know a lot
12 of us get rejected.
13 INMATE TYSON: Yes, sir.
14 PRESIDING COMMISSIONER BIGGERS: Okay. But we
15 handled it differently.
16 INMATE TYSON: Yes.
17 PRESIDING COMMISSIONER BIGGERS: We don't go around
18 stabbing and robbing women just because we got rejected.
19 INMATE TYSON: No, sir, we don't.
20 PRESIDING COMMISSIONER BIGGERS: Well, then have you
21 ever considered looking at other causative factors as to
22 why you may have this resentment toward women?
23 INMATE TYSON: At the time I didn't, Commissioner.
24 PRESIDING COMMISSIONER BIGGERS: Okay.
25 INMATE TYSON: But now it's -- it's a -- I see it's
26 a lot different.
27 PRESIDING COMMISSIONER BIGGERS: It appears that

24

1  each time that you did this, one of these offenses, the -
2  - the woman was always by herself. Is that correct?
3  INMATE TYSON: Yes, sir. They were.
4  PRESIDING COMMISSIONER BIGGERS: You would always --
5  you asked one lady for a cigarette and she refused your
6  request. Then another one was jogging. She had her
7  seven-year-old niece with her, didn't she?
8  INMATE TYSON: Yes, sir.
9  PRESIDING COMMISSIONER BIGGERS: They'd been out
10 skating and were walking back to their apartment when you
11 jogged -- a man jogged from them behind. And you jumped
12 out of the bushes and struck her in the face.
13 INMATE TYSON: Yes, sir, I did.
14 PRESIDING COMMISSIONER BIGGERS: What was your
15 intention? Other than -
16 INMATE TYSON: To rob her.
17 PRESIDING COMMISSIONER BIGGERS: Rob her.
18 INMATE TYSON: My -- my intention was to rob her.
19 PRESIDING COMMISSIONER BIGGERS: And you hit her?
20 INMATE TYSON: Yes.
21 PRESIDING COMMISSIONER BIGGERS: Okay, then there
22 was a nurse, Ms. Karen Kline. And, again, they were
23 walking the streets by themselves. And you knocked her
24 to the ground.
25 INMATE TYSON: Yes, sir, I did.
26 PRESIDING COMMISSIONER BIGGERS: "Don't scream or
27 I'll kill you." There's got to be some factors that make

25

```
 1   you do this. This type of stuff, you know.
 2       INMATE TYSON:  Yes.  I said those things because I
 3   thought that it would scare them and make them, you know,
 4   do what I wanted them to do.
 5       PRESIDING COMMISSIONER BIGGERS:  And that was just
 6   strictly to rob them?
 7       INMATE TYSON:  Yes, sir.
 8       PRESIDING COMMISSIONER BIGGERS:  Well, you had a
 9   rape charge back there in Georgia.
10       INMATE TYSON:  Yes, I did.
11       PRESIDING COMMISSIONER BIGGERS:  Okay, was your
12   intention to sexually molest them in any way?
13       INMATE TYSON:  No, sir, it wasn't at the time, but I
14   -- my intentions was to rob a liquor store and I had
15   never robbed anybody before in my life and she had come
16   along -- I had met her --
17       PRESIDING COMMISSIONER BIGGERS:  There are four
18   though.
19       INMATE TYSON:  -- a while -- excuse me, sir?
20       PRESIDING COMMISSIONER BIGGERS:  Three women.
21   One, Janet Charles --
22       INMATE TYSON:  Yes, you're talk -
23       PRESIDING COMMISSIONER BIGGERS:  -- Tina Marie
24   Boston, Karen Kline, actually, four women.
25       INMATE TYSON:  Yes, but you're talking about the one
26   in Georgia, right?
27       PRESIDING COMMISSIONER BIGGERS:  Well, no, I
```

26

```
 1   just --
 2       INMATE TYSON:  Oh, okay.
 3       PRESIDING COMMISSIONER BIGGERS:  -- brought that up
 4   as an arrest report.
 5       INMATE TYSON:  Oh, I'm sorry.  I thought you were
 6   talking --
 7       PRESIDING COMMISSIONER BIGGERS:  There were four
 8   women involved here in crimes in California.
 9       INMATE TYSON:  Yes.
10       PRESIDING COMMISSIONER BIGGERS:  They were all
11   walking by themselves.
12       INMATE TYSON:  Yes, sir.
13       PRESIDING COMMISSIONER BIGGERS:  With the exception
14   of that one lady who had her seven-year-old niece with
15   her.
16       INMATE TYSON:  Yes.
17       PRESIDING COMMISSIONER BIGGERS:  Okay.  My question
18   to you was if you were just there to -- to rob them, you
19   know, one would surmise since you had a rape charge in
20   Georgia -
21       INMATE TYSON:  Yes.
22       PRESIDING COMMISSIONER BIGGERS:  -- that you
23   could've had intentions to do something else.  And that's
24   what I was asking you about.  Was this strictly for
25   robbery or -- or was it to get involved with them in any
26   other manner other than -
27       INMATE TYSON:  Oh, no, I wasn't trying to get
```

27

1  involved with them, I didn't -- no, that wasn't it. My
2  intentions were to rob them.
3  PRESIDING COMMISSIONER BIGGERS: Okay. And -- but
4  was it necessary to use -- for you to knock them down as
5  a way of robbing them?
6  INMATE TYSON: Well, now that I see it wasn't
7  necessary, but I did. I thought it was necessary at the
8  time.
9  PRESIDING COMMISSIONER BIGGERS: Okay. Is there
10  anything else you want to tell me about these crimes, I
11  mean, this is subsequent hearing number five, so it's
12  pretty well-documented about the crime.
13  INMATE TYSON: Yes.
14  PRESIDING COMMISSIONER BIGGERS: We're not here to
15  re-try your case so is there anything that you want to
16  put on the record about the crimes that has not been
17  discussed in previous cases or something that I may have
18  left out?
19  INMATE TYSON: Yes, sir. I -- I did commit these
20  crimes.
21  PRESIDING COMMISSIONER BIGGERS: Oh, I understand
22  that.
23  INMATE TYSON: And I committed a number of crimes
24  against women and I know it looks like I have a problem
25  with women, that I hate women, but I don't. I love my
26  mother and I have two sisters, I have three daughters. I
27  love them all the same.

28

1  PRESIDING COMMISSIONER BIGGERS: Well, we're going
2  to get into your social history. Right now I'm only
3  concerned about the crime. Is there anything in the
4  crime or crimes that I have -- that I failed to mention
5  or has not been mentioned before that is not in the
6  record?
7  INMATE TYSON: No, sir.
8  PRESIDING COMMISSIONER BIGGERS: Okay. You have any
9  questions there, Deputy Commissioner?
10  DEPUTY COMMISSIONER BLONIEN: Well, the
11  Commissioner's asked you the question four different ways
12  about the insight that you have.
13  INMATE TYSON: Yes, ma'am.
14  DEPUTY COMMISSIONER BLONIEN: And I -- and I am
15  going to talk to you about your psych report, but in
16  reading your psych report, you said that you went after
17  these women because you wanted someone to talk to. Your
18  psych report was only five days ago.
19  INMATE TYSON: No -- yes, it was. It was about five
20  days ago.
21  DEPUTY COMMISSIONER BLONIEN: So --
22  INMATE TYSON: Well, I --
23  DEPUTY COMMISSIONER BLONIEN: -- I don't know if
24  you've thought this through or not --
25  INMATE TYSON: I told her the same thing.
26  DEPUTY COMMISSIONER BLONIEN: But she didn't write
27  down the same thing.

29

1   INMATE TYSON: I -- I explained it to her the same
2   way I'm explaining it to you. I -- I have no idea how
3   she got that idea.
4   DEPUTY COMMISSIONER BLONIEN: We'll talk about it
5   more but I just wanted to remind you --
6   INMATE TYSON: Yes, ma'am.
7   DEPUTY COMMISSIONER BLONIEN: -- five days ago
8   there's a whole document.
9   INMATE TYSON: Yes, ma'am.
10  PRESIDING COMMISSIONER BIGGERS: All right, now,
11  going into your social history. You were born in
12  Virginia in '51 to Morgan and Bernelle Tyson?
13  INMATE TYSON: Yes, sir, I was.
14  PRESIDING COMMISSIONER BIGGERS: And your father was
15  serving in the military. What branch?
16  INMATE TYSON: In the Army.
17  PRESIDING COMMISSIONER BIGGERS: In the Army. Was
18  he stationed at Fort Belibar (phonetic)?
19  INMATE TYSON: Yes, sir, he was.
20  PRESIDING COMMISSIONER BIGGERS: Okay. After several
21  years in Germany with your parents you returned to the
22  States where you resided in Columbus, Georgia for seven
23  years until your parents separated?
24  INMATE TYSON: Yes, I did.
25  PRESIDING COMMISSIONER BIGGERS: And your father re
26  -- remained in Georgia and your mother moved to Oakland
27  in '77?

30

1   INMATE TYSON: Yes, sir, I -- I think it was '74
2   that she moved out here.
3   PRESIDING COMMISSIONER BIGGERS: Okay.
4   INMATE TYSON: But she did move to California, yes,
5   she did.
6   PRESIDING COMMISSIONER BIGGERS: And then she moved
7   -- and -- and she started to reside in Oakland in '77?
8   Somewhere in there.
9   INMATE TYSON: I don't -- somewhere near there. I
10  don't know exactly.
11  PRESIDING COMMISSIONER BIGGERS: Okay. And you feel
12  that your father was supporting your mother in -- at some
13  point. Is that what you were saying?
14  INMATE TYSON: Yes, he did.
15  PRESIDING COMMISSIONER BIGGERS: Okay. So you had
16  two brothers?
17  INMATE TYSON: Excuse me?
18  PRESIDING COMMISSIONER BIGGERS: You had two
19  brothers?
20  INMATE TYSON: I have three brothers.
21  PRESIDING COMMISSIONER BIGGERS: Three brothers.
22  INMATE TYSON: Yes, sir.
23  PRESIDING COMMISSIONER BIGGERS: Okay, and were they
24  by your mother and father?
25  INMATE TYSON: Yes, sir. All -- all my brothers and
26  sisters. Well, except for my sister. She was --
27  PRESIDING COMMISSIONER BIGGERS: Okay.

31

1    INMATE TYSON: -- born out of wedlock.
2    PRESIDING COMMISSIONER BIGGERS: Okay, so you have
3    two brothers -- two brothers --
4    INMATE TYSON: Three.
5    PRESIDING COMMISSIONER BIGGERS: Three brothers.
6    INMATE TYSON: Three brothers and one sister --
7    PRESIDING COMMISSIONER BIGGERS: And are they older
8    or younger?
9    INMATE TYSON: They're younger than me.
10   PRESIDING COMMISSIONER BIGGERS: Okay.
11   INMATE TYSON: They're not -- I'm -- I'm the oldest.
12   PRESIDING COMMISSIONER BIGGERS: Okay, so, you know,
13   they looked up to you, did they not?
14   INMATE TYSON: Yes, sir, they did.
15   PRESIDING COMMISSIONER BIGGERS: Okay. Now, two of
16   your brothers, one is in San Diego in the United States
17   Navy, and one resides in Oakland. And he's a Merchant
18   Marine?
19   INMATE TYSON: Let me clarify that, Commissioner. My
20   brother, he's no longer in the service -- my -- my
21   brother is no longer in the service. He lives in
22   Chicago. He's a policeman in Chicago.
23   PRESIDING COMMISSIONER BIGGERS: Okay.
24   INMATE TYSON: My brother doesn't live in Oakland
25   any more. He lives in Modesto. He works with the
26   Department of Transportation.
27   PRESIDING COMMISSIONER BIGGERS: Okay.

32

1    INMATE TYSON: And I also have a brother that lives
2    in Atlanta. He works with Georgia Pacific Power Company.
3    PRESIDING COMMISSIONER BIGGERS: Okay. And what
4    does your sister do?
5    INMATE TYSON: My sister, she works for an insurance
6    company in Detroit. And I also have a sister in Oakland.
7    She works for -- she works for a hospital that take care
8    of the elderly.
9    PRESIDING COMMISSIONER BIGGERS: Oh, like hospice?
10   INMATE TYSON: I don't even know. What is a
11   hospice?
12   PRESIDING COMMISSIONER BIGGERS: That's where -
13   ATTORNEY CARBONE: That -- that -- that very thing
14   that you just described.
15   INMATE TYSON: Oh, okay. That's what she works for.
16   PRESIDING COMMISSIONER BIGGERS: Similar to that
17   where they go out and they work with people.
18   INMATE TYSON: Oh, no, she works in sort of a
19   hospital for the eld -
20   PRESIDING COMMISSIONER BIGGERS: Well, there's --
21   there's --
22   INMATE TYSON: I don't know what it is.
23   PRESIDING COMMISSIONER BIGGERS: Okay.
24   INMATE TYSON: It's just elderly.
25   PRESIDING COMMISSIONER BIGGERS: So you had two
26   sisters out of wedlock.
27   INMATE TYSON: No. No, sir.

33

1  PRESIDING COMMISSIONER BIGGERS: One?
2  INMATE TYSON: I have one sister out of wedlock.
3  PRESIDING COMMISSIONER BIGGERS: Okay.
4  INMATE TYSON: And all the rest of my brothers and
5  sisters were --
6  PRESIDING COMMISSIONER BIGGERS: From your --
7  INMATE TYSON: -- from my father and mother.
8  PRESIDING COMMISSIONER BIGGERS: Okay.
9  INMATE TYSON: Yes, sir.
10  PRESIDING COMMISSIONER BIGGERS: Now, since you've
11  had all these other siblings and none of them ever been
12  in the -- have they ever been involved with police
13  contact?
14  INMATE TYSON: No, well, my sister, she --
15  PRESIDING COMMISSIONER BIGGERS: Which one now?
16  INMATE TYSON: My oldest sister. She's younger than
17  me but she's my oldest sister.
18  PRESIDING COMMISSIONER BIGGERS: I understand.
19  INMATE TYSON: She was. Well --
20  PRESIDING COMMISSIONER BIGGERS: And what did she
21  get involved with?
22  INMATE TYSON: She just refused to do what my mother
23  said and she -- my mother had her committed to a -- what
24  do you call it? A place in Millersville, down in
25  Millersville, Georgia. Sort of like a crazy house.
26  PRESIDING COMMISSIONER BIGGERS: A camp?
27  INMATE TYSON: Yeah, something like that. I don't

34

1  know.
2  PRESIDING COMMISSIONER BIGGERS: Crazy, what do you
3  mean? She had -- did she have mental health issues?
4  INMATE TYSON: Mental. I guess a mental -- mental
5  institution.
6  PRESIDING COMMISSIONER BIGGERS: Mental health
7  issues.
8  INMATE TYSON: Mental hosp -- yeah, mental hospital.
9  Yeah.
10  PRESIDING COMMISSIONER BIGGERS: Would you consider
11  your -- your -- your mother strict?
12  INMATE TYSON: Yes, sir, I -- she is strict. I
13  mean, as far as I -- as I know, yes, she is. Not as
14  strict as my father. She's --
15  PRESIDING COMMISSIONER BIGGERS: So in other words,
16  you came from a --
17  INMATE TYSON: -- was more understanding.
18  PRESIDING COMMISSIONER BIGGERS: -- strict -- strict
19  family situation, is what I'm getting at?
20  INMATE TYSON: Yes, I did.
21  PRESIDING COMMISSIONER BIGGERS: Okay.
22  INMATE TYSON: Very strict.
23  PRESIDING COMMISSIONER BIGGERS: All right, let's --
24  let's move on. You -- you attended elementary school in
25  Germany and -- and you went through -- you attended
26  Carver High School in Columbus, Georgia, but you
27  terminated in the 11th grade to get married?

35

1  **INMATE TYSON:** Yes, sir, I did.

2  **PRESIDING COMMISSIONER BIGGERS:** Okay. So what

3  happened to your wife?

4  **INMATE TYSON:** My wife and I, we divorced. That was

5  --

6  **PRESIDING COMMISSIONER BIGGERS:** When did you get

7  married?

8  **INMATE TYSON:** In 1970. April 28ᵗʰ, 1970.

9  **PRESIDING COMMISSIONER BIGGERS:** Okay, and when'd

10  you get divorced?

11  **INMATE TYSON:** It was 19 --

12  **PRESIDING COMMISSIONER BIGGERS:** Because it's not

13  clear here in the record.

14  **INMATE TYSON:** In 1970 -- no, I think it was 1980.

15  Somewhere around there.

16  **PRESIDING COMMISSIONER BIGGERS:** Okay.

17  **INMATE TYSON:** I don't remember the exact date.

18  **PRESIDING COMMISSIONER BIGGERS:** Well, approximately

19  ten years you were married to her, is that right?

20  **INMATE TYSON:** Yes, but we were -- we had been

21  separated for a number of years.

22  **PRESIDING COMMISSIONER BIGGERS:** Separated -- okay.

23  And her name was Beverly Norris.

24  **INMATE TYSON:** Yes, sir.

25  **PRESIDING COMMISSIONER BIGGERS:** N-O-R-R-I-S. And

26  she was 19. How old were you when you got married to

27  her?

36

1  **INMATE TYSON:** I was 18.

2  **PRESIDING COMMISSIONER BIGGERS:** Eighteen. And you

3  had two daughters by her?

4  **INMATE TYSON:** Yes.

5  **PRESIDING COMMISSIONER BIGGERS:** Okay. And what are

6  the daughters doing now?

7  **INMATE TYSON:** My daughters are -- one lives in

8  Malibu. The other one lives in Oregon.

9  **PRESIDING COMMISSIONER BIGGERS:** Do they come visit

10  you?

11  **INMATE TYSON:** My oldest daughter does.

12  **PRESIDING COMMISSIONER BIGGERS:** She does.

13  **INMATE TYSON:** She has and -- but my youngest

14  daughter, she hasn't come to visit me. She's -- she's --

15  she's just been having, you know, financial problems.

16  **PRESIDING COMMISSIONER BIGGERS:** Okay.

17  **INMATE TYSON:** But I do hear from them every now and

18  then.

19  **PRESIDING COMMISSIONER BIGGERS:** Every now and then.

20  Okay. It says here you listed the divorce in 1974.

21  **INMATE TYSON:** Well, that's -- that's when we

22  separated. That's what I meant to say.

23  **PRESIDING COMMISSIONER BIGGERS:** Okay.

24  **INMATE TYSON:** We separated in '74 but we didn't get

25  divorced until --

26  **PRESIDING COMMISSIONER BIGGERS:** In 1980.

27  **INMATE TYSON:** -- somewhere in 1980. I was in

37

1 prison then at the time.
2 PRESIDING COMMISSIONER BIGGERS: Okay. You were
3 also in the Navy?
4 INMATE TYSON: Yes, sir, I was.
5 PRESIDING COMMISSIONER BIGGERS: You joined for a
6 two-year stint. So you were discharged 1971 from -- you
7 were stationed in Philadelphia?
8 INMATE TYSON: Yes, I was. That's where my last
9 duty station was. I was stationed there.
10 PRESIDING COMMISSIONER BIGGERS: And you got out
11 under honorable conditions, too.
12 INMATE TYSON: Yes, sir.
13 PRESIDING COMMISSIONER BIGGERS: Right?
14 INMATE TYSON: I did.
15 PRESIDING COMMISSIONER BIGGERS: And you were in
16 England for a year and you were a Boatswain's mate?
17 INMATE TYSON: Yes, sir.
18 PRESIDING COMMISSIONER BIGGERS: And -- and a
19 welder.
20 INMATE TYSON: Yes.
21 PRESIDING COMMISSIONER BIGGERS: Okay. And it says
22 here you denied the use intoxicants. You used a variety
23 of narcotics and then your (inaudible) did not want to
24 list them. Why?
25 INMATE TYSON: Well, at the time they just made me
26 feel good. But I didn't know that they would do this to
27 me.

38

1 PRESIDING COMMISSIONER BIGGERS: Okay. And as I see
2 here, we talked about that earlier, you were committed to
3 the Georgia State Prison on March 20th, 1978, on a rape
4 and auto-entering charges.
5 INMATE TYSON: Yes, sir, I was.
6 PRESIDING COMMISSIONER BIGGERS: With sentence to
7 run concurrently with the auto charge -- charge carrying
8 a three year sentence and the rape charge an eight year
9 sentence. Who was the young lady that you raped?
10 INMATE TYSON: Her name was Robin -- Robin
11 Davenport, I think.
12 PRESIDING COMMISSIONER BIGGERS: How old was she?
13 INMATE TYSON: I don't -- I don't know how old she
14 was.
15 PRESIDING COMMISSIONER BIGGERS: Okay. You -- did
16 it ever occur to you that with all this stuff going and
17 the support and the family that you had that you probably
18 should've tried to live a clean life?
19 INMATE TYSON: Yes, sir, it has occurred to me.
20 PRESIDING COMMISSIONER BIGGERS: After the fact.
21 Prior to?
22 INMATE TYSON: Yes, sir.
23 PRESIDING COMMISSIONER BIGGERS: Okay. Because,
24 again, you were released and got out of prison that you -
25 - what kind of work did you try to do when you got out to
26 California out of prison?
27 INMATE TYSON: After I got out of prison I just

39

1 searched for any type of work. Any type of labor job or
2 whatever there was that I could be hired at.
3 PRESIDING COMMISSIONER BIGGERS: Did you ever go to
4 the Veteran's Administration or go to any veteran's
5 groups to seek assistance?
6 INMATE TYSON: No, sir, I didn't.
7 PRESIDING COMMISSIONER BIGGERS: Why not?
8 INMATE TYSON: I didn't think about it.
9 PRESIDING COMMISSIONER BIGGERS: Okay. You
10 honorably served. You know that you had all this
11 available to you?
12 INMATE TYSON: Yes and no, but, like I said, I
13 didn't really, you know, think about those -- those
14 options.
15 PRESIDING COMMISSIONER BIGGERS: Only because at the
16 time you just didn't like a structured environment,
17 basically, is what you're telling me. Is that correct?
18 INMATE TYSON: True. I didn't.
19 PRESIDING COMMISSIONER BIGGERS: Okay. All right,
20 let's go -- I'm going to look at your priors. As a
21 juvenile you had naught on record.
22 INMATE TYSON: None, sir.
23 PRESIDING COMMISSIONER BIGGERS: And then -- so your
24 only offense prior -- only couple of -- of offenses prior
25 to this offense was a -- the auto and rape conviction.
26 Is that correct? In '78?
27 INMATE TYSON: Yes, it was.

40

1 PRESIDING COMMISSIONER BIGGERS: And then -
2 INMATE TYSON: I --
3 PRESIDING COMMISSIONER BIGGERS: -- in '82 in San
4 Diego, what happened there in '82? Was this -- '82 I'm
5 reading something here that -- booked on -- you were
6 booked on July the 30th -- it had here a warrant in San
7 Diego, California. Were you down in San Diego?
8 INMATE TYSON: Yes, that's -- I was there --
9 PRESIDING COMMISSIONER BIGGERS: When they --
10 INMATE TYSON: That's when they arrested me.
11 PRESIDING COMMISSIONER BIGGERS: -- arrested you for
12 the warrant.
13 INMATE TYSON: For the warrant up here in Oakland.
14 PRESIDING COMMISSIONER BIGGERS: Okay. How'd you
15 get to San Diego from Oakland?
16 INMATE TYSON: I caught the bus.
17 PRESIDING COMMISSIONER BIGGERS: You caught the bus.
18 So after you did all these crimes you wanted to get away?
19 INMATE TYSON: Yes, sir, I did. I wanted to get
20 away.
21 PRESIDING COMMISSIONER BIGGERS: And -- so they
22 tracked you down to San Diego.
23 INMATE TYSON: Yes, sir, they did.
24 PRESIDING COMMISSIONER BIGGERS: Okay. Okay. And I
25 see here also, and this was dropped, and the only reason
26 I'm bringing it up cause the case was in fact dismissed,
27 but they had an escape charge that was pending at one

41

1  time.
2  INMATE TYSON: Yes, sir.
3  PRESIDING COMMISSIONER BIGGERS: What happened
4  there?
5  INMATE TYSON: I was in the county jail and -- in
6  Oakland and at the time, they had some people in there
7  that were trying to escape. I just happened to be in the
8  same cell block they were in.
9  PRESIDING COMMISSIONER BIGGERS: Okay.
10 INMATE TYSON: But I never tried to escape. I never
11 tried to go anywhere.
12 PRESIDING COMMISSIONER BIGGERS: Well, they
13 dismissed the charge, so --
14 INMATE TYSON: Yes, they did.
15 PRESIDING COMMISSIONER BIGGERS: So undoubtedly they
16 felt that was wrong, but I just wanted to get your
17 clarification of that because that would've concerned me
18 if you didn't have any reason for how to do that. Okay,
19 is there anything that I missed on your social or your
20 priors that need to be brought out?
21 INMATE TYSON: Yes, sir.
22 PRESIDING COMMISSIONER BIGGERS: Did I miss
23 something?
24 INMATE TYSON: We were just talking about crime and
25 -- in Georgia.
26 PRESIDING COMMISSIONER BIGGERS: Right.
27 INMATE TYSON: And you had asked me about why I

42

1  didn't seek employment, you know, and as I said I just,
2  at the time, I didn't really want to learn a trade and I
3  really wasn't, you know, interested in trying to get any
4  type of skills. But I did want to lead a clean life, but
5  I just didn't have the skills but --
6  PRESIDING COMMISSIONER BIGGERS: You were a welder
7  in the Navy.
8  INMATE TYSON: Excuse me. Excuse me, Commissioner.
9  No, well, I was a welder in the Navy but I had to stop
10 welding because when you weld, you know, the soot, the
11 asphyxiate -- from the welding rods it would always -- it
12 would go into my lungs and I had to stop and -- but,
13 anyway, I didn't seek any type of skills when I was in
14 the -- in prison. My only thought when I was in prison
15 was trying to get out. That's all. I didn't, you know,
16 have any intentions of trying to learn any kind of skills
17 to get any type of education so that when once I got out
18 I could, you know, have a decent life.
19 PRESIDING COMMISSIONER BIGGERS: Uh-huh.
20 INMATE TYSON: You know, for myself. And that was --
21 -- that was the main reason that when I came to California
22 I really couldn't find employment. You know, had I had
23 the skills and the training, I'm pretty sure I could've
24 found, you know, employment and a good education. I
25 didn't even have an education at the time.
26 PRESIDING COMMISSIONER BIGGERS: Okay. Well,
27 anything you can remember and I see you are taking some -

43

1  advantage of some of the programs here. But as a
2  former military man --
3      INMATE TYSON: Yes, sir.
4      PRESIDING COMMISSIONER BIGGERS: -- whenever
5  somebody's discharged a lot of things are explained to
6  them as what's available for them once they get out.
7  It's just a matter of whether or not the person wants to
8  take advantage of --
9      INMATE TYSON: Yes, sir. You're right and at the
10 time I was discharged --
11     PRESIDING COMMISSIONER BIGGERS: You didn't want to
12 take advantage.
13     INMATE TYSON: -- I -- no, it -- in 1970 the only
14 thing was in -- cause most guys in the service, I'm
15 getting out of the war, I'm going home. And that -- I
16 basically had the same attitude as everyone else.
17     PRESIDING COMMISSIONER BIGGERS: Okay. That --
18 that's what I wanted to hear. You have any other
19 questions there, ma'am?
20     DEPUTY COMMISSIONER BLONIEN: I don't.
21     PRESIDING COMMISSIONER BIGGERS: Okay. I'm going to
22 ask the Deputy Commissioner to talk to you about your
23 post-conviction factors.
24     DEPUTY COMMISSIONER BLONIEN: Mr. Tyson, this is
25 your sixth subsequent hearing.
26     INMATE TYSON: Yes, ma'am.
27     DEPUTY COMMISSIONER BLONIEN: Have you read the

44

1  transcripts from your other hearings?
2      INMATE TYSON: Yes, ma'am, I have.
3      DEPUTY COMMISSIONER BLONIEN: And -- and did you
4  read them before you came in here to refresh your memory?
5      INMATE TYSON: Not last night. I think it was last
6  week.
7      DEPUTY COMMISSIONER BLONIEN: Okay.
8      INMATE TYSON: Some time last week.
9      DEPUTY COMMISSIONER BLONIEN: So it's my job to go
10 over what you've been doing in the institution since your
11 last hearing. And you came before the Board on November
12 30th of '05 and the hearing was postponed and a new psych
13 was ordered. And the psych was just completed on the 21st
14 of July. Did you get a copy of it?
15     INMATE TYSON: Yes, ma'am. I just got it yesterday.
16     DEPUTY COMMISSIONER BLONIEN: Did you read it?
17     INMATE TYSON: Yes, ma'am, I did. I read it. I was
18 not really pleased with it, but --
19     DEPUTY COMMISSIONER BLONIEN: And -- and we're going
20 to talk about it.
21     INMATE TYSON: All right.
22     DEPUTY COMMISSIONER BLONIEN: So I've read the psych
23 report and since then that was so new I went back and
24 read your -- your previous three or four psych reports.
25 I read everything in your -- your volumes of your C-File.
26 I read your counselor's report by Counselor Hillard, H-
27 I-L-L-A-R-D. [alarm sound] And I'm going to change the

45

1  tape here.
2        [Thereupon, the tape was turned over.]
3        DEPUTY COMMISSIONER BLONIEN: Okay, we're back on
4  tape, side two. I read your counselor's report by
5  Counselor Hilliard, H-I-L-L-I-A-R-D. And then the new --
6  new psych report dated 7/21/06 by Michel, M-I-C-H-E-L,
7  Inaba, I-N-A-B-A. And I think the -- the first question
8  that -- that I had for you was I saw in your '01 hearing
9  you asked to be transferred to San Quentin so you could
10 complete your college and I don't see any college courses
11 that you've taken since you've been here.
12       INMATE TYSON: Well, the reason I haven't been in
13 college -- I -- I did go to college, but then I had so
14 many programs that I had to get in -- I couldn't fit
15 them all in one. I -- college was every night. Monday,
16 Thursdays and Fridays, I had programs. There was no way
17 I could fit them in.
18       DEPUTY COMMISSIONER BLONIEN: And -- and what was
19 your goal in college?
20       INMATE TYSON: Just to -- just to finish.
21       DEPUTY COMMISSIONER BLONIEN: Just to finish?
22       INMATE TYSON: Yes, ma'am. Just to finish.
23       DEPUTY COMMISSIONER BLONIEN: Just to get piece of
24 paper?
25       INMATE TYSON: Well, I -- well, just -- just to get
26 the piece of paper, but I've never been the type of
27 person that could -- that would sit down and -- and --

46

1  and do things, you know, with thinking. I'm -- I'm
2  better with my hands building with trades, working with
3  wood, bricks, stuff -- I'm -- I -- I like doing labor
4  things.
5        DEPUTY COMMISSIONER BLONIEN: So I looked -- I
6  looked for your TABE score and I saw just a chrono where
7  you refused to take it. Did you take it at some point?
8        INMATE TYSON: Yes, I did. I did take it at -- I
9  did refuse and I -- the reason I refused -
10       DEPUTY COMMISSIONER BLONIEN: That's March 4th of
11 2003.
12       INMATE TYSON: Yes, I had -- I had told the
13 instructor that was giving the TABE test I said I have a
14 high school diploma and I presented it to the lady and
15 she said well, I don't care. I want you to take it
16 anyway over again. I said but I have a high school
17 diploma.
18       DEPUTY COMMISSIONER BLONIEN: Do you know why?
19 Because a lot of people have high school diplomas and
20 they can't read.
21       INMATE TYSON: Uh-huh.
22       DEPUTY COMMISSIONER BLONIEN: So we're under a
23 mandate by --
24       INMATE TYSON: I -- I know.
25       DEPUTY COMMISSIONER BLONIEN: -- the State -
26       INMATE TYSON: I know.
27       DEPUTY COMMISSIONER BLONIEN: -- that if inmates

47

1  can't read we owe them the opportunity to learn how to
2  read before we try to --
3  DEPUTY COMMISSIONER BLONIEN: Absolutely.
4  INMATE TYSON: -- give them trades
5  and all that.
6  INMATE TYSON: Yes, ma'am, I know and that was
7  explained to me and I -- and that was one of the reasons
8  that that law came out. The, you know, inmates were
9  forced to go to school if they didn't have a -- a -- a
10  score of like, I don't know, seven point -
11  DEPUTY COMMISSIONER BLONIEN: Six point zero.
12  INMATE TYSON: Six point zero, something like that.
13  But I had -- I took -- the first thing I did when I was
14  incarcerated in prison here at San Quentin, I asked for a
15  GED book and I read that GED book, I think it was about
16  20 times, over and over and over and that was the first
17  thing I did when I went to the mainline in Soledad was to
18  get my high school diploma. So that was the first thing
19  I did.
20  DEPUTY COMMISSIONER BLONIEN: Do you have a copy of
21  your GED?
22  INMATE TYSON: It's in -- in my -- it should be in
23  my file somewhere, but I -
24  DEPUTY COMMISSIONER BLONIEN: Did you do an Olson
25  Review and see it?
26  INMATE TYSON: Yes, ma'am. Oh, no, I did -- I did.
27  I did. I saw it in there. Matter of fact, Ms. Hilliard,

48

1  she showed it me the other day when I was just, you know,
2  cause she was doing -
3  INMATE TYSON: Yeah, it's --
4  DEPUTY COMMISSIONER BLONIEN: -- my report.
5  INMATE TYSON: -- it's -- it's in the
6  other volume of your C-File.
7  INMATE TYSON: And she couldn't find it and I had
8  to remind her that it was in and that she had labeled it.
9  DEPUTY COMMISSIONER BLONIEN: But I was trying to
10  stress with you the importance of reviewing your C-File
11  because --
12  INMATE TYSON: I know.
13  DEPUTY COMMISSIONER BLONIEN: -- maybe another
14  Deputy Commissioner wouldn't have gone to the other
15  volume.
16  INMATE TYSON: And let me say -- let me say
17  something about that, Commissioner. You know, my
18  counselors and them had told me that everything that's in
19  there is -- is a fact. That was the reason I didn't go
20  through my file and look -- there's no way I could change
21  it and if there was no way I could change it then I said
22  to myself I said what is the really the sense of looking
23  it when I can't change it.
24  DEPUTY COMMISSIONER BLONIEN: Well, that's -
25  INMATE TYSON: But I didn't know, you know, stuff
26  might have been added to my file.
27  DEPUTY COMMISSIONER BLONIEN: Yeah, and as someone

49

1  who has to read your C-File, and I read maybe 20 a week,
2  you'd be amazed at how many other inmate's information
3  can be in your C-File and someone who's reviewing it
4  might not always just look at the bottom to see if that
5  is your 115.
6  INMATE TYSON: Absolutely right.
7  DEPUTY COMMISSIONER BLONIEN: They just may see
8  refused -- refusing to test and --
9  INMATE TYSON: Right.
10  DEPUTY COMMISSIONER BLONIEN: -- attribute it to you
11  cause it's in your C-File.
12  INMATE TYSON: Right.
13  PRESIDING COMMISSIONER BIGGERS: Excuse me, Deputy
14  Commissioner, one other thing. One thing that you said
15  may not necessarily be true. You indicated that you --
16  they told you everything was in your C-File -- that's in
17  your C-File that nothing could be added or --
18  INMATE TYSON: Well, I -- I didn't mean add. What I
19  mean was it was considered as fact.
20  PRESIDING COMMISSIONER BIGGERS: It is but there's
21  also things in there as she pointed out that you could
22  have removed if it's not pertinent to you.
23  INMATE TYSON: No, I can't have it --
24  DEPUTY COMMISSIONER BLONIEN: And has some --
25  INMATE TYSON: -- removed.
26  DEPUTY COMMISSIONER BLONIEN: As someone who knows
27  how to 602 well, like you know how to --

50

1  PRESIDING COMMISSIONER BIGGERS: That's all you got
2  to do is try to 602 it.
3  DEPUTY COMMISSIONER BLONIEN: You got to get a Panel
4  who's never been in a prison before to believe what you
5  say.
6  INMATE TYSON: Yes, I --
7  DEPUTY COMMISSIONER BLONIEN: And you've got to
8  think big --
9  INMATE TYSON: Well, I -- it seemed like when I --
10  when I write things down on paper I can -- they come out
11  right. But when I speak --
12  DEPUTY COMMISSIONER BLONIEN: Uh-huh.
13  PRESIDING COMMISSIONER BIGGERS: Okay, well, a 602
14  does in fact happen like -- in other words, don't say
15  that you can't get things removed from your -- from your
16  C-File.
17  INMATE TYSON: And, you know something,
18  Commissioner, you're absolutely right, because I just had
19  a -- a -- a 128 rescinded by --
20  PRESIDING COMMISSIONER BIGGERS: Hello.
21  INMATE TYSON: -- an officer -- I -- but now, you
22  know, I'm -- I'll tell you, I was out there I was working
23  and the officer said -- he said Tyson, do you need a
24  chrono, and I thought he was talking about I needed a
25  chrono -
26  PRESIDING COMMISSIONER BIGGERS: I understand that
27  but that's not the issue. The issue here is what you

51

1  said.
2  INMATE TYSON: That's what I'm saying, Officer
3  Commissioner. He asked me if I needed a chrono and I
4  said no, but I didn't know he was talking about
5  rescinding a chrono that he had wrote on me before, and I
6  said well, no, I don't need a chrono for working. I
7  thought he meant that, you know, to let my supervisor
8  know that I was working --
9  PRESIDING COMMISSIONER BIGGERS: Okay.
10  INMATE TYSON: -- with him.
11  PRESIDING COMMISSIONER BIGGERS: Right, that's what
12  I'm talking about.
13  DEPUTY COMMISSIONER BLONIEN: Well, Mr. Tyson, the
14  reason this Panel's even taking any time with you is I
15  think we see some hope in you.
16  INMATE TYSON: Oh God.
17  DEPUTY COMMISSIONER BLONIEN: And you -- you --
18  you're busy struggling --
19  INMATE TYSON: Oh, please stop. Please stop,
20  please. Oh God, thank you, thank you, thank you.
21  PRESIDING COMMISSIONER BIGGERS: But you don't have
22  any hope in yourself, sir.
23  INMATE TYSON: I know it. Thank you. Oh, God. Go
24  ahead, please. Go ahead.
25  DEPUTY COMMISSIONER BLONIEN: And all of this
26  struggling that you're doing is not necessarily moving
27  you forward. So when I asked you if you read all your

52

1  transcripts from your last hearings, I asked you --
2  INMATE TYSON: Thank you.
3  DEPUTY COMMISSIONER BLONIEN: -- because each
4  hearing's an opportunity to show your growth.
5  INMATE TYSON: Yes.
6  DEPUTY COMMISSIONER BLONIEN: And not -- not fight
7  the war of past bad decisions, bad behavior.
8  INMATE TYSON: Yes, ma'am.
9  DEPUTY COMMISSIONER BLONIEN: And that's why we're
10  taking some time with you.
11  INMATE TYSON: Thank you.
12  DEPUTY COMMISSIONER BLONIEN: We don't -- we're not
13  verbal sparring with you.
14  INMATE TYSON: Thank you.
15  DEPUTY COMMISSIONER BLONIEN: So getting back to
16  since you've been incarcerated, you've had three 115s,
17  the last one in 1993.
18  INMATE TYSON: Yes, ma'am.
19  DEPUTY COMMISSIONER BLONIEN: You've had 20 128s,
20  the last one in 1998.
21  INMATE TYSON: Yes, ma'am.
22  DEPUTY COMMISSIONER BLONIEN: And I think I would
23  attribute it to the fact that you were young and immature
24  for a long time.
25  INMATE TYSON: Yes, ma'am, I was.
26  DEPUTY COMMISSIONER BLONIEN: Past your age, your
27  physical age.

53

1 INMATE TYSON: Yes.
2 DEPUTY COMMISSIONER BLONIEN: In terms of working,
3 you are a worker. You've completed vocations in Auto
4 Painting, Dry Cleaning, Electric Technician --
5 Electronics Technician in --
6 INMATE TYSON: No, that's --
7 DEPUTY COMMISSIONER BLONIEN: -- '04?
8 INMATE TYSON: Oh, God. Let me see. It's Certified
9 Customer Service --
10 DEPUTY COMMISSIONER BLONIEN: Yeah, Customer
11 Service. I've got that but what's the Electronics,
12 what's that?
13 INMATE TYSON: That's -- that's the -- the
14 Customer Service.
15 DEPUTY COMMISSIONER BLONIEN: And you work at PIA.
16 INMATE TYSON: Yes, ma'am, I do.
17 DEPUTY COMMISSIONER BLONIEN: And your job is?
18 INMATE TYSON: Right now I work in the mattress
19 factory and I -- I make the covers for mattresses, but I
20 -- I can also build chairs. Matter of fact the chairs
21 that you're sitting here right now I have a certificate
22 in -- in -- in making those same chairs. A Proficiency
23 certificate. It should be in there.
24 DEPUTY COMMISSIONER BLONIEN: I -- I've never fallen
25 out of one of these chairs either. They're -- they're
26 good. Good. "Congratulations. The Electronics
27 Technicians Association is pleased to announce that one

54

1 of your outstanding employees, Morgan Tyson, has
2 successfully completed examination in any hands-on skills
3 necessary to attain an ETA-1 Professional Customer
4 Service Specialist Certification." That's by Russell
5 Glass, President. So at PIA, what's -- what's your pay
6 number?
7 INMATE TYSON: I make 65 cents an hour.
8 DEPUTY COMMISSIONER BLONIEN: So you're getting
9 toward the top. So you're --
10 INMATE TYSON: Yes, ma'am.
11 DEPUTY COMMISSIONER BLONIEN: -- you're good.
12 INMATE TYSON: And right now I'm -- I'm -- I'm up
13 for a raise but there are also -- I think it's five other
14 people that are considered for the raise also.
15 DEPUTY COMMISSIONER BLONIEN: Right, and -- and only
16 so many get it.
17 INMATE TYSON: Yes, ma'am.
18 DEPUTY COMMISSIONER BLONIEN: There's a tiered
19 system. And in looking at your evaluation reports, you
20 know, they say you're a good worker. You're dependable.
21 You get two's and three's.
22 INMATE TYSON: Yes, ma'am.
23 DEPUTY COMMISSIONER BLONIEN: Satisfactory and above
24 average.
25 INMATE TYSON: Yeah, if I can -- if -- if -- if I'm
26 sorry for me to say this. I think there are only three
27 people in my whole shop that can sew as well as me. I'm

55

1  not better and I'm not saying I saw better than them, but
2  only, let's see, well, there was three. No, it's two
3  now. Two. Matter of fact one went home.
4  DEPUTY COMMISSIONER BLONIEN: And do you have the
5  kind of supervisor who doesn't give out outstandings?
6  INMATE TYSON: I -- I -- I couldn't really tell you
7  that. I -- I don't know.
8  DEPUTY COMMISSIONER BLONIEN: But -
9  INMATE TYSON: I'm pretty sure she does because
10  inmate that went home yest -- yesterday, Ben Bong
11  (phonetic) --
12  DEPUTY COMMISSIONER BLONIEN: Oh, yeah. Yeah.
13  INMATE TYSON: He -- he -- he was really -- he was -
14  - matter of fact he told me how to use the overlock in
15  Soledad. He was the lead man in Soledad. And he -- he -
16  - he -- he knows --
17  DEPUTY COMMISSIONER BLONIEN: An overlock's a
18  stitching process?
19  INMATE TYSON: Yes, it is and he -- he knows how to
20  fix all the machines and everything.
21  DEPUTY COMMISSIONER BLONIEN: Well, in '03 you had
22  over 2500 hours of experience.
23  INMATE TYSON: Yes, ma'am.
24  DEPUTY COMMISSIONER BLONIEN: So it's only grown in
25  the -- the last three years. You also participate in the
26  Vietnam Veterans Group?
27  INMATE TYSON: Well, not anymore.

56

1  DEPUTY COMMISSIONER BLONIEN: From '92 to '98.
2  INMATE TYSON: Yes, I did.
3  DEPUTY COMMISSIONER BLONIEN: And you don't
4  participate anymore because?
5  INMATE TYSON: They have a waiting list right now
6  and --
7  DEPUTY COMMISSIONER BLONIEN: I asked an inmate
8  earlier today how many people were in the group and he
9  thought about 40.
10  INMATE TYSON: I think it was -- yeah. About 40.
11  It's about 40 inmates in there.
12  DEPUTY COMMISSIONER BLONIEN: You've participated in
13  Narcotics Anonymous --
14  INMATE TYSON: Yes.
15  DEPUTY COMMISSIONER BLONIEN: -- '03, '04, '05.
16  INMATE TYSON: Yes.
17  DEPUTY COMMISSIONER BLONIEN: Your last chrono was
18  April of '06.
19  INMATE TYSON: Yes.
20  DEPUTY COMMISSIONER BLONIEN: Have you worked
21  through all the Steps?
22  INMATE TYSON: I -- I -- I've worked through them
23  during our classes. But trying to remember, now, I can
24  remember some of them. But trying to remember --
25  DEPUTY COMMISSIONER BLONIEN: If you can remember
26  interlock stitch, you can remember -/
27  INMATE TYSON: Yes, I -- I can remember some.

57

```
1    DEPUTY COMMISSIONER BLONIEN:  So --
2        INMATE TYSON:  I can remember some.
3    DEPUTY COMMISSIONER BLONIEN:  -- it's not so much
4    even remembering them.
5        INMATE TYSON:  But not word-for-word.
6    DEPUTY COMMISSIONER BLONIEN:  It's how you apply
7    them to your reality and how you plan to transfer them
8    as --
9        INMATE TYSON:  Right.
10   DEPUTY COMMISSIONER BLONIEN:  -- help in the
11   community.
12       INMATE TYSON:  Right, and -- and -- and see, now, I
13   didn't understand that before and now I understand that
14   when you -- when you're using you have to apply them.
15   It's like I admitted that I was powerless over my drug
16   addiction and that my life was unmanageable and I was, I
17   was powerless over my drug addiction and my -- the drugs
18   were in control of me.  And to ask God to remove all my
19   defects.  I think that's number -- number -- number 10.
20   No, no, no, that's --
21   DEPUTY COMMISSIONER BLONIEN:  No.
22       INMATE TYSON:  -- number --
23   DEPUTY COMMISSIONER BLONIEN:  Don't get -- it
24   doesn't matter what number.
25       INMATE TYSON:  Number 7, Number 7.  And -- and I
26   had to use those things, you know, to help me to -- to
27   stop smoking and to stop using drugs.
```

58

```
1    DEPUTY COMMISSIONER BLONIEN:  When's the last time
2    you used drugs?
3        INMATE TYSON:  I think it was 1978, 1978 I stopped
4    using drugs.  Oh, no, it was 19 -- December of 1977, I
5    had made a New Year's resolution to stop smoking and I
6    started in December because I said New Year's
7    resolutions, they don't work.  They -- they never work.
8    I tried it once before and it never worked.  I went back
9    to smoking so that's why I started in December.  I said
10   I'll do this right now.  There's no need to wait until
11   the New Year.  And I haven't smoked a cigarette, I
12   haven't used any drugs since then.
13   DEPUTY COMMISSIONER BLONIEN:  You also participate
14   in the Trust Program.
15       INMATE TYSON:  Yes, I do.
16   DEPUTY COMMISSIONER BLONIEN:  The Impact Program.
17       INMATE TYSON:  Yes, ma'am.
18   DEPUTY COMMISSIONER BLONIEN:  So tell me, you -- if
19   you work 4/10s, so you work four days a week ten hours a
20   day.
21       INMATE TYSON:  I work overtime also.  I work Fridays
22   or Saturdays whichever day is overtime.  I worked this
23   Saturday overtime.
24   DEPUTY COMMISSIONER BLONIEN:  Okay, and then what
25   night do you go to NA?
26       INMATE TYSON:  Friday nights.
27   DEPUTY COMMISSIONER BLONIEN:  Okay, and when do you
```

59

```
1   go to Trust?
2       INMATE TYSON:  Thursday.
3       DEPUTY COMMISSIONER BLONIEN:  And when do you go to
4   Impact?
5       INMATE TYSON:  Monday.
6       DEPUTY COMMISSIONER BLONIEN:  So what do you do
7   Tuesday and Wednesday?
8       INMATE TYSON:  Well, I try to work out.  I try to
9   study.  I try to read a little bit.  I, you know, I -- I
10  never liked reading, but I try to read because it's good.
11  It's, you know, my father always said it's good for me to
12  always just pick up something and read.
13      DEPUTY COMMISSIONER BLONIEN:  And what do you -
14      INMATE TYSON:  And I try to read.
15      DEPUTY COMMISSIONER BLONIEN:  And what are you
16  reading?
17      INMATE TYSON:  I read history books.  I read
18  fiction.  I read my Koran, mostly.
19      DEPUTY COMMISSIONER BLONIEN:  Okay.  In either your
20  Trust or Impact groups, since your criminal history is
21  full of your inability to deal with women --
22      INMATE TYSON:  Yes.
23      DEPUTY COMMISSIONER BLONIEN:  -- what are you doing
24  that allows you now to function and be able to deal with
25  women?
26      INMATE TYSON:  You know, it was -- it was a time in
27  my life that I -- I didn't have a problem with women.
```

60

```
1   It's just that I felt like if I said something to
2   somebody, you know, say hey, I like you and, you know,
3   maybe we could be friends or whatever when I was younger
4   and that, you know, they would like, you know, a lot of
5   people would say oh, I don't like you.  And then I met my
6   wife.  Now, she was the first person that I loved.  I
7   loved her dearly.  And she was my childhood sweetheart.
8       DEPUTY COMMISSIONER BLONIEN:  You were like 16?
9       INMATE TYSON:  Yes.  I was 15.
10      DEPUTY COMMISSIONER BLONIEN:  Fifteen.
11      INMATE TYSON:  Yes, yes, I was.  Well, anyway, you
12  know, I was young.  And I knew then that I would marry
13  her in my life.  We -- we loved each other.  I -- I can't
14  deny that.  And after our breakup, it was more like
15  rejection and it wasn't as much as I had a problem with
16  women as I had a problem with myself, because I didn't
17  use my ability to talk to people.  I have never been a --
18  a person to speak out.  Now, if I was to go back in my
19  building right now I could sit down with the people in my
20  building and talk to them.  I can talk with staff, you
21  know, and -- and be comfortable because, you know, I've
22  been around them.  It's just -- it's just hard, you know,
23  to walk up to someone and say hey, I like you, you know,
24  without the -- the fear of being rejected.  And it really
25  hurts.  You know, it just -- it just -- it hurts.  It
26  really hurts.
27      DEPUTY COMMISSIONER BLONIEN:  So in order to cope
```

61

1  with that or can you cope with that?
2      INMATE TYSON: Yes, I can.
3      DEPUTY COMMISSIONER BLONIEN: If there's a rejection
4  out there -
5      INMATE TYSON: Now -- now by -- by going to these
6  classes rejection is rejection. Of course it is. You
7  know, now I understand, you know, okay, well, sometimes
8  you win, sometimes you lose. You can't win all the time.
9  You can't lose all the time either. You know. And but I
10 don't -- I don't go out of my way to say anything to
11 women here; I know it's against the rules. But I know
12 somewhere along the line that I can speak to women. I
13 mean, I married a woman from the streets that was in here
14 and we got along real well, you know. And I had -- I had
15 learned to love her, you know. So, I mean, you know.
16     DEPUTY COMMISSIONER BLONIEN: And -- and where is
17 she now?
18     INMATE TYSON: Right now she's in New York. She
19 went back home to her mother's in --
20     DEPUTY COMMISSIONER BLONIEN: So are you still
21 married or --
22     INMATE TYSON: Yes, we are married. We are married
23 but I had planned to -- well, I still plan to divorce her
24 because, you know, of her relationship with someone else.
25 And I wish -- I wish her the best, you know.
26     DEPUTY COMMISSIONER BLONIEN: Uh-huh.
27     INMATE TYSON: But, I mean, you know, she didn't

62

1  want to be with me so I have to, you know, do what's best
2  for me now.
3      DEPUTY COMMISSIONER BLONIEN: And -- and do you
4  attend religious services?
5      INMATE TYSON: Yes, ma'am. I go to Juma every
6  Friday.
7      DEPUTY COMMISSIONER BLONIEN: To what?
8      INMATE TYSON: To Juma. That's -- it's Islamic --
9  Islamic prayer. And, matter of fact, the only time I
10 missed Juma was last Friday when I was doing my psych
11 report. Ms. Inaba she -- she kept me in there -- in
12 there for two and a half hours or so and one of the
13 amenes of our -- in our community came, you know, while I
14 was there and asked me, you know, how come I missed Juma.
15 They saw that I was in there with her. But I -- I never
16 miss Juma. Friday's when -- when I work overtime and I
17 get off at 1 o'clock I go to my cell, I take a shower and
18 I get ready for Juma. I go to Juma. And when I come from
19 Juma I go to the (inaudible).
20     DEPUTY COMMISSIONER BLONIEN: The reason I asked you
21 is because Ms. Inaba -- Dr. Inaba mentioned in her -- her
22 report your religious -
23     INMATE TYSON: Yes.
24     DEPUTY COMMISSIONER BLONIEN: -- affiliation. In
25 going over Ms. Inaba's report -- Dr. Inaba's report, I
26 mean, the main thing she talked about is insight and that
27 you have little insight into the motivation behind your

63

1  crimes, that you gave answers that were rather pat such
2  as you needed money at the time.
3       "He then related that the robberies resulted
4  in only pocket change from the victims. He
5  stated that one of the victims had only a
6  few cents in her purse. He has a theory
7  that his commitment offense occurred because
8  he wanted someone to talk to. At the same
9  time he related that he approached the
10 victim who was not carrying a purse with a
11 kitchen knife and he -- that he had
12 concealed in his back pocket. When tried --
13 when she tried to discourage him he grabbed
14 her and stabbed her through her jacket. He
15 was not able to give any explanation for his
16 action and stated that he was asking himself
17 why he was stabbing her while he was doing
18 it. His judgment is adequate for
19 functioning in a controlled setting. He has
20 a history of poor judgment while on the
21 streets."
22 And under your clinical diagnosis under Axis I, she notes
23 your Cannabis Dependence, Poly-Substance Dependence,
24 Impulse Control dis -- both in -- in controlled
25 environment. That's a typo. I think she means in
26 remission in a controlled environment. Although I can't
27 put words on her report.

64

1  INMATE TYSON: No, ma'am. You can't.
2  DEPUTY COMMISSIONER BLONIEN: And I know you just
3  got it on the 21st so you couldn't petition for the
4  correction but that -
5  INMATE TYSON: I saw her this morning and I asked
6  her about that. And she -- she -- well, she told me
7  well, I have a -- would have to talk to my lawyer about
8  removing the chronos in -- from my file. And she said
9  well, this was in your file. But now, I mean, I can't
10 change her -- her --
11 DEPUTY COMMISSIONER BLONIEN: Now, I --
12 INMATE TYSON: -- but she said -- let me -- let me
13 say this though, Commissioner. I'm sorry that she didn't
14 understand, you know, that she didn't -- that -- that she
15 didn't understand what I was saying, but I -- everything
16 about the crime as I'm telling you now is the same thing
17 I told her.
18 DEPUTY COMMISSIONER BLONIEN: Well, maybe --
19 INMATE TYSON: The same thing.
20 DEPUTY COMMISSIONER BLONIEN: -- in your
21 presentation you became disjointed and she had trouble
22 following you.
23 INMATE TYSON: That may have been it. But I -- I
24 don't have a problem with discussing the crime anymore.
25 DEPUTY COMMISSIONER BLONIEN: She noted Impulse
26 Control Disorder not Otherwise Specified by History.
27 Conduct Disorder, Adolescent Type; Severe by History, and

65

1 Mixed Traits not Otherwise Specified of a Personality
2 Disorder. Under Axis III she said your Shoulder Hurts --
3 INMATE TYSON: Yes, ma'am. It does.
4 DEPUTY COMMISSIONER BLONIEN: -- and gives you a
5 Global Assessment Functioning score of 80, which makes
6 you a highly functioning individual if you were in the
7 community and definitely a highly functioning inmate.
8 INMATE TYSON: Thank you.
9 DEPUTY COMMISSIONER BLONIEN: So -- and that's
10 unusual that by history she notes lack of insight, but by
11 diagnosis gives you very good Global --
12 INMATE TYSON: I noticed --
13 DEPUTY COMMISSIONER BLONIEN: -- Assessment
14 Functioning --
15 INMATE TYSON: -- the same thing, Commissioner.
16 DEPUTY COMMISSIONER BLONIEN: -- score. So in
17 assessing your dangerousness, she notes that one of your
18 1985 115s was for presenting yourself unclothed in front
19 -- in front of a female custody officer. But you have no
20 write-ups in prison for any violent offenses. That you
21 have attended NA while at San Quentin and completed an
22 Anger Management course. You're been disciplinary-free
23 since 1993 and you would be expected to continue to
24 remain violence-free in a controlled environment. That
25 the risk factors associated for violent recidivism
26 include your elementary school maladjustment, childhood
27 behavior problems, admission to Corrections, failure on

66

1 conditional release, history of nonviolent offenses,
2 history of violent offenses, escape from secure custody
3 which you didn't have. We talked about that. Strangers
4 as victims, very troubling.
5 INMATE TYSON: Yes, ma'am.
6 DEPUTY COMMISSIONER BLONIEN: Personality disorder,
7 attitudes supportive of crime, lack of empathy, attitudes
8 unfavorable toward convention, lack of realistic life
9 goals, little responsibility for self, long history of
10 substance abuse. Then the very next sentence is that you
11 take responsibility for committing your crimes, but you
12 lack insight for the reason for the crimes other than
13 financial pressure and somehow wanting to impress family
14 members.
15 "Mr. Tyson has made gains in that he takes
16 responsibility for his crimes after
17 initially denying any responsibility. He is
18 also programing in a positive manner. He
19 was cooperative and -- and disclosing during
20 the interview for this report and there is
21 no evidence displayed of anger problems with
22 impulse control during the interview. It
23 would appear that left on his own devices
24 Mr. Tyson lacks the ability to make positive
25 adjustment to society. During this time Mr.
26 Tyson was living at home and had the active
27 support of his family. In order to lessen

67

1 the odds of future violence, Mr. Tyson would
2 benefit from several interventions. The
3 first being a continuation of positive
4 programming, such as NA and also educational
5 activities. That he would also benefit from
6 counseling in regard to motivation for his
7 crime and his attachment to the attitude
8 toward females. He has engaged in several
9 forms of assaultive behavior toward women
10 including rape and murder. While Mr. Tyson
11 may have no intention of killing his victim
12 he left her in a wounded and vulnerable
13 state that resulted in her death. He would
14 benefit from therapeutic work to explore
15 both his motivation and behavior of that
16 crime. Any plans for release would need to
17 provide for a structured environment. While
18 Mr. Tyson's parole plan shows good judgment
19 on his part in selecting to be involved with
20 a positive peer group, would be important to
21 examine whether any program he selects would
22 provide adequate levels of service,
23 supervision, structure to insure public
24 safety."
25 So gives us lots of questions and some answers. And a
26 lot of this has to come from -- from you, because --
27 INMATE TYSON: Yes, ma'am.

68

1 DEPUTY COMMISSIONER BLONIEN: -- as you are here in
2 San Quentin the reality is that therapy is not available
3 and you're going to have to look to yourself --
4 INMATE TYSON: Yes, ma'am.
5 DEPUTY COMMISSIONER BLONIEN: -- to work through and
6 I would recommend books or once you get into the Vietnam
7 Veterans group, they have therapy programs that allow you
8 not only to acknowledge past problems but articulate
9 future remedies that are happening with you.
10 INMATE TYSON: Yes, ma'am. If I could say
11 something, Commissioner.
12 DEPUTY COMMISSIONER BLONIEN: Uh-huh.
13 INMATE TYSON: Let me start right here in 1985 where
14 it says counsel in 1985 regarding his purposely
15 presenting himself unclothed in front of a female custody
16 officer, and she just gave me a copy of the chrono this
17 morning and I never knew that was in my file and going
18 back to what the other Commissioner said I should've
19 looked in my file not knowing it was there. But I should
20 -- I should've --
21 DEPUTY COMMISSIONER BLONIEN: Go ahead, I'm
22 listening.
23 INMATE TYSON: -- at the -- the way the showers are
24 built is that when you get out -- when you out the
25 shower, you're -- you're right there in the building, and
26 officers and -- and inmates, you know, they -- they can
27 see you, and my intentions weren't to -- to be lewd in

69

```
1    front of this -- this officer, and I -- and --
2         DEPUTY COMMISSIONER BLONIEN:  Well, and -- and --
3    and here's the thing, I -- I understand what you're
4    saying and that you only got a 128 for that. You didn't
5    get a 115.
6         INMATE TYSON:  Yes, ma'am. I just wanted to clarify
7    that.
8         DEPUTY COMMISSIONER BLONIEN:  So that goes along
9    with your explanation.
10        INMATE TYSON:  Yes, ma'am.  And --
11        DEPUTY COMMISSIONER BLONIEN:  You don't -- you don't
12   need to refute steps --
13        INMATE TYSON:  I --
14        DEPUTY COMMISSIONER BLONIEN:  -- step-by-step what -
15   - what's in there.
16        INMATE TYSON:  Yes, ma'am. I -- it's just that, you
17   know, I -- how do you say it, I just wanted to clarify
18   some of things you said, you know, and I just couldn't
19   remember, you know, and -- and just add a little bit more
20   to it.
21        DEPUTY COMMISSIONER BLONIEN:  Uh-huh.
22        INMATE TYSON:  You know.  Because, you know, what
23   you're saying is -- is -- is true and like -- like
24   I say I -- I programmed, you know, and the other things
25   that -- let me stop.
26        DEPUTY COMMISSIONER BLONIEN:  How old are you?
27        INMATE TYSON:  I'm 54.
```

70

```
1         DEPUTY COMMISSIONER BLONIEN:  So that's old enough
2    to get it all together I think.
3         INMATE TYSON:  Yes.
4         DEPUTY COMMISSIONER BLONIEN:  And talking and
5    looking at your parole plans you have done some
6    research --
7         INMATE TYSON:  Yes, ma'am.
8         DEPUTY COMMISSIONER BLONIEN:  -- and found was it
9    Ploughs and Ploughshare Program?
10        INMATE TYSON:  Sword to Ploughshare.
11        DEPUTY COMMISSIONER BLONIEN:  Sword to Ploughshare.
12        INMATE TYSON:  Yes, ma'am.
13        DEPUTY COMMISSIONER BLONIEN:  And that's over where?
14        INMATE TYSON:  It's on -- it's at Treasure Island.
15   It's at 1433 -- I don't know how to pronounce that.
16        ATTORNEY CARBONE:  Halibut.
17        INMATE TYSON:  Halibut Court, Suite F, in San Fran -
18   - San Francisco, California. The number is 415-834-0341.
19   And --
20        DEPUTY COMMISSIONER BLONIEN:  And how -- how do you
21   know they'll accept you?
22        INMATE TYSON:  Well, I've written letters to the one
23   in the Swords and Ploughshares Program in Treasure
24   Island. I've also written a letter to the one in Menlo
25   Park. And I've gotten the information and they said that
26   the only way they would accept me -- they can't do
27   anything for me right now because I'm in prison, but once
```

**71**

```
 1  out of prison I could be accepted to the program.  And
 2  also -- I've also found further information that I --
 3
 4  DEPUTY COMMISSIONER BLONIEN:  You have a letter
 5  there?
 6  INMATE TYSON:  No, ma'am.  I gave it to the -- to my
 7  counselor the last Board hearing.  It was in my last
 8  Board hearing.  I just read it at my last Board hearing
 9  where it was in there.
10  DEPUTY COMMISSIONER BLONIEN:  You're supposed to
11  update your letters for every Board hearing.
12  INMATE TYSON:  And they also -- they -- they said
13  that if -- if a veteran has been incarcerated for ten
14  years or more, it's considered a disability and they give
15  you $3,200 a month.
16  DEPUTY COMMISSIONER BLONIEN:  A month?
17  INMATE TYSON:  Yes, ma'am.  And they give you free
18  rent, room and board.  They give you opportunity to
19  acquire trades.  And see the trade that I would -- that I
20  want is -- is the trade to become a tailor and that's
21  what I would like to do.  If -- if not a tailor, a chef.
22  Those are the two things that I do want to do.  I want to
23  cook or I want to become a tailor.  And the reason I want
24  to become a tailor is because I've noticed that through
25  the time I've been in prison, that some people don't make
26  clothes for big and tall people.  See big people and tall
27  people, they don't have clothes, you know.  Some -- some,
    you know, places do but I figured that if I could just
```

**72**

```
 1  have a little business making suits for big men, making
 2  clothes for tall and big women, that it would be
 3  successful.  Not anything big.  I don't want to be a
 4  millionaire.  I -- I've stopped looking at that -- that
 5  life.  That's -- that's out the picture.  That's what got
 6  me in here.  And I, you know, something that's small that
 7  I can be successful.  I can pay my rent every month, I
 8  can pay my utilities and my bills and take care of
 9  myself.
10  DEPUTY COMMISSIONER BLONIEN:  In your letters from
11  people you have a letter from Mrs. Bernelle Tyson.  Is
12  that your --
13  INMATE TYSON:  Yes, ma'am.  That's my mother.
14  DEPUTY COMMISSIONER BLONIEN:  That's your mom.  And
15  she can't understand how you -- you made all your bad
16  decisions either.  But she's very supportive of you and
17  she prays about you.  And she has seen a tremendous
18  change for the better -
19  INMATE TYSON:  Yes, she has.
20  DEPUTY COMMISSIONER BLONIEN:  -- in you and she'll
21  be there to help you.  That you can live with her for one
22  month?
23  INMATE TYSON:  Yes, ma'am.  She has -- she stays in
24  a senior citizen home.
25  DEPUTY COMMISSIONER BLONIEN:  Uh-huh.
26  INMATE TYSON:  And she has a grace period for 30
27  days.  The last time I did see my mother was -- was about
```

73

1 three weeks ago in the visiting room. She went back
2 home, back East to see -- to visit with her family and to
3 celebrate her birthday and stuff, and she'll be back next
4 month. Well, she told me that she found a nice little
5 studio for me. Had I been out I could've gotten that
6 studio. My brothers and my sisters they have already
7 made plans once I get out that they -- they are going to
8 get an apartment for me. My mother, she has a car for
9 me. But now I also can stay at the halfway houses that
10 are listed right -- the halfway houses and in my last
11 Board report I had the letter -- I had the letters in
12 there where, you know, that I had written to the people,
13 matter of --
14     PRESIDING COMMISSIONER BIGGERS: The Fellowship
15 Service House.
16     INMATE TYSON: Yes, sir. The one over in San
17 Francisco.
18     PRESIDING COMMISSIONER BIGGERS: That's Hayden House
19 and --
20     DEPUTY DISTRICT ATTORNEY KLINGE: Walden House.
21     PRESIDING COMMISSIONER BIGGERS: Yes, it's Walden
22 House.
23     INMATE TYSON: Yes, ma'am. Walden House. And they
24 -- like I said, they only -- the only time that they
25 could accept me into the program is that I have to be out
26 of prison. I even talked to the lady, She was in the
27 building.

74

1     DEPUTY COMMISSIONER BLONIEN: Uh-huh.
2     INMATE TYSON: Also --
3     ATTORNEY CARBONE: Do you want to talk about your
4 jobs?
5     INMATE TYSON: Oh, my jobs. And I had -- and I have
6 the places in -- in -- two places in Oakland that -- that
7 hire ex-felons and one in Berkeley. Also I have --
8     DEPUTY COMMISSIONER BLONIEN: A job consortium and
9 the Career --
10     INMATE TYSON: Yes, ma'am.
11     DEPUTY COMMISSIONER BLONIEN: -- Resource
12 Development Center and the East Bay One Stop Career
13 Center.
14     INMATE TYSON: Yes, ma'am. And there are a few more
15 also, but I only just listed those three right there.
16 But I -- they also had a pamphlet (alarm sound) that
17 lists all the -- right there. Right here. I also have a
18 pamphlet right here, Alameda County, where you can --
19 where they hire ex-felons to -- to work and being that
20 they have a tax-incentive to hire ex-felons --
21     DEPUTY COMMISSIONER BLONIEN: I'm familiar with
22 that.
23     INMATE TYSON: And if --
24     DEPUTY COMMISSIONER BLONIEN: I'm going to change
25 the tape.
26     INMATE TYSON: Yes, ma'am.
27     DEPUTY COMMISSIONER BLONIEN: It -- it's still going

75

```
1   but I'm going to change it.
2       ATTORNEY CARBONE: It'll just take a moment.
3       [Thereupon, the tape was changed.]
4       INMATE TYSON: And --
5       DEPUTY COMMISSIONER BLONIEN: Okay, we're -- we're
6   moving. Okay.
7       INMATE TYSON: And they also hire ex-felons. Now,
8   the Swords and Ploughshare program, that's a two-year
9   program.
10      DEPUTY COMMISSIONER BLONIEN: I know.
11      INMATE TYSON: And so that's a long-term program.
12      DEPUTY COMMISSIONER BLONIEN: Could you do that?
13      INMATE TYSON: Yes, ma'am. That's -- I really want
14  to get into that program. I really want to get in. Once
15  -- if -- if I'm released. You know, you don't have to
16  give me a parole date, but to get into that program would
17  enable me to set my foot back in the community on the
18  right -- on -- directly on the right path. To be able to
19  have a life again. To have -- to be successful.
20      DEPUTY COMMISSIONER BLONIEN: Well, you got -- you
21  got a family out there and they --
22      INMATE TYSON: Yes, ma'am.
23      DEPUTY COMMISSIONER BLONIEN: -- and they all wrote
24  letters --
25      INMATE TYSON: And they're also -- they're all
26  behind me.
27      DEPUTY COMMISSIONER BLONIEN: We have -- we read
```

76

```
1   your mom's. You have one from Quentin Martinez.
2       INMATE TYSON: That's my nephew.
3       DEPUTY COMMISSIONER BLONIEN: That's your nephew.
4   And he tells that he's very supportive of -- of you and
5   that you've been there for him and that -- and he thinks
6   that you have remorse and that you made many
7   accomplishments, and then your sister, Joanne Martinez --
8       INMATE TYSON: Yes, ma'am.
9       DEPUTY COMMISSIONER BLONIEN: -- wrote a letter
10  saying that it's time for you to get back to a productive
11  life. And that you've been a positive mentor to her
12  children.
13      INMATE TYSON: Yes, I have.
14      DEPUTY COMMISSIONER BLONIEN: And that you know --
15  she knows that if you're released that you will be a good
16  son, father, brother, uncle, and respectful and she asks
17  to let you come home to your caring family. And then
18  Raymond Buford, B-U-F-O-R-D, wrote a letter.
19      INMATE TYSON: Yes, ma'am.
20      DEPUTY COMMISSIONER BLONIEN: He's your uncle.
21      INMATE TYSON: Yes, ma'am.
22      DEPUTY COMMISSIONER BLONIEN: And you lived with him
23  for awhile -
24      INMATE TYSON: Yes, I did.
25      DEPUTY COMMISSIONER BLONIEN: -- in Washington D.C.?
26      INMATE TYSON: Yes, ma'am. I did.
27      DEPUTY COMMISSIONER BLONIEN: And he's very
```

77

1  supportive of you and he'll do anything and everything in
2  -- in his power to help you adjust. And then Darryl
3  Tyson, D-A-R-R-Y-L, your brother, wrote saying that --
4  giving your history and that you've missed out on being a
5  father, son, brother, and grandfather and that makes the
6  whole family truly sad. And that he lives in California
7  and he will do his best to make sure that he will be very
8  supportive and he thinks you've learned your lesson and
9  you deserve another chance. And then Correction Officer
10 Simone, S-I-M-O-N-E, who's known you for seven years and
11 has watched your interaction with staff and other
12 inmates, he sees your demeanor is quiet and respectful
13 and he thinks that you would be a law-abiding citizen if
14 paroled. And Correctional Officer Stevenson, S-T-E-V-E-
15 N-S-O-N, wrote you a letter saying that you've worked
16 with him before and he's had contact with you and you're
17 always performed your duties as a professional and you're
18 ready -- ready to be released back into society. And
19 Correctional Officer Gladson, G-L-A-D-S-O-N. You also
20 worked for Officer Gladson as a recreation clerk and that
21 your interaction with staff and inmates as well as
22 respect for staff and fellow inmates has always been
23 exceptional. And his -- he or she has discussed with you
24 your parole plans and feels that they're positive and
25 feels you're ready for parole. Any other letters that I
26 didn't read? Those are all the ones I have here.
27        INMATE TYSON: I have some more in my cell. I just

78

1  never -- my counselor's never put them in there. In the
2  -- in the -
3        DEPUTY COMMISSIONER BLONIEN: No, this is your
4  parole hearing.
5        INMATE TYSON: I know.
6        DEPUTY COMMISSIONER BLONIEN: And the responsibility
7  for what's presented --
8        INMATE TYSON: Yes, ma'am.
9        DEPUTY COMMISSIONER BLONIEN: -- is all yours.
10       INMATE TYSON: Yes, ma'am.
11       ATTORNEY CARBONE: I think there are two additional
12 letters, Deputy Commissioner in our parole supplemental
13 packet, which is the last attachment under the blue
14 sheet.
15       DEPUTY COMMISSIONER BLONIEN: From Dwayne Tyson?
16       ATTORNEY CARBONE: There is --
17       INMATE TYSON: That's my brother.
18       ATTORNEY CARBONE: -- a letter from -- I believe you
19 covered a Daryl Tyson letter, did you not?
20       DEPUTY COMMISSIONER BLONIEN: Yes.
21       ATTORNEY CARBONE: And then there was a letter from
22 a Ms. Martinez, Quentin Martinez, and -- you did cover
23 that as well, I apologize. And then there was one -- did
24 you cover Joe --
25       INMATE TYSON: Yes, sir.
26       ATTORNEY CARBONE: Thank you. I apologize.
27       DEPUTY COMMISSIONER BLONIEN: The one from Dwayne

79

1  Tyson notes that in 16 years he has witnessed a
2  significant change in your state of mind and asks us to
3  consider your accomplishments and thinks you're ready for
4  parole. He also says that at the time of your crime you
5  were severely distraught and on drugs. And you were
6  distraught over your ex-wife.
7      INMATE TYSON: True. That --
8      DEPUTY COMMISSIONER BLONIEN: Well, I --
9      INMATE TYSON: -- not only that my -- my wife and --
10  Well, I wasn't using drugs, but I was distraught over my
11  wife and like I say not finding job, being rejected, all
12  of those things.
13      DEPUTY COMMISSIONER BLONIEN: You know, the
14  consistency in your explanation is -- is not here. You
15  know, it's different. And you have to go back and look
16  at every report --
17      INMATE TYSON: Uh-huh.
18      DEPUTY COMMISSIONER BLONIEN: -- and every time
19  you've talked to a counselor, anything that's documented.
20  Either in your transcripts or in your C-File --
21      INMATE TYSON: Uh-huh.
22      DEPUTY COMMISSIONER BLONIEN: -- and go back and --
23  and in your mind --
24      INMATE TYSON: It's kind of hard --
25      DEPUTY COMMISSIONER BLONIEN: -- come to the truth.
26      INMATE TYSON: It's kind of hard to remember. I'm
27  sorry.

80

1      DEPUTY COMMISSIONER BLONIEN: But you have time.
2  You have to come to the truth because --
3      INMATE TYSON: Yes, ma'am.
4      DEPUTY COMMISSIONER BLONIEN: -- you're not
5  believable until you come to the truth. And I -- I don't
6  know if you know it or not yet. I don't -- I don't know
7  if you know how rambling you are.
8      INMATE TYSON: I just try to remember everything.
9      DEPUTY COMMISSIONER BLONIEN: I know.
10      INMATE TYSON: And it's -- it's hard.
11      DEPUTY COMMISSIONER BLONIEN: And -- and I see your
12  earnestness. But you've got to read what you're saying
13  and then you, yourself, are going to say oh, my gosh.
14      INMATE TYSON: All right.
15      DEPUTY COMMISSIONER BLONIEN: So with that, we also
16  sent out 3042 notices to victim next of kin, law
17  enforcement.
18      INMATE TYSON: Yes, ma'am.
19      DEPUTY COMMISSIONER BLONIEN: And although I didn't
20  get any formal responses the District Attorney from
21  Alameda County is here.
22      INMATE TYSON: Yes, ma'am.
23      DEPUTY COMMISSIONER BLONIEN: And at the right time
24  she'll be given the opportunity to --
25      INMATE TYSON: All right.
26      DEPUTY COMMISSIONER BLONIEN: -- speak for the
27  People.

81

1    INMATE TYSON: All right.

2    DEPUTY COMMISSIONER BLONIEN: And I'm going to

3    return it to the Chair.

4    PRESIDING COMMISSIONER BIGGERS: Thank you. First

5    of all, I'm going to ask the District Attorney from

6    Alameda County if she has any questions for you.

7    DEPUTY DISTRICT ATTORNEY KLINGE: I do is -- I also

8    want to request that -- request a quick recess.

9    PRESIDING COMMISSIONER BIGGERS: Yes.

10   DEPUTY DISTRICT ATTORNEY KLINGE: Thank you.

11   PRESIDING COMMISSIONER BIGGERS: Let's take about a

12   five-minute break.

13                      (Off The Record)

14   DEPUTY COMMISSIONER BLONIEN: We are back on record.

15   PRESIDING COMMISSIONER BIGGERS: Okay, before we --

16   let the record reflect that everyone that was in here

17   when we took a short recess is now back in the room and

18   I've asked the District Attorney to -- if she has a

19   couple questions for the inmate.

20   DEPUTY DISTRICT ATTORNEY KLINGE: I have a few

21   questions, thank, you. Could the Panel ask the inmate,

22   regarding the offense, the victim, Gail Williams, who was

23   murdered was it his intent to rob her, specifically?

24   ATTORNEY CARBONE: You'll be addressing the Panel.

25   Mr. Tyson?

26   INMATE TYSON: Yes.

27   ATTORNEY CARBONE: Address the Panel.

82

1    INMATE TYSON: No, ma'am. My intent wasn't

2    really --

3    PRESIDING COMMISSIONER BIGGERS: No, to the Panel.

4    ATTORNEY CARBONE: Sir, address the Panel.

5    PRESIDING COMMISSIONER BIGGERS: Address the Panel,

6    not --

7    INMATE TYSON: Oh.

8    ATTORNEY CARBONE: Talk -- talk to --

9    DEPUTY DISTRICT ATTORNEY KLINGE: It's kind of hard,

10   but you have to talk to them and I have to talk to them.

11   INMATE TYSON: Yes, ma'am. My intent wasn't to -- I

12   forgot what the question was.

13   PRESIDING COMMISSIONER BIGGERS: The question was

14   were your intentions to rob the victim?

15   INMATE TYSON: No, sir, it wasn't intended to rob

16   her. But knowing that I -- what I know now I probably

17   had other things in mind also.

18   PRESIDING COMMISSIONER BIGGERS: Well, I asked you

19   about that. Remember that?

20   INMATE TYSON: Yes, sir.

21   PRESIDING COMMISSIONER BIGGERS: I asked you about

22   that few minutes ago. What was your intention with the

23   victim?

24   INMATE TYSON: It was -- it was to talk to her at --

25   at that time. Yes, sir.

26   DEPUTY DISTRICT ATTORNEY KLINGE: And this is a

27   follow-up. What other things did you maybe have in mind?

83

1 INMATE TYSON: I don't -- I really have no idea but
2 I -- I've discussed this with my attorney and just came
3 to the conclusion I probably had other things that I
4 might have done had I not killed -- took her life.
5 DEPUTY DISTRICT ATTORNEY KLINGE: And one -- just to
6 follow-up on that. So it was enlighten -- enlightenment
7 through discussion with your attorney today that makes
8 you think this?
9 ATTORNEY CARBONE: I think it's not -- perhaps a
10 discussion. I think that's just objection that misstates
11 the record. He simply stated that there were discussions
12 with his attorney. Not necessarily put in context when
13 those discussions occurred. They certainly could have
14 been previous to today and, in fact, I think they were.
15 PRESIDING COMMISSIONER BIGGERS: Okay. Rephrase the
16 question, please.
17 DEPUTY DISTRICT ATTORNEY KLINGE: Was it recently
18 that you came to these realizations in discussions with
19 whatever attorney it was?
20 PRESIDING COMMISSIONER BIGGERS: I think that's a
21 fair -- when did you come to the -- to this conclusion --
22 INMATE TYSON: I --
23 PRESIDING COMMISSIONER BIGGERS: -- that something
24 else could have transpired?
25 INMATE TYSON: While talking to my attorney.
26 PRESIDING COMMISSIONER BIGGERS: When -- and that
27 was recent?

84

1 INMATE TYSON: Yes, sir, it was.
2 PRESIDING COMMISSIONER BIGGERS: Okay.
3 INMATE TYSON: It was recent.
4 PRESIDING COMMISSIONER BIGGERS: Move on, please.
5 DEPUTY DISTRICT ATTORNEY KLINGE: Was that -- one
6 last question on that area. Was that before or after you
7 talked to the psychologist for this current report?
8 INMATE TYSON: That was before I -- I talked to the
9 psychologist on -- psychologist on this report. Yes,
10 ma'am.
11 DEPUTY DISTRICT ATTORNEY KLINGE: And then you
12 mentioned when we were speaking of the victim, Janet
13 Charles, whom you stabbed in the head and chest, that
14 this was the result of feeling rejected because she
15 refused your request for a cigarette. I'm a little
16 confused on whether the attack was because you were
17 feeling rejected or as part of a robbery. Could you --
18 could the inmate expand on that a little bit?
19 INMATE TYSON: Yes, ma'am. Yes, sir.
20 PRESIDING COMMISSIONER BIGGERS: Don't matter. Just
21 go ahead and deal with the question.
22 INMATE TYSON: Part rejection and also I -- I did
23 intend to rob her and -- what was her question, please,
24 sir?
25 PRESIDING COMMISSIONER BIGGERS: She just wanted you
26 to clarify were your intentions to rob her?
27 INMATE TYSON: Yes, they were. My intentions were

85

1    to rob her.

2    PRESIDING COMMISSIONER BIGGERS:  Okay.

3    INMATE TYSON:  Yes, ma'am.

4    DEPUTY DISTRICT ATTORNEY KLINGE:  The attack on

5    Karen Kline where the inmate grabbed her and tried to

6    pull her up the street as she resisted and begged him to

7    let her go, what was the in -- inmate's intent when he

8    was trying to drag her up the street?

9    INMATE TYSON:  I intended to rob her, too.  But I

10   remember the incident and it was right in front of the

11   hospital or back of the hospital, I don't know whether it

12   was the front or back, but it was -- it was a well-lit

13   area, and I didn't want anybody to see me, you know,

14   commiting my crime.

15   PRESIDING COMMISSIONER BIGGERS:  Okay.

16   DEPUTY DISTRICT ATTORNEY KLINGE:  Okay, and in 2001

17   when the Commission asked the inmate what the reason was

18   for trying to pull her down the street, he couldn't

19   remember and didn't know what was going through his mind

20   at the time.  So what has jogged his memory between 2001

21   and today?

22   INMATE TYSON:  Well, during that time, I did refuse

23   to -- to answer those questions because I felt ashamed of

24   what I had done and I didn't want people to look down on

25   me and -- and say well, you didn't commit no robbery like

26   Jesse James or someone by doing -- doing something that,

27   you know, gangsters do and I was ashamed of what I had

86

1    done.

2    DEPUTY DISTRICT ATTORNEY KLINGE:  The discharge you

3    received from the Navy was honorable, but was it for

4    possession of marijuana?

5    INMATE TYSON:  The discharge that I received from

6    the Navy it was -- it was honorable and -- but the

7    marijuana charge was -- was -- was civil -- civilian.  It

8    didn't have anything to do with the military.

9    DEPUTY DISTRICT ATTORNEY KLINGE:  The discharge --

10   let me clarify that.  The possession of marijuana offense

11   occurred while you -- the inmate was in the service?

12   INMATE TYSON:  Yes, ma'am, it occurred while I was

13   in the service.

14   DEPUTY DISTRICT ATTORNEY KLINGE:  And the military

15   was made aware of that offense?

16   INMATE TYSON:  Yes, ma'am, they were.  As a matter

17   of fact the -- they were there when I was arrested that

18   night.  The military police and the British police they -

19   - they came to -- to my place that I had and arrested me.

20   Yes, ma'am, they did.  They were made aware.

21   DEPUTY DISTRICT ATTORNEY KLINGE:  The parole plans,

22   has the inmate contacted any of the individual businesses

23   listed in the pamphlet he brought from the businesses

24   that hire ex-felons?

25   INMATE TYSON:  No, ma'am, I -- I didn't contact --

26   oh, I'm sorry.  No.  No, sir, I didn't contact any of

27   these people, per se.

87

1    DEPUTY DISTRICT ATTORNEY KLINE: The three place --
2    temporary employment agencies listed in the inmate's
3    parole plan letter submitted, has he contacted any of
4    them to see what kind of temporary work is available?
5    INMATE TYSON: No, sir, I haven't, but if I can
6    explain.
7    PRESIDING COMMISSIONER BIGGERS: You'll get your
8    chance on that.
9    INMATE TYSON: Oh, all right.
10   DEPUTY DISTRICT ATTORNEY KLINE: And then the --
11   the idea about being a tailor, has the inmate researched
12   how much a tailor can make in the Oakland or Bay area?
13   INMATE TYSON: I put in a quest -- excuse me, I put
14   in a request with the Trust fellows, the group -- the --
15   one of the self-help groups that I have, but they didn't
16   have the -- the information on it but they did have
17   information on -- as for a chef and they gave me the
18   information for California Culinary Academy on 16 -- was
19   it 1625 Polk Street in San Francisco, and they just
20   didn't have the information for that.
21   DEPUTY DISTRICT ATTORNEY KLINE: And if I may just
22   have one minute. I think that's all the questions I
23   have.
24   PRESIDING COMMISSIONER BIGGERS: Okay, thank you.
25   Mr. Carbone, you have --
26   ATTORNEY CARBONE: Yeah, I just have a few. I want
27   to go back to your military history, Mr. Tyson. You

88

1    indicated that you were unable to weld because of prob --
2    dust problems. Did they assign you to a different
3    position in the military?
4    INMATE TYSON: Yes, they did. They assigned me to
5    Deck Division which was Boatswain's Mate.
6    ATTORNEY CARBONE: And did you perceive that to be a
7    -- a skill of lesser importance than the welding?
8    INMATE TYSON: Yes, all it was was just painting,
9    chipping the side off the submarines and on the ship,
10   painting and --
11   ATTORNEY CARBONE: And then --
12   INMATE TYSON: -- other jobs.
13   ATTORNEY CARBONE: -- after -- after you were
14   reassigned you -- this is where the marijuana charge came
15   into play, is that correct?
16   INMATE TYSON: Yes. It did.
17   ATTORNEY CARBONE: And so suffice it to say or is
18   it fair to state you -- you felt at the time of your
19   discharge from the military that you had essentially not
20   succeeded at what could perhaps be termed the -- the
21   straight life?
22   INMATE TYSON: Yes, sir.
23   ATTORNEY CARBONE: And was that one of the reasons
24   why you felt more accepted or more successful, if you
25   will, at the -- the crooked life?
26   INMATE TYSON: Yes, sir.
27   ATTORNEY CARBONE: And in hindsight, do you believe

89

1  that that was a -- a critical misstep or a critical
2  mistake that you made at an important part of departure
3  in your life?
4  INMATE TYSON: Yes, it was a critical mistake
5  because it led me to be incarcerated in prison for the
6  rest of my life.
7  ATTORNEY CARBONE: And I want to talk about the
8  causative factors a little bit because I know that's been
9  a -- a concern in terms of your ability to articulate or
10  express the causative factors. Do you think narcotics
11  played a role in your crime?
12  INMATE TYSON: Yes. It -- it is hard for me to
13  articulate but -- to articulate myself because I've
14  always been a very outspoken person and, for some reason,
15  you know, it's just hard to express myself. You know, I
16  -- I don't like to go on like I'm rambling because I know
17  what I want say. It's just that it's -- it comes out,
18  you know --
19  ATTORNEY CARBONE: Well, let me try to focus you.
20  You said that you thought that narcotics played a role in
21  your crime. I know you were using narcotics prior to
22  your crime. You were not high at the time of your crime,
23  were you?
24  INMATE TYSON: No, sir, I -- I wasn't high at the
25  time of my crime.
26  ATTORNEY CARBONE: Okay, so why then do you think
27  then narcotics played a role in your crime?

90

1  INMATE TYSON: Well, I had stopped using drugs, but
2  before I had stopped using drugs, I had taken a -- a lot
3  of drugs. Not heroin or cocaine. I had tried those two
4  drugs but mescaline, TAC, and acid. I had taken those
5  drugs a lot and I remember -- I -- excuse me. I remember
6  two incidences where I remember -- I remember the acid that I had to
7  leave a party because it seemed like my world had just
8  turned all the way upside down and I was -- I had lost
9  focus of everything. I didn't know where I was. And I -
10  - I couldn't -- I couldn't -- I couldn't function and I,
11  you know, I just knew I had to get away from where I was
12  and to go home to where I knew I was safe.
13  ATTORNEY CARBONE: Let me ask you some -- about some
14  of the other causative factors. At the time of the crime
15  do -- do you feel like you were suffering from low self-
16  esteem?
17  INMATE TYSON: Yes, low self-esteem, yes.
18  ATTORNEY CARBONE: Like you were depressed at the
19  time?
20  INMATE TYSON: I was depressed a lot. I was
21  depressed a lot and I didn't know it then, but the drugs
22  had -- had made me that way from taking, you know, all
23  that mescaline, TAC, and acid, and I -- I didn't know it
24  at the time that it had -- had, you know, probably
25  destroyed me somewhat on my -- my brain cells.
26  ATTORNEY CARBONE: Let me ask you, after you -- in
27  terms of the first crime, after you committed that crime

91

1 -- let's place you back the day after you committed the
2 crime. You wake up, you had viciously attacked a woman.
3 How did you feel about what you had done? Did you feel
4 empowered? Did you feel depressed? Did you feel
5 important? What was your -- your feeling in relationship
6 to that first crime?
7 INMATE TYSON: I felt bad for what I did. But at
8 the same time I just said, you know, I -- I had committed
9 this crime. What the heck, I just -- nothing is going
10 right for me, so I just might as well keep doing what I'm
11 doing.
12 ATTORNEY CARBONE: And, sir, you're familiar with
13 the term fatalism?
14 INMATE TYSON: No, not really.
15 ATTORNEY CARBONE: You don't -- you don't -- you
16 don't know what the term fatalistic means?
17 INMATE TYSON: No.
18 ATTORNEY CARBONE: No. Do you think you had passed
19 a point of no return?
20 INMATE TYSON: Yes, I -- I did. I did pass the
21 point of no return.
22 ATTORNEY CARBONE: One last question, actually, two
23 -- few more. Commissioner Biggers at one point during
24 the hearing said that you perhaps had given up hope on
25 yourself. Do you feel like you had given up hope on
26 yourself?
27 INMATE TYSON: Yes. I did.

92

1 ATTORNEY CARBONE: At present do you feel like you
2 have given up hope on yourself?
3 INMATE TYSON: Somewhat, but I -- I do have a little
4 hope left.
5 ATTORNEY CARBONE: What is the single greatest
6 accomplishment of your life, Mr. Tyson?
7 INMATE TYSON: My two children.
8 ATTORNEY CARBONE: And what is the single greatest
9 failure of your life?
10 INMATE TYSON: What I did to come to this prison.
11 ATTORNEY CARBONE: No further questions.
12 PRESIDING COMMISSIONER BIGGERS: Okay. Thank you.
13 At this point I'm going to ask the District Attorney to
14 close, please.
15 DEPUTY DISTRICT ATTORNEY KLINGE: Thank you, and I
16 apologize if it's somewhat disjointed at this point. The
17 -- the Alameda County District Attorney's office is
18 opposed to parole at this time. I believe that the
19 inmate is unsuitable for parole and does currently pose a
20 risk to society if released. This is based on several
21 factors, beginning with the commitment offense. The
22 commitment offense was carried in a cruel and callous
23 manner. We -- everybody knows the facts of the victim
24 that died. Basically, was approached on the street,
25 asked a question, stabbed to death, staggered into her
26 apartment and passed away. Complete stranger attacked on
27 the street. This was conducted in a manner which

93

1 exhibited a callous disregard for human life and the
2 suffering of another. And in this crime, multiple
3 victims were attacked and injured and one killed. You
4 could argue that some were defiled and mutilated because
5 there were stabbings in heads and chests. The motive for
6 the crime is very confusing at this point, if there is a
7 motive for the crime. And I'll go into that. But it's
8 certainly trivial in relation to what ended up happening
9 to these victims. The inmate's previous record did
10 indicate an escalating pattern of criminal conduct. The
11 inmate had just been released from prison serving an
12 eight-year sentence for rape. He has a pattern of
13 violent and assaultive behavior, particularly against
14 women. And I'd say, you know, I would say a pattern of
15 somewhat tumultuous relationships out of custody and in
16 custody. His marriage, his interaction with women, his
17 marriage in custody unfortunately failed, I believe, due
18 to his -- alleged wife's relationship with a correctional
19 officer. His previous grant of parole did not avoid
20 future criminality. And institutionally, he does have
21 his vocations, which I do commend him for. And he does
22 how that he's very proud of his skills in the mattress
23 department and I do commend for that. In recent times he
24 has started to program with the groups he's attended.
25 Recently it seems he's started to finally concentrate on
26 groups that might begin to give him some insight into his
27 crimes. So I do commend him for that. The psychiatric

94

1 reports are still not favorable and I think I would like
2 to go a little bit into detail in this. The inmate has
3 gone from complete denial of his crimes to different
4 explanations of his crimes over the years and it's kind
5 of a disjointed pattern. At times he denies the rape,
6 then he admits the rape later, then he denies it after
7 that point in time. There's been absolutely nothing
8 consistent throughout the transcripts and the review of
9 the psych reports that I've seen. In 2001, he appeared
10 before the Board and did address the life commitment
11 crime and he did answer questions about the crime, but he
12 then did claim to not be able to remember certain things
13 when asked. He was still back on 'I was trying to talk
14 to somebody, but I don't know why.' He really didn't
15 show any insight that could give us any glean into why he
16 committed these crimes from his perspective in 2001. In
17 2003, on advice of counsel, he de -- declined to comment
18 on the crime, but he did, on page 30 of that transcript,
19 speak about it and it -- it -- he even speaks about that
20 he knows he's supposed to give insight at line 7. And he
21 said from his understanding -- the understanding of
22 insight is that he know -- knows he committed the crime.
23 Not why, just that he knows he did it. Then he says,
24 "and why did I do it? It was because I was
25 having problems, you know. And from there,
26 you know, it just kept going on. Other
27 things were while, you know, you can deal

95

1  with problems and stuff. I mean, I'm a
2  human being like everyone else, you know. I
3  can deal with some things and some things I
4  can't. There's so much pressure I can take.
5  There's so much pressure any being can take,
6  you know. And I was having bad times, bad
7  breaks, bad luck, you know. And I had not -
8  - had I not been in prison and used drugs, I
9  don't think I would've done this thing I
10  did."

11  Which isn't really any kind of insight or explanation into
12  his crimes. Counsel speaks about his drug use and cause -
13  - as being a causative factor today in questions. He says
14  he last used drugs in December of 1977. And these crimes
15  are committed some five years later. So I'm not clear on
16  the causative factor that that has -- it wasn't explained
17  thoroughly. He does seem to today try to explain some
18  causative factors. Now, the psychiatrists over the years
19  have never been able to glean the causative factors from
20  him and we should thank counsel because he -- based on his
21  interaction he seems to now be coming up with some
22  causative factors. And maybe if these are truly the
23  causative factors that are coming from the inmate, this is
24  a starting point for him to finally be able to address
25  them and deal with them. It's the first time I've ever
26  seen anything articulated as to a causative factor. In --
27  the psych report in 2000 the inmate said he lied to

96

1  psychiatrist before about his past psychiatric history.
2  If he's going to admit lying to the psychiatrist it's
3  really hard for me to determine when we believe him and
4  when we don't. There's no history, there's nothing base -
5  - that we can -- [phone ringing]

6  PRESIDING COMMISSIONER BIGGERS:  Go ahead.

7  DEPUTY DISTRICT ATTORNEY KLINGE:  -- base a

8  consistent pattern on. He's -- it's also quoted in the
9  2002 report that the inmate is not an accurate historian.

10  And then in 2000 he was still denying the rape offense.

11  He stated today several times that he didn't have a
12  problem with women, but he did state that he had a problem
13  with himself, which I will commend him for that part of
14  it. I think there's a step missing here clearly still.
15  That -- I don't see the true insight as to that his crimes
16  did in -- indicate a severe problem with women. Plus a
17  problem with himself, I'm sure. In the current
18  psychiatric report, the psychiatrist stated there seems to
19  be little true -- oh, speaking of remorse. He's now
20  willing to acknowledge his responsibility for the crimes
21  but has no understanding of why he took such action. He
22  expressed remorse for his crimes. There seems to be
23  little true feeling behind his statements." And while she
24  did have some complimentary things to say about the inmate
25  it's clearly not a favorable report for release. Counsel
26  did submit his parole packet and on the bullet point
27  number two he stated that the 2003 psychological report

97

1  put the inmate at a low degree of threat to public safety.
2  And I apologize if I missed it but I don't see that
3  anywhere in the report. I just wanted to point that out.
4  In 2003, he also did not talk to the psychiatrist
5  thoroughly about the crime itself. And if you bear with
6  me, I am almost finished.
7  PRESIDING COMMISSIONER BIGGERS: I thought you were
8  talking about parole plans.
9  DEPUTY DISTRICT ATTORNEY KLINGE: I am now. His
10  parole plans are headed in the right direction, because I
11  believe that he does need transitional housing. The
12  letters from his relatives are supportive, but not
13  specific as to 'we can give him $300 a month. I, this
14  brother, can rent him an apartment and I, his sister, can
15  give him a car.' They are extremely supportive but
16  they're not specific. The concerns that the psychiatrist
17  indicated about the veteran's program I also have how
18  structured is it? What kind of support do they beyond the
19  housing and helping him get jobs? That would be
20  information that would be very beneficial. And the jobs
21  themselves, he does have some marketable skills, but he
22  has not presented anything about how he could get a job
23  with mattress work. He has dreams and hopes which are
24  good. Own your own business, be a tailor. But it's
25  extremely hard to start your own business. It's extremely
26  hard to support yourself. People that are in alterations
27  businesses, it's extremely hard to support yourself. So

98

1  there isn't anything concrete for his job and supporting
2  himself in the community which would then cause stresses
3  and rejections from employers and rejections from people
4  which, if we're to believe him today, are part of the
5  causative factors of his crimes. So based on all those
6  factors, I feel that the inmate needs significant time to
7  finally address what he's starting to say today in a
8  coherent manner as to what caused him to commit the
9  crimes, how he's going to prevent that in the future, and
10  to solidify his parole plans a little bit kind of more for
11  the job end of it. I know that a lot of the programs the
12  living situations won't give you a firm commitment until
13  you're out. Some will. There are some in the Bay area
14  that will and maybe he could find some of those and get
15  some more information on the Veteran's program. And with
16  that, I'll submit it.
17  PRESIDING COMMISSIONER BIGGERS: Thank you.
18  Mr. Carbone?
19  ATTORNEY CARBONE: Thank you, Commissioners and thank
20  you again for your thoughtful and thorough consideration
21  of this case. Let me start by just addressing the
22  somewhat incoherence at times of Mr. Tyson which I think
23  we've all been sort of dancing around, but in terms of
24  pinpointing and I -- I think it really stems from three
25  things. First and foremost I think it comes from shame
26  that these crimes perhaps no one of the victims and the
27  victim's family hates these crimes more than Mr. Tyson.

99

1   And I think that is prod -- one of the products of that is
2   his inability to be as articulate as he would like because
3   of some of the shame, and then thirdly, I think some of
4   the nervousness that he has disables him from presenting
5   as well as he would like. The important thing I want to
6   say about that, however, is that I don't think that should
7   be mistaken for his -- for Mr. Tyson not having a
8   significant degree of insight into the crime and I'll be
9   specific about that in -- in -- as I go one but I just
10  wanted to point out that I don't want the Panel to mistake
11  his inability to articulate at times for lack of insight.
12  I want to say four things about the crime. One, that he
13  obviously terrorized these women who were particularly
14  vulnerable. I think some of the women were even
15  caretakers that were related to the hospital. And so
16  these were particularly vulnerable people in our community
17  and that is entirely reprehensible. Secondly, I think at
18  the time, if you go back and look at the history involving
19  these crimes, he also placed an entire community in fear
20  and I think that's something that he has also owned up
21  that it wasn't simply how it affected these four victims
22  but it was an entire community in Oakland at one time,
23  naturally so, that was placed in fear as a consequence of
24  his actions. Thirdly, that the -- the robberies did not
25  need to result in any assaults, much less a murder. And I
26  think he also realizes that. And, fourth, this was a man
27  many years ago, over 25 years ago now, that at the time

100

1   did not learn his lesson. And, unfortunately, coming out
2   of the Georgia rape conviction, talk about a wake up call.
3   He should've had one of the biggest wake up calls and, in
4   fact, it might have cemented his return to a criminal
5   lifestyle after his disengagement from the military. In
6   fact, the District Attorney commented that narcotics
7   didn't play a role in this crime and his -- and Mr.
8   Tyson's discussion of that doesn't -- indicates he doesn't
9   have insight. In fact, it does. It's just the opposite.
10  He was not high at the crime. In fact, he was sober, but
11  it's the old adage of people, places and things. And he
12  was still attached to the criminal lifestyle as a
13  consequence of being involved in -- in narcotics, and so I
14  think it -- it actually demonstrates his greater insight
15  in the fact that even though he wasn't using drugs, drugs
16  still had an influence over him and an influence in his
17  life because he was part of a -- a criminal lifestyle. So
18  there is no hiding, masking or denying the four elements
19  that I've talked about in relation to the crime and, as I
20  said, I think Mr. Tyson is deeply disgraceful and
21  resentful about that. I looked at the record, the
22  earliest discussion of remorse I could find was in 1991
23  where he discusses with the psychiatrist that he expresses
24  deeply deep remorse and that he regrets it. And that's
25  over 15 years now in terms of a showing, at least on the
26  record, that he has remorse and I think contrary to what
27  the District Attorney says that those are true feelings.

101

1  He's not -- doesn't recognize the Board wants to hear that
2  and so he's simply giving lip service to that. In fact,
3  in our parole supplemental packet we have two letters of
4  remorse that he authored back in 1999 and so, obviously,
5  it was important enough to him to put on the record a
6  direct apology to the -- the victims. In terms of his
7  psych reports, I think the psych reports can best be
8  described as -- what was -- what Dr. Frances referred in
9  2003 as an information gap. And what keeps on with Mr.
10 Tyson is that when given an opportunity to discuss the
11 crime, because of shame, because of distrust that,
12 unfortunately, he has about those types of encounters he
13 ends up being per -- perceived as not being completely
14 forthcoming and honest. But I will submit this to you.
15 for all his inarticulateness, there isn't a taboo subject
16 for Mr. Tyson in relation to these crimes. There isn't
17 anything today that you asked of him or the district
18 Attorney asked of him that he essentially said oh, no, I'm
19 not willing to discuss that or I'm, you know, I'm -- I'm
20 suddenly getting fuzzy in my memory. He was very candid
21 and he has accepted responsibility for the crimes and I
22 think that speaks to his insight and I think it also
23 speaks to him understanding the magnitude of the offense.
24 Quite simply there are five reasons why this crime
25 occurred in terms of the causative factors. And I've
26 spelled them out in my points, so I'll very brief on them.
27 One is the narcotic issue. I think I've already addressed

102

1  that. Two is the -- the, excuse me, the
2  misperception that because of a lack of a skill set that
3  he had to commit crimes. Granted that was a
4  misperception, but it still was, in fact, a causative
5  factor. Three was the financial gain that he wanted to --
6  to get from the crimes and I think the confusion that
7  that's produced over time is they say well, there's no
8  motive because you never got any money. Well, he didn't
9  know how much money was in the purses of these particular
10 women. He still did the crime for financial gain. Four,
11 he was engaging -- he doesn't know the word but it was
12 fatalistic behavior, and I wanted to -- I asked him that
13 important question about how did you feel about you
14 committing the crimes because it was clear after he
15 committed the crimes he wasn't empowered, he wasn't
16 (inaudible). This wasn't feeding his ego. He knew that
17 he was doing something wrong and he was then engaging in
18 that fatalistic behavior that probably started, I put it
19 at the juncture of, when he left the military. And, in
20 fact, he -- he saw that as a causative factor in making
21 that bad decision to sort of give up, if you will, on --
22 on the straight life. And then he was suffering from low
23 self-esteem and depression, a failed marriage, and the
24 dejection from the military, and throughout all of these,
25 those are not excuses. He was the architect. He -- it
26 was his choices to embrace those causative factors and act
27 upon them in such a terrible manner. And, in fact, I

103

1    think he's tried to address his programming in a way
2    that's addressed those points. He's been drug and alcohol
3    free I -- my calculation is for 29 years now. And that is
4    extraordinary. He really should be commended for that and
5    I think talk about a point of no return. He is past the
6    point of no return of going back to a life of drug and
7    alcohol abuse. There's no question about that. Long-
8    standing participation in AA and NA. And, in fact, even
9    in 2006 he was still working on the -- through the Impact
10   Program on his addiction. In terms of, you know, this
11   question of has he given up on himself. I think he --
12   he's thinking that, but his actions defy that, because
13   somebody who's going out and getting four vocations and
14   working hard and continuing to earn laudable chronos and
15   working overtime is not someone who has given up on
16   himself. It's someone who absolutely still believes in
17   himself and I don't -- even though he's not mouthing it, I
18   think his -- his walk is demonstrating that he has
19   improved in terms of his self-esteem and some of his
20   depression and in terms of expanding upon his skill set.
21   And we see that I think most -- most amply by the -- the
22   laudable chronos from the staff that know him well. The
23   COs Gladstone and Simone and Stevenson, who have no reason
24   to stick their neck out and vouch for his character, but
25   call him a law-abiding citizen, demeanor's respected and
26   quiet. And Correctional Officer Stevenson saying he could
27   make a positive contribution to the community. So the

104

1    correctional staff who work with him, know him well and
2    I'll tell you every time I'm in this institution visiting
3    Mr. Tyson it's the same thing. I see staff go out of
4    their way consistently to greet him in -- in a -- in a
5    friendly -- in an -- almost as a -- an old friend would
6    and so it's very apparent to me that he has struck that
7    balance that's very difficult to find as an inmate by
8    being well-respected both by staff and by inmates. I
9    think if you take that in tandem with the psych reports in
10   2003 -- and I apologize -- and -- and he was not found in
11   low degree. The psychiatrist, Dr. Frances, simply said he
12   does not appear to present an imminent risk of violence to
13   himself and in others. In 2000 he was said that his
14   violence potential was only slightly above a person of the
15   average community and I think I've addressed that
16   information gap that, unfortunately, keeps reoccurring
17   itself in the additional psych reports. (alarm sound)
18       DEPUTY COMMISSIONER BLONIEN: I have one more minute.
19       ATTORNEY CARBONE: I don't think I could do it in
20   one.
21       DEPUTY COMMISSIONER BLONIEN: Okay.
22       ATTORNEY CARBONE: Spoken like a true lawyer.
23   I'm --
24       PRESIDING COMMISSIONER BIGGERS: All right, then
25   we'll switch the tape.
26       ATTORNEY CARBONE: Thank you.
27           [Thereupon, the tape was changed.]

105

1  DEPUTY COMMISSIONER BLONIEN: Okay, we're back on
2  record. Tape two side two.
3  ATTORNEY CARBONE: Thank you, Deputy Commissioner.
4  And I think the -- the evidentiary record demonstrates,
5  not by opinion, but by fact, that Mr. Tyson doesn't pose
6  an unreasonable risk to society. We know he's been
7  disciplinary-free. We know he's basically taking care of
8  any attitudinal problems that he had and is -- conforms
9  his behavior strictly to the institution's rules. In
10 terms of his parole plans, I think he has shown some
11 insight by having both short-term, very short-term 30-day
12 plans, and a longer-term plan that he recognizes he does
13 need a structured environment. This is a person that has
14 spent a lot of time in prison, that has a lot of issues on
15 the outside, that he is going to have difficulty getting
16 employment and so recognizing that has sought out these
17 structured environments to provide him a stable and
18 suitable residence. It's difficult for him to find firm
19 job offers and I think he's done the best that he could in
20 getting a number of firm job leads. He does have
21 supportive and loving family that has stuck with him
22 through all of these years and I think he does have a -- a
23 good social network on the outside that is waiting for
24 him. And all of those things in consideration with a very
25 long prison sentence, 25 years, deservedly so. He placed
26 an entire community in fear and committed horrible crimes
27 and so he did need to do some serious time and, in fact,

106

1  he does -- has done that time and more importantly it's
2  how he's done that time. And I think he's tried to use
3  that time to make himself worthy of re-entry back into
4  society. And I think we're at that point and so on it I
5  would submit that he is, in fact, suitable for parole.
6  And thank you.
7  PRESIDING COMMISSIONER BIGGERS: Okay. Now, Mr.
8  Tyson, you can -- you have the opportunity to tell this
9  Panel why you feel you are suitable or you can rest of
10 what your attorney has said.
11 INMATE TYSON: Yes, sir. May I speak now?
12 PRESIDING COMMISSIONER BIGGERS: Yes, you can. But I
13 want you to focus on why you feel are -
14 INMATE TYSON: Yes, sir.
15 PRESIDING COMMISSIONER BIGGERS: -- suitable
16 for parole.
17 INMATE TYSON: I will. First off, District Attorney,
18 thank you for giving me an opportunity to express my
19 feeling on why I deserve suitability. Thank you for being
20 here and the Commissioners. I'm not as articulate as my
21 lawyer. My only wish was that I could be. I know the
22 crime I committed is a horrible crime and I committed the
23 crime against women. And I have done a lot harder time in
24 here because of my crime. It's hard to say to people
25 inside a prison yeah, man, I killed a woman. Yeah, I did
26 this to women. I snatched purses. And people look down
27 at you because they're ashamed. They're ashamed of you.

107

1  And I'm ashamed of myself for what I done and there's no
2  explanation. I take full responsibility for that. And
3  like my lawyer said, had I learned my lesson in Georgia,
4  got an education and through my failed marriage and other
5  things that have occurred in my life, I wouldn't be
6  sitting here in prison. I would be out in society right
7  now doing what I'm supposed to do. I love working. I
8  like working with my hands. And I -- I don't mind
9  working. I only wish I had had a -- a decent job before I
10 even committed these crimes. Had it not been for my drug
11 use, and I know I can feel the effects of it now because I
12 don't the privilege to really speak as well as some people
13 do, because I am a little nervous and not only that, you
14 know, the drug use. So it's sort of somewhat taking my
15 ability, but rest assured, I do know what I'm saying. I
16 do know right from wrong. I didn't have an education when
17 I came to prison. I didn't have an education when I was
18 in the service. But I have an education now and I -- I
19 can move forward. I have two trades, well, three trades
20 and I can do them well. I needed money in the street like
21 everyone else in order to survive. Had it not been for my
22 low self-esteem and drug use and not having an education,
23 I probably would have survived a lot better than I did
24 when I was on the street. I -- I appreciate my lawyer
25 doing what he did for me today. And I know -- and I know
26 now that I realize I have to fight for my freedom. I have
27 to fight and I'm going to do everything that I can to --

108

1  to gain my freedom again. I know who I am now. I know
2  I'm not the person that I was. I wasn't born that person.
3  I just became that person. But just like I became that
4  person, I can also become myself again. And I pray that
5  one day I'll be completely myself and be able to live my
6  life like I used to live. I do intend to go to my self-
7  help groups and I'm sorry that the Board may not think or
8  the District Attorney may not think I have insight on my
9  crime, but I do. I realize I did it. And trying to
10 explain it is hard, but I don't have a problem trying to
11 explain it no more and I don't have a problem with talking
12 about it anymore. It did hurt. And it's like walking
13 around with a -- a burden on your shoulder for awhile.
14 PRESIDING COMMISSIONER BIGGERS: Okay, but I want you
15 to tell us why you feel you're suitable for parole. I've
16 heard one thing.
17 INMATE TYSON: All right. Oh, yes, sir. I will.
18 PRESIDING COMMISSIONER BIGGERS: Anything else on the
--
19
20 INMATE TYSON: Yes, yes, yes, it is.
21 PRESIDING COMMISSIONER BIGGERS: All right, go
22 on.
23 INMATE TYSON: I have -- I have -- I have completed
24 trades. I have gone to self-help groups. I have gained
25 insight in things that I -- that -- in the criminal things
26 that I've done and I've tried everything that I can that I
27 know how possibly to avoid those things. It may not seem

109

1 like it to the Board or to the District Attorney, but
2 believe me, and I pray that you will, that I do know that
3 I -- I deserve to be found suitable today. I pray that
4 you do find me suitable and I know you don't have to find
5 me suitable. You don't have to give me a parole date. I
6 understand that. And also that I do understand that, you
7 know, there's no explanation and -- and at all times the
8 victims -- the victims are more important. But I've done
9 all that I can that I know how and if there is something
10 else that I have to do just let me know and I'll -- I'll
11 try to achieve it.
12         PRESIDING COMMISSIONER BIGGERS: Okay. All
13 right. We will go into deliberations at this time.
14                          R E C E S S
                           --o0o--

---

110

CALIFORNIA BOARD OF PAROLE HEARINGS

D E C I S I O N

1         DEPUTY COMMISSIONER BLONIEN: We are back on record.
2         PRESIDING COMMISSIONER BIGGERS: Okay, let the
3 record reflect that everyone that was in the room when we
4 went into deliberations are now back in the room. In the
5 matter of Morgan Tyson, T-Y-S-O-N. The Panel has
6 reviewed all information received from the public and
7 relied on the following circumstances in concluding that
8 the prisoner is not suitable for parole and would pose an
9 unreasonable risk of danger to society or a threat to
10 public safety if released from prison. Mr. Tyson, the --
11 the Panel looked at, number one, the crime -- the crimes.
12 The crimes were done in such a cruel manner -- in a
13 callous manner as brought out by the District Attorney in
14 that on -- you had a pattern of assaulting women as they
15 were walking down the street for whatever reason. The
16 motive could've been robbery; the motive could've been
17 something else. However, you were found guilty of
18 attempted robbery on a couple occasions and also with
19 weapons and in the course of that crime spree, if you
20 would, one person lost their life. But the -- although
21 multiple victims were involved, one lost their life and
22 the others were, in fact, injured. Cause you did, in
23 fact, cut them with -- with a weapon. The -- if the
24 offense itself was carried out in a manner that

MORGAN TYSON   C-81713   DECISION PAGE 1   7/25/06

111

1  demonstrated an exceptional callous disregard for human
2  suffering because you -- those victims that are still
3  living will have a traumatic experience based on what you
4  did to them to the point that who -- we will never know.
5  They are scarred. You did, in fact, cut them or hit them
6  on the head. I forget right now, my mind's a little full
7  end of the day, but it did show a pattern of callous
8  disregard for human suffering and it was always with
9  women. Single women. They were walking, they were
10 minding their business, they were vulnerable, quite
11 vulnerable because they never expected that to be -- that
12 someone would come up like they -- like you did and do
13 what you did to them. The crime itself -- all -- all --
14 all of the crimes involve great bodily harm, and the fact
15 that you used a weapon is also of -- of some concern to
16 the Panel. These statements were -- before I do that,
17 the trivial -- the crimes themselves were very trivial in
18 that in reading the transcript, it's very hard to know
19 what your motive was. At one time you said it was money.
20 Then another time when you talked to your attorney it was
21 for something else. And I forget the -- the term. I
22 think it was fatalistic or something like -- of that
23 nature which means that there are other fantasizing
24 things that maybe you were doing. I don't know. But it
25 was very trivial irregardless of which one it was. All
26 of these were taken from the probation officer's report.
27 MORGAN TYSON   C-81713   DECISION PAGE 2   7/25/06

112

1  The Panel also looked at your -- looked at your
2  escalating pattern of criminal conduct for violence and
3  your failure to profit from society's previous attempts
4  in that you were in charge -- you were involved with auto
5  burglary. You were accused and convicted of a rape down
6  in Georgia which sent you to the penitentiary for eight
7  years, so you had a prior criminal -- prior prison term,
8  as well. You have programmed exceptionally well. You
9  have four vocations. Those four vocations are -- I want
10 to get them into the record. Auto Painting, Dry Cleaning,
11 Tile Layering and Cutting, and Mattress. Being a
12 seamstress in the PIA mattress shop. You -- you have
13 upgraded yourself extremely well vocationally. And from
14 listening to you talk, I get the sense that -- that you
15 have upgraded yourself educationally as well, because
16 judging from what I've read in the past, as compared to
17 what you're doing right now, you have upgraded yourself
18 somewhat educationally, too. However, there's one thing
19 that I want to caution you at this point is that I think
20 some time that you need to organize your thought process
21 before you speak, and the reason I'm saying that is
22 because sometime you'll answer a question or say
23 something that's very positive and you turn around and
24 turn it into a negative, which is causing you to come
25 across as you don't know what the -- you don't know which
26 way you want to go so I would ask you, you know, take a
27 MORGAN TYSON   C-81713   DECISION PAGE 3   7/25/06

113

1  minute, step back and then speak before you say something
2  and that may help you even in the institution. You --
3  you had 20 128s and the last one being in 98. So you
4  three serious 115s, the last one being in 1993. So you
5  haven't been totally disciplinary-free. But, again, I
6  think it's a matter of you not thinking because some of
7  those that you had back there was had to do with the
8  mouth, okay. The psychological report I think has been
9  covered very well, but I just want to read a couple of
10  things to you. And it was by Dr. Inaba and it was dated
11  7/21/2006. And I realize you just got this today and I
12  admire you for going forward even though it was somewhat
13  unfavorable. She indicated you had little insight into
14  the motivation behind the crime and this Panel does agree
15  with that. When we say insight, we're not talking about
16  taking responsibility. We're talking about the causative
17  factors that led you to do this. And also, as I
18  mentioned earlier, that I felt that it was necessary for
19  you to understand deeply why you had this either fixation
20  or this dislike for women. Although you say you didn't
21  have it. Something had to happen to you to -- to go
22  after these women to include the rape that you did back
23  in Georgia. There's got to be a -- an underlying cause
24  that you may not even be aware of, and I would encourage
25  you to seek out help, even from this psychiatrist that
26  you just went to see. Since you said you got a chance to
27  MORGAN TYSON   C-81713   DECISION PAGE 4   7/25/06

114

1  see her and you talked to her. You know, tell her feel
2  you may need therapy. I don't know. In addition, she
3  said that you do not have a severe mental disorder, but
4  she did say that you even denied that you committed the
5  rape for which you had been convicted of. So, again,
6  those factors keep coming up. That you -- you don't
7  understand why you did what you did. And he -- she did
8  mention, though, that you would also benefit from
9  counseling with regard to the motivation of this crime as
10  attached to attitude toward women. It's just -- and
11  also, finally, you lack insight into the reason for the
12  crime other than financial pressure of some kind and
13  wanting to impress family members. Again, causative
14  factors. Not only in this report, but even so stuff that
15  we talked about tonight -- today. You really need to --
16  to get down to the brass knuckles of what transpired.
17  finally, your parole plans, you've done some research on
18  your parole plans, but the problem that I see with those
19  is you write these letters to these different people and
20  they tell you things like they will be able to assist you
21  in getting this, assist you in getting that, yeah, we'll
22  give you a bed when you get a parole date. You need to
23  firm them up a little bit. You need to -- they're --
24  they're not -- they're all over the place. And, yeah,
25  they send you brochures and you get them, you read
26  something, but things change every year. Sometimes they
27  MORGAN TYSON   C-81713   DECISION PAGE 5   7/25/06

115

1  may not have the funding to be able to get you a bed. So
2  you need to firm that up, and what I would encourage you
3  to do is you got family support outside, have them go to
4  different places so that you can identify exactly where
5  you're going to go, let them know what your situation is.
6  You had a -- a -- a short-term goal a few minutes ago.
7  Well, short-term goal to stay with your mother, but
8  that's only for 30 days. And, you know, again letters of
9  support to support that. Even your letters that you have
10 in your files were, you know, we would help you this, we
11 would help you do that, but they're not specific enough
12 to say he could stay with me until such time as he got a
13 job. We will help him get a job. Four vocations. You -
14 - you -- you're not going to have a problem. You've got
15 marketable skills that can help you get a job. Have them
16 look for those types of places that you have -- you have
17 dreams. There's nothing wrong with having dreams. If
18 you want to be a cook -- not -- I'm -- a chef, excuse me.
19 There's a difference between a chef and a cook. You want
20 to be a chef that's fine. But then see if there's
21 anything in apprentice programs out there. Something --
22 of the -- the restaurants and see what they will do to
23 assist you in that. Maybe try to get yourself in the
24 kitchen here and work with people who can identify people
25 out there that you need. The same thing holds true with
26 you wanted to be a tailor. There's a lot of tailor shops
27 MORGAN TYSON   C-81713   DECISION PAGE 6   7/25/06

116

1  out there that, you know, may be able to assist you. But
2  don't rely on just when you get the brochure. That's all
3  propaganda and marketable stuff. Okay? We know there
4  were no 3042 responses, but the District Attorney of
5  Alameda County indicated her opposition to a finding of
6  parole suitability. The Panel also feels that your gains
7  are recent. You are beginning to show -- and I think the
8  District Attorney brought that out very well, that you're
9  now beginning to make that turn, which is good for you
10 because all this time you say you've been incarcerated
11 for 20-some years, you really haven't accepted the fact
12 of what took place because you've been rambling all over
13 the place. But you're beginning to make the turn and I
14 think that's going to be in your best interests now that
15 you've begin it. But I still -- the Panel still feels
16 that you need to go back to the underlying causes.
17 Nevertheless, you should be commended for obtained four -
18 - four vocations, you have excellent work history, the
19 Trust and Impact program, and your involvement in AA,
20 which has been continuous. However, these positive
21 aspects do not outweigh the factors of unsuitability. In
22 a separate decision, the Panel finds it is not necessary
23 to expect that parole would be granted at a hearing
24 during the following two years. The reason for that
25 again was the multiple victims were attacked and
26 assaulted, one was killed. And all these in separate
27 MORGAN TYSON   C-81713   DECISION PAGE 7   7/25/06

117

1  acts, but they still have the same M.O. The offenses
2  were carried out in a manner which demonstrated callous
3  disregard for human suffering. The psychological
4  evaluation by Dr. Inaba basically indicated, as I
5  mentioned before, you still have not come to grips with
6  the fact that -- what were the causative factors of you
7  doing this. And until you do that, you still can be
8  considered to be dangerous to be outside. And you really
9  just need to get a hold of that. Also, the Panel wants
10  to recommend that you, you know, remain disciplinary-
11  free. And I will pass it over to -- let me pass it over
12  to the Deputy -- Deputy before I get into the
13  recommendations.
14  DEPUTY COMMISSIONER BLONIEN: Yeah, I think at the
15  end of the hearing when you were talking about your
16  suitability, you said in essence that you were going to
17  take charge and fight for yourself, so you have to give
18  yourself the tools to do that. And the first tool you
19  need is the information. So you have to read everything
20  and then your excellent attorney -- see how he outlined
21  the strategy and the points he wanted to make?
22  INMATE TYSON: Yes, ma'am.
23  DEPUTY COMMISSIONER BLONIEN: You do that and then
24  you make the goals to get you where -- where you want to
25  be, how you're going to do it. And you -- you -- so you
26  get this plan and then you implement the plan and you're
27  MORGAN TYSON    C-81713    DECISION PAGE 8    7/25/06

118

1  heading for success. You have an idea of where you're
2  going. You're thinking that -- you're thinking it all
3  the time, because I'm sorry you didn't come to this
4  realization of where you are 15 years ago, but you
5  didn't, but you're still a -- a -- a young person and you
6  still have the ability to get out of here and be
7  successful. So I hope you do it.
8  INMATE TYSON: Yes, ma'am.
9  DEPUTY COMMISSIONER BLONIEN: You have the ability.
10  So good luck.
11  INMATE TYSON: Yes, ma'am.
12  PRESIDING COMMISSIONER BIGGERS: In addition to
13  that, the -- you also have family out there waiting for
14  you. So you need to keep that in mind. Don't be down on
15  yourself. All right, the Panel's going to recommend that
16  you remain disciplinary-free, continue to get those
17  positive chronos in working with -- that you're doing in
18  your work assignments, continue to upgrade yourself both
19  educationally and vocationally. You know you got four
20  vocations. Don't stop there. And just continue to
21  participate in self-help. If you do that I think you'll
22  be fine. But you turned the corner, now you just got to
23  keep it going. The time is now 2:10. That concludes the
24  hearing. Good luck to you, sir.
25  ///
26  ///
27  MORGAN TYSON    C-81713    DECISION PAGE 9    7/25/06

119

INMATE TYSON: Thank you.

ATTORNEY CARBONE: Thank you.

DEPUTY COMMISSIONER BLONIEN: Good luck.

INMATE TYSON: Yes, ma'am.

--o0o--

PAROLE DENIED TWO YEARS

THIS DECISION WILL BE FINAL ON: NOV 2 2 2006

YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

DATE, THE DECISION IS MODIFIED.

MORGAN TYSON   C-81713   DECISION PAGE 10   7/25/06

---

120

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, TRACY RICHARDSON, a duly designated

transcriber, VINE, McKINNON & HALL, do hereby

declare and certify under penalty of perjury that

I have transcribed tape(s) which total two in

number and cover a total of pages numbered 1 -

119, and which recording was duly recorded at

CALIFORNIA STATE PRISON at SAN QUENTIN,

CALIFORNIA, in the matter of the SUBSEQUENT PAROLE

CONSIDERATION HEARING of MORGAN TYSON, CDC No.

C-81713, on JULY 25, 2006, and that the foregoing

pages constitute a true, complete, and accurate

transcription of the aforementioned tape(s) to the

best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated OCTOBER 17, 2006, at Sacramento

County, California.

TRACY RICHARDSON
Transcriber
VINE, McKINNON & HALL