# EXHIBIT 5
# Part 2 of 2

61

1   with that or can you cope with that?

2        **INMATE TYSON:**  Yes, I can.

3        **DEPUTY COMMISSIONER BLONIEN:**  If there's a rejection

4   out there –

5        **INMATE TYSON:**  Now -- now by -- by going to these

6   classes rejection is rejection.  Of course it is.  You

7   know, now I understand, you know, okay, well, sometimes

8   you win, sometimes you lose.  You can't win all the time.

9   You can't lose all the time either.  You know.  And but I

10  don't -- I don't go out of my way to say anything to

11  women here; I know it's against the rules.  But I know

12  somewhere along the line that I can speak to women.  I

13  mean, I married a woman from the streets that was in here

14  and we got along real well, you know.  And I had -- I had

15  learned to love her, you know.  So, I mean, you know.

16       **DEPUTY COMMISSIONER BLONIEN:**  And -- and where is

17  she now?

18       **INMATE TYSON:**  Right now she's in New York.  She

19  went back home to her mother's in --

20       **DEPUTY COMMISSIONER BLONIEN:**  So are you still

21  married or --

22       **INMATE TYSON:**  Yes, we are married.  We are married

23  but I had planned to -- well, I still plan to divorce her

24  because, you know, of her relationship with someone else.

25  And I wish -- I wish her the best, you know.

26       **DEPUTY COMMISSIONER BLONIEN:**  Uh-huh.

27.      **INMATE TYSON:**  But, I mean, you know, she didn't

62

1   want to be with me so I have to, you know, do what's best
2   for me now.
3        **DEPUTY COMMISSIONER BLONIEN:**  And -- and do you
4   attend religious services?
5        **INMATE TYSON:**  Yes, ma'am.  I go to Juma every
6   Friday.
7        **DEPUTY COMMISSIONER BLONIEN:**  To what?
8        **INMATE TYSON:**  To Juma.  That's -- it's Islamic --
9   Islamic prayer.  And, matter of fact, the only time I
10  missed Juma was last Friday when I was doing my psych
11  report.  Ms. Inaba she -- she kept me in there -- in
12  there for two and a half hours or so and one of the
13  *ameres* of our -- in our community came, you know, while I
14  was there and asked me, you know, how come I missed Juma.
15  They saw that I was in there with her.  But I -- I never
16  miss Juma.  Friday's when -- when I work overtime and I
17  get off at 1 o'clock I go to my cell, I take a shower and
18  I get ready for Juma.  I go to Juma.  And when I come from
19  Juma I go to the (inaudible).
20       **DEPUTY COMMISSIONER BLONIEN:**  The reason I asked you
21  is because Ms. Inaba -- Dr. Inaba mentioned in her -- her
22  report your religious -
23       **INMATE TYSON:**  Yes.
24       **DEPUTY COMMISSIONER BLONIEN:**  -- affiliation.  In
25  going over Ms. Inaba's report -- Dr. Inaba's report, I
26  mean, the main thing she talked about is insight and that
27  you have little insight into the motivation behind your

1    crimes, that you gave answers that were rather pat such

2    as you needed money at the time.

3        "He then related that the robberies resulted

4        in only pocket change from the victims. He

5        stated that one of the victims had only a

6        few cents in her purse. He has a theory

7        that his commitment offense occurred because

8        he wanted someone to talk to. At the same

9        time he related that he approached the

10        victim who was not carrying a purse with a

11        kitchen knife and he -- that he had

12        concealed in his back pocket. When tried --

13        when she tried to discourage him he grabbed

14        her and stabbed her through her jacket. He

15        was not able to give any explanation for his

16        action and stated that he was asking himself

17        why he was stabbing her while he was doing

18        it. His judgment is adequate for

19        functioning in a controlled setting. He has

20        a history of poor judgment while on the

21        streets."

22    And under your clinical diagnosis under Axis I, she notes

23    your Cannabis Dependence, Poly-Substance Dependence,

24    Impulse Control dis -- both in -- in controlled

25    environment. That's a typo. I think she means in

26    remission in a controlled environment. Although I can't

27    put words on her report.

1    **INMATE TYSON:**  No, ma'am.  You can't.

2    **DEPUTY COMMISSIONER BLONIEN:**  And I know you just

3    got it on the 21st so you couldn't petition for the

4    correction but that –

5    **INMATE TYSON:**  I saw her this morning and I asked

6    her about that.  And she -- she -- well, she told me

7    well, I have a -- would have to talk to my lawyer about

8    removing the chronos in -- from my file.  And she said

9    well, this was in your file.  But now, I mean, I can't

10   change her -- her --

11   **DEPUTY COMMISSIONER BLONIEN:**  Now, I --

12   **INMATE TYSON:**  -- but she said -- let me -- let me

13   say this though, Commissioner.  I'm sorry that she didn't

14   understand, you know, that she didn't -- that -- that she

15   didn't understand what I was saying, but I -- everything

16   about the crime as I'm telling you now is the same thing

17   I told her.

18   **DEPUTY COMMISSIONER BLONIEN:**  Well, maybe --

19   **INMATE TYSON:**  The same thing.

20   **DEPUTY COMMISSIONER BLONIEN:**  -- in your

21   presentation you became disjointed and she had trouble

22   following you.

23   **INMATE TYSON:**  That may have been it.  But I -- I

24   don't have a problem with discussing the crime anymore.

25   **DEPUTY COMMISSIONER BLONIEN:**  She noted Impulse

26   Control Disorder not Otherwise Specified by History.

27   Conduct Disorder, Adolescent Type, Severe by History, and

65

1    Mixed Traits not Otherwise Specified of a Personality

2    Disorder.  Under Axis III she said your Shoulder Hurts --

3         **INMATE TYSON:**  Yes, ma'am.  It does.

4         **DEPUTY COMMISSIONER BLONIEN:**  -- and gives you a

5    Global Assessment Functioning score of 80, which makes

6    you a highly functioning individual if you were in the

7    community and definitely a highly functioning inmate.

8         **INMATE TYSON:**  Thank you.

9         **DEPUTY COMMISSIONER BLONIEN:**  So -- and that's

10   unusual that by history she notes lack of insight, but by

11   diagnosis gives you very good Global --

12        **INMATE TYSON:**  I noticed --

13        **DEPUTY COMMISSIONER BLONIEN:**  -- Assessment

14   Functioning --

15        **INMATE TYSON:**  -- the same thing, Commissioner.

16        **DEPUTY COMMISSIONER BLONIEN:**  -- score.  So in

17   assessing your dangerousness, she notes that one of your

18   1985 115s was for presenting yourself unclothed in front

19   -- in front of a female custody officer.  But you have no

20   write-ups in prison for any violent offenses.  That you

21   have attended NA while at San Quentin and completed an

22   Anger Management course.  You've been disciplinary-free

23   since 1993 and you would be expected to continue to

24   remain violence-free in a controlled environment.  That

25   the risk factors associated for violent recidivism

26   include your elementary school maladjustment, childhood

27   behavior problems, admission to Corrections, failure on

66

1    conditional release, history of nonviolent offenses,

2    history of violent offenses, escape from secure custody

3    which you didn't have.  We talked about that.  Strangers

4    as victims, very troubling.

5        **INMATE TYSON:**  Yes, ma'am.

6        **DEPUTY COMMISSIONER BLONIEN:**  Personality disorder,

7    attitudes supportive of crime, lack of empathy, attitudes

8    unfavorable toward convention, lack of realistic life

9    goals, little responsibility for self, long history of

10   substance abuse.  Then the very next sentence is that you

11   take responsibility for committing your crimes, but you

12   lack insight for the reason for the crimes other than

13   financial pressure and somehow wanting to impress family

14   members.

15           "Mr. Tyson has made gains in that he takes

16           responsibility for his crimes after

17           initially denying any responsibility.  He is

18           also programming in a positive manner.  He

19           was cooperative and -- and disclosing during

20           the interview for this report and there is

21           no evidence displayed of anger problems with

22           impulse control during the interview.  It

23           would appear that left on his own devices

24           Mr. Tyson lacks the ability to make positive

25           adjustment to society.  During this time Mr.

26           Tyson was living at home and had the active

27           support of his family.  In order to lessen

1        the odds of future violence, Mr. Tyson would

2        benefit from several interventions.    The

3        first being a continuation of positive

4        programming, such as NA and also educational

5        activities.    That he would also benefit from

6        counseling in regard to motivation for his

7        crime and his attachment to the attitude

8        toward females.    He has engaged in several

9        forms of assaultive behavior toward women

10        including rape and murder.    While Mr. Tyson

11        may have no intention of killing his victim

12        he left her in a wounded and vulnerable

13        state that resulted in her death.    He would

14        benefit from therapeutic work to explore

15        both his motivation and behavior of that

16        crime.    Any plans for release would need to

17        provide for a structured environment.    While

18        Mr. Tyson's parole plan shows good judgment

19        on his part in selecting to be involved with

20        a positive peer group, would be important to

21        examine whether any program he selects would

22        provide adequate levels of service,

23        supervision, structure to insure public

24        safety."

25   So gives us lots of questions and some answers.    And a

26   lot of this has to come from -- from you, because --

27        **INMATE TYSON:**    Yes, ma'am.

68

1     **DEPUTY COMMISSIONER BLONIEN:**  -- as you are here in

2     San Quentin the reality is that therapy is not available

3     and you're going to have to look to yourself --

4     **INMATE TYSON:**  Yes, ma'am.

5     **DEPUTY COMMISSIONER BLONIEN:**  -- to work through and

6     I would recommend books or once you get into the Vietnam

7     Veterans group, they have therapy programs that allow you

8     not only to acknowledge past problems but articulate

9     future remedies that are happening with you.

10    **INMATE TYSON:**  Yes, ma'am.  If I could say

11    something, Commissioner.

12    **DEPUTY COMMISSIONER BLONIEN:**  Uh-huh.

13    **INMATE TYSON:**  Let me start right here in 1985 where

14    it says counsel in 1985 regarding his purposely

15    presenting himself unclothed in front of a female custody

16    officer, and she just gave me a copy of the chrono this

17    morning and I never knew that was in my file and going

18    back to what the other Commissioner said I should've

19    looked in my file not knowing it was there.  But I should

20    -- I should've --

21    **DEPUTY COMMISSIONER BLONIEN:**  Go ahead, I'm

22    listening.

23    **INMATE TYSON:**  -- at the -- the way the showers are

24    built is that when you get out -- when you out the

25    shower, you're -- you're right there in the building, and

26    officers and -- and inmates, you know, they -- they can

27    see you, and my intentions weren't to -- to be lewd in

69

1  front of this -- this officer, and I -- and --

2  **DEPUTY COMMISSIONER BLONIEN:**  Well, and -- and --

3  and here's the thing.  I -- I understand what you're

4  saying and that you only got a 128 for that.  You didn't

5  get a 115.

6  **INMATE TYSON:**  Yes, ma'am.  I just wanted to clarify

7  that.

8  **DEPUTY COMMISSIONER BLONIEN:**  So that goes along

9  with your explanation.

10  **INMATE TYSON:**  Yes, ma'am.  And --

11  **DEPUTY COMMISSIONER BLONIEN:**  You don't -- you don't

12  need to refute steps --

13  **INMATE TYSON:**  I --

14  **DEPUTY COMMISSIONER BLONIEN:**  -- step-by-step what -

15  - what's in there.

16  **INMATE TYSON:**  Yes, ma'am.  I -- it's just that, you

17  know, I -- how do you say it, I just wanted to clarify

18  some of things you said, you know, and I just couldn't

19  remember, you know, and -- and just add a little bit more

20  to it.

21  **DEPUTY COMMISSIONER BLONIEN:**  Uh-huh.

22  **INMATE TYSON:**  You know.  Because, you know, what

23  you're saying is -- is -- is -- is true and like -- like

24  I say I -- I programmed, you know, and the other things

25  that -- let me stop.

26  **DEPUTY COMMISSIONER BLONIEN:**  How old are you?

27  **INMATE TYSON:**  I'm 54.

70

1    **DEPUTY COMMISSIONER BLONIEN:**  So that's old enough

2    to get it all together I think.

3        **INMATE TYSON:**  Yes.

4    **DEPUTY COMMISSIONER BLONIEN:**  And talking and

5    looking at your parole plans you have done some

6    research --

7        **INMATE TYSON:**  Yes, ma'am.

8    **DEPUTY COMMISSIONER BLONIEN:**  -- and found was it

9    Ploughs and Ploughshare Program?

10        **INMATE TYSON:**  Sword to Ploughshare.

11    **DEPUTY COMMISSIONER BLONIEN:**  Sword to Ploughshare.

12        **INMATE TYSON:**  Yes, ma'am.

13    **DEPUTY COMMISSIONER BLONIEN:**  And that's over where?

14        **INMATE TYSON:**  It's on -- it's at Treasure Island.

15    It's at 1433 -- I don't know how to pronounce that.

16        **ATTORNEY CARBONE:**  Halibut.

17    **INMATE TYSON:**  Halibut Court, Suite F, in San Fran -

18    - San Francisco, California.  The number is 415-834-0341.

19    And --

20    **DEPUTY COMMISSIONER BLONIEN:**  And how -- how do you

21    know they'll accept you?

22        **INMATE TYSON:**  Well, I've written letters to the one

23    in the Swords and Ploughshares Program in Treasure

24    Island.  I've also written a letter to the one in Menlo

25    Park.  And I've gotten the information and they said that

26    the only way they would accept me -- they can't do

27    anything for me right now because I'm in prison, but once

1    out of prison I could be accepted to the program.  And

2    also -- I've also found further information that I --

3        **DEPUTY COMMISSIONER BLONIEN:**  You have a letter

4    there?

5        **INMATE TYSON:**  No, ma'am.  I gave it to the -- to my

6    counselor the last Board hearing.  It was in my last

7    Board hearing.  I just read it at my last Board hearing

8    where it was in there.

9        **DEPUTY COMMISSIONER BLONIEN:**  You're supposed to

10   update your letters for every Board hearing.

11       **INMATE TYSON:**  And they also -- they -- they said

12   that if -- if a veteran has been incarcerated for ten

13   years or more, it's considered a disability and they give

14   you $3,200 a month.

15       **DEPUTY COMMISSIONER BLONIEN:**  A month?

16       **INMATE TYSON:**  Yes, ma'am.  And they give you free

17   rent, room and board.  They give you opportunity to

18   acquire trades.  And see the trade that I would -- that I

19   want is -- is the trade to become a tailor and that's

20   what I would like to do.  If -- if not a tailor, a chef.

21   Those are the two things that I do want to do.  I want to

22   cook or I want to become a tailor.  And the reason I want

23   to become a tailor is because I've noticed that through

24   the time I've been in prison, that some people don't make

25   clothes for big and tall people.  See big people and tall

26   people, they don't have clothes, you know.  Some -- some,

27   you know, places do but I figured that if I could just

1    have a little business making suits for big men, making

2    clothes for tall and big women, that it would be

3    successful.  Not anything big.  I don't want to be a

4    millionaire.  I -- I've stopped looking at that -- that

5    life.  That's -- that's out the picture.  That's what got

6    me in here.  And I, you know, something that's small that

7    I can be successful.  I can pay my rent every month.  I

8    can pay my utilities and my bills and take care of

9    myself.

10    **DEPUTY COMMISSIONER BLONIEN:**   In your letters from

11    people you have a letter from Mrs. Bernelle Tyson.  Is

12    that your --

13    **INMATE TYSON:**  Yes, ma'am.  That's my mother.

14    **DEPUTY COMMISSIONER BLONIEN:**  That's your mom.  And

15    she can't understand how you -- you made all your bad

16    decisions either.  But she's very supportive of you and

17    she prays about you.  And she has seen a tremendous

18    change for the better -

19    **INMATE TYSON:**  Yes, she has.

20    **DEPUTY COMMISSIONER BLONIEN:**  -- in you and she'll

21    be there to help you.  That you can live with her for one

22    month?

23    **INMATE TYSON:**  Yes, ma'am.  She has -- she stays in

24    a senior citizen home.

25    **DEPUTY COMMISSIONER BLONIEN:**  Uh-huh.

26    **INMATE TYSON:**  And she has a grace period for 30

27    days.  The last time I did see my mother was -- was about

1    three weeks ago in the visiting room. She went back

2    home, back East to see -- to visit with her family and to

3    celebrate her birthday and stuff, and she'll be back next

4    month. Well, she told me that she found a nice little

5    studio for me. Had I been out I could've gotten that

6    studio. My brothers and my sisters they have already

7    made plans once I get out that they -- they are going to

8    get an apartment for me. My mother, she has a car for

9    me. But now I also can stay at the halfway houses that

10   are listed right -- the halfway houses and in my last

11   Board report I had the letter -- I had the letters in

12   there where, you know, that I had written to the people,

13   matter of --

14        **PRESIDING COMMISSIONER BIGGERS:** The Fellowship

15   Service House.

16        **INMATE TYSON:** Yes, sir. The one over in San

17   Francisco.

18        **PRESIDING COMMISSIONER BIGGERS:** That's Hayden House

19   and --

20        **DEPUTY DISTRICT ATTORNEY KLINGE:** Walden House.

21        **PRESIDING COMMISSIONER BIGGERS:** Yes, it's Walden

22   House.

23        **INMATE TYSON:** Yes, ma'am. Walden House. And they

24   -- like I said, they only -- the only time that they

25   could accept me into the program is that I have to be out

26   of prison. I even talked to the lady, she was in the

27   building.

74

1        DEPUTY COMMISSIONER BLONIEN:  Uh-huh.

2        INMATE TYSON:  Also --

3        ATTORNEY CARBONE:  Do you want to talk about your

4    jobs?

5        INMATE TYSON:  Oh, my jobs.  And I had -- and I have

6    the places in -- in -- two places in Oakland that -- that

7    hire ex-felons and one in Berkeley.  Also I have –

8        DEPUTY COMMISSIONER BLONIEN:  A job consortium and

9    the Career --

10       INMATE TYSON:  Yes, ma'am.

11       DEPUTY COMMISSIONER BLONIEN:  -- Resource

12   Development Center and the East Bay One Stop Career

13   Center.

14       INMATE TYSON:  Yes, ma'am.  And there are a few more

15   also, but I only just listed those three right there.

16   But I -- they also had a pamphlet [alarm sound] that

17   lists all the -- right there.  Right here.  I also have a

18   pamphlet right here, Alameda County, where you can --

19   where they hire ex-felons to -- to work and being that

20   they have a tax-incentive to hire ex-felons --

21       DEPUTY COMMISSIONER BLONIEN:  I'm familiar with

22   that.

23       INMATE TYSON:  And if --

24       DEPUTY COMMISSIONER BLONIEN:  I'm going to change

25   the tape.

26       INMATE TYSON:  Yes, ma'am.

27       DEPUTY COMMISSIONER BLONIEN:  It -- it's still going

75

1    but I'm going to change it.

2         **ATTORNEY CARBONE:** It'll just take a moment.

3              [Thereupon, the tape was changed.]

4    **INMATE TYSON:** And --

5    **DEPUTY COMMISSIONER BLONIEN:** Okay, we're -- we're

6    moving. Okay.

7    **INMATE TYSON:** And they also hire ex-felons. Now,

8    the Swords and Ploughshare program, that's a two-year

9    program.

10        **DEPUTY COMMISSIONER BLONIEN:** I know.

11        **INMATE TYSON:** And so that's a long-term program.

12        **DEPUTY COMMISSIONER BLONIEN:** Could you do that?

13        **INMATE TYSON:** Yes, ma'am. That's -- I really want

14   to get into that program. I really want to get in. Once

15   -- if -- if I'm released. You know, you don't have to

16   give me a parole date, but to get into that program would

17   enable me to set my foot back in the community on the

18   right -- on -- directly on the right path. To be able to

19   have a life again. To have -- to be successful.

20        **DEPUTY COMMISSIONER BLONIEN:** Well, you got -- you

21   got a family out there and they --

22        **INMATE TYSON:** Yes, ma'am.

23        **DEPUTY COMMISSIONER BLONIEN:** -- and they all wrote

24   letters --

25        **INMATE TYSON:** And they're also -- they're all

26   behind me.

27        **DEPUTY COMMISSIONER BLONIEN:** We have -- we read

76

1    your mom's.  You have one from Quentin Martinez.

2          **INMATE TYSON**:  That's my nephew.

3          **DEPUTY COMMISSIONER BLONIEN**:  That's your nephew.

4    And he tells that he's very supportive of -- of you and

5    that you've been there for him and that -- and he thinks

6    that you have remorse and that you made many

7    accomplishments, and then your sister, Joanne Martinez --

8          **INMATE TYSON**:  Yes, ma'am.

9          **DEPUTY COMMISSIONER BLONIEN**:  -- wrote a letter

10   saying that it's time for you to get back to a productive

11   life.  And that you've been a positive mentor to her

12   children.

13         **INMATE TYSON**:  Yes, I have.

14         **DEPUTY COMMISSIONER BLONIEN**:  And that you know --

15   she knows that if you're released that you will be a good

16   son, father, brother, uncle, and respectful and she asks

17   to let you come home to your caring family.  And then

18   Raymond Buford, B-U-F-O-R-D, wrote a letter.

19         **INMATE TYSON**:  Yes, ma'am.

20         **DEPUTY COMMISSIONER BLONIEN**:  He's your uncle.

21         **INMATE TYSON**:  Yes, ma'am.

22         **DEPUTY COMMISSIONER BLONIEN**:  And you lived with him

23   for awhile —

24         **INMATE TYSON**:  Yes, I did.

25         **DEPUTY COMMISSIONER BLONIEN**:  -- in Washington D.C.?

26         **INMATE TYSON**:  Yes, ma'am.  I did.

27         **DEPUTY COMMISSIONER BLONIEN**:  And he's very

77

1    supportive of you and he'll do anything and everything in

2    -- in his power to help you adjust.  And then Darryl

3    Tyson, D-A-R-R-Y-L, your brother, wrote saying that --

4    giving your history and that you've missed out on being a

5    father, son, brother, and grandfather and that makes the

6    whole family truly sad.  And that he lives in California

7    and he will do his best to make sure that he will be very

8    supportive and he thinks you've learned your lesson and

9    you deserve another chance.  And then Correction Officer

10    Simone, S-I-M-O-N-E, who's known you for seven years and

11    has watched your interaction with staff and other

12    inmates, he sees your demeanor is quiet and respectful

13    and he thinks that you would be a law-abiding citizen if

14    paroled.  And Correctional Officer Stevenson, S-T-E-V-E-

15    N-S-O-N, wrote you a letter saying that you've worked

16    with him before and he's had contact with you and you've

17    always performed your duties as a professional and you're

18    ready -- ready to be released back into society.  And

19    Correctional Officer Gladson, G-L-A-D-S-O-N.  You also

20    worked for Officer Gladson as a recreation clerk and that

21    your interaction with staff and inmates as well as

22    respect for staff and fellow inmates has always been

23    exceptional.  And his -- he or she has discussed with you

24    your parole plans and feels that they're positive and

25    feels you're ready for parole.  Any other letters that I

26    didn't read?  Those are all the ones I have here.

27        **INMATE TYSON:**  I have some more in my cell.  I just

1    never -- my counselor's never put them in there.  In the

2    -- in the -

3        **DEPUTY COMMISSIONER BLONIEN:**  No, this is your

4    parole hearing.

5        **INMATE TYSON:**  I know.

6        **DEPUTY COMMISSIONER BLONIEN:**  And the responsibility

7    for what's presented --

8        **INMATE TYSON:**  Yes, ma'am.

9        **DEPUTY COMMISSIONER BLONIEN:**  -- is all yours.

10       **INMATE TYSON:**  Yes, ma'am.

11       **ATTORNEY CARBONE:**  I think there are two additional

12   letters, Deputy Commissioner, in our parole supplemental

13   packet, which is the last attachment under the blue

14   sheet.

15       **DEPUTY COMMISSIONER BLONIEN:**  From Dwayne Tyson?

16       **ATTORNEY CARBONE:**  There is --

17       **INMATE TYSON:**  That's my brother.

18       **ATTORNEY CARBONE:**  -- a letter from -- I believe you

19   covered a Darryl Tyson letter, did you not?

20       **DEPUTY COMMISSIONER BLONIEN:**  Yes.

21       **ATTORNEY CARBONE:**  And then there was a letter from

22   a Ms. Martinez, Quentin Martinez, and -- you did cover

23   that as well, I apologize.  And then there was one -- did

24   you cover Joe --

25       **INMATE TYSON:**  Yes, sir.

26       **ATTORNEY CARBONE:**  Thank you.  I apologize.

27       **DEPUTY COMMISSIONER BLONIEN:**  The one from Dwayne

79

1    Tyson notes that in 16 years he has witnessed a

2    significant change in your state of mind and asks us to

3    consider your accomplishments and thinks you're ready for

4    parole.  He also says that at the time of your crime you

5    were severely distraught and on drugs.  And you were

6    distraught over your ex-wife.

7        INMATE TYSON:  True.  That --

8        DEPUTY COMMISSIONER BLONIEN:  Well, I --

9        INMATE TYSON:  -- not only that my -- my wife and --

10   well, I wasn't using drugs, but I was distraught over my

11   wife and like I say not finding job, being rejected, all

12   of those things.

13       DEPUTY COMMISSIONER BLONIEN:  You know, the

14   consistency in your explanation is -- is not here.  You

15   know, it's different.  And you have to go back and look

16   at every report --

17       INMATE TYSON:  Uh-huh.

18       DEPUTY COMMISSIONER BLONIEN:  -- and every time

19   you've talked to a counselor, anything that's documented.

20   Either in your transcripts or in your C-File --

21       INMATE TYSON:  Uh-huh.

22       DEPUTY COMMISSIONER BLONIEN:  -- and go back and --

23   and in your mind --

24       INMATE TYSON:  It's kind of hard --

25       DEPUTY COMMISSIONER BLONIEN:  -- come to the truth.

26       INMATE TYSON:  It's kind of hard to remember.  I'm

27   sorry.

1    **DEPUTY COMMISSIONER BLONIEN:**  But you have time.

2   You have to come to the truth because --

3    **INMATE TYSON:**  Yes, ma'am.

4    **DEPUTY COMMISSIONER BLONIEN:**  -- you're not

5   believable until you come to the truth.  And I -- I don't

6   know if you know it or not yet.  I don't -- I don't know

7   if you know how rambling you are.

8    **INMATE TYSON:**  I just try to remember everything.

9    **DEPUTY COMMISSIONER BLONIEN:**  I know.

10    **INMATE TYSON:**  And it's -- it's hard.

11    **DEPUTY COMMISSIONER BLONIEN:**  And -- and I see your

12   earnestness.  But you've got to read what you're saying

13   and then you, yourself, are going to say oh, my gosh.

14    **INMATE TYSON:**  All right.

15    **DEPUTY COMMISSIONER BLONIEN:**  So with that, we also

16   sent out 3042 notices to victim next of kin, law

17   enforcement.

18    **INMATE TYSON:**  Yes, ma'am.

19    **DEPUTY COMMISSIONER BLONIEN:**  And although I didn't

20   get any formal responses the District Attorney from

21   Alameda County is here.

22    **INMATE TYSON:**  Yes, ma'am.

23    **DEPUTY COMMISSIONER BLONIEN:**  And at the right time

24   she'll be given the opportunity to --

25    **INMATE TYSON:**  All right.

26    **DEPUTY COMMISSIONER BLONIEN:**  -- speak for the

27   People.

81

1       **INMATE TYSON:** All right.

2       **DEPUTY COMMISSIONER BLONIEN:** And I'm going to

3    return it to the Chair.

4       **PRESIDING COMMISSIONER BIGGERS:** Thank you. First

5    of all, I'm going to ask the District Attorney from

6    Alameda County if she has any questions for you.

7       **DEPUTY DISTRICT ATTORNEY KLINGE:** I do is -- I also

8    want to request that -- request a quick recess.

9       **PRESIDING COMMISSIONER BIGGERS:** Yes.

10      **DEPUTY DISTRICT ATTORNEY KLINGE:** Thank you.

11      **PRESIDING COMMISSIONER BIGGERS:** Let's take about a

12   five-minute break.

13                    **(Off The Record)**

14      **DEPUTY COMMISSIONER BLONIEN:** We are back on record.

15      **PRESIDING COMMISSIONER BIGGERS:** Okay, before we --

16   let the record reflect that everyone that was in here

17   when we took a short recess is now back in the room and

18   I've asked the District Attorney to -- if she has a

19   couple questions for the inmate.

20      **DEPUTY DISTRICT ATTORNEY KLINGE:** I have a few

21   questions, thank, you. Could the Panel ask the inmate,

22   regarding the offense, the victim, Gail Williams, who was

23   murdered was it his intent to rob her, specifically?

24      **ATTORNEY CARBONE:** You'll be addressing the Panel.

25   Mr. Tyson?

26      **INMATE TYSON:** Yes.

27      **ATTORNEY CARBONE:** Address the Panel.

82

1      **INMATE TYSON:**  No, ma'am.  My intent wasn't

2    really --

3      **PRESIDING COMMISSIONER BIGGERS:**  No, to the Panel.

4      **ATTORNEY CARBONE:**  Sir, address the Panel.

5      **PRESIDING COMMISSIONER BIGGERS:**  Address the Panel,

6    not --

7      **INMATE TYSON:**  Oh.

8      **ATTORNEY CARBONE:**  Talk -- talk to --

9      **DEPUTY DISTRICT ATTORNEY KLINGE:**  It's kind of hard,

10   but you have to talk to them and I have to talk to them.

11      **INMATE TYSON:**  Yes, ma'am.  My intent wasn't to -- I

12   forgot what the question was.

13      **PRESIDING COMMISSIONER BIGGERS:**  The question was

14   were your intentions to rob the victim?

15      **INMATE TYSON:**  No, sir, it wasn't intended to rob

16   her.  But knowing that I -- what I know now I probably

17   had other things in mind also.

18      **PRESIDING COMMISSIONER BIGGERS:**  Well, I asked you

19   about that.  Remember that?

20      **INMATE TYSON:**  Yes, sir.

21      **PRESIDING COMMISSIONER BIGGERS:**  I asked you about

22   that few minutes ago.  What was your intention with the

23   victim?

24      **INMATE TYSON:**  It was -- it was to talk to her at --

25   at that time.  Yes, sir.

26      **DEPUTY DISTRICT ATTORNEY KLINGE:**  And this is a

27   follow-up.  What other things did you maybe have in mind?

83

1          **INMATE TYSON:**  I don't -- I really have no idea but

2    I -- I've discussed this with my attorney and just came

3    to the conclusion I probably had other things that I

4    might have done had I not killed -- took her life.

5          **DEPUTY DISTRICT ATTORNEY KLINGE:**  And one -- just to

6    follow-up on that.  So it was enlighten -- enlightenment

7    through discussion with your attorney today that makes

8    you think this?

9          **ATTORNEY CARBONE:**  I think it's not -- perhaps a

10   discussion.  I think that's just objection that misstates

11   the record.  He simply stated that there were discussions

12   with his attorney.  Not necessarily put in context when

13   those discussions occurred.  They certainly could have

14   been previous to today and, in fact, I think they were.

15         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Rephrase the

16   question, please.

17         **DEPUTY DISTRICT ATTORNEY KLINGE:**  Was it recently

18   that you came to these realizations in discussions with

19   whatever attorney it was?

20         **PRESIDING COMMISSIONER BIGGERS:**  I think that's a

21   fair -- when did you come to the -- to this conclusion --

22         **INMATE TYSON:**  I --

23         **PRESIDING COMMISSIONER BIGGERS:**  -- that something

24   else could have transpired?

25         **INMATE TYSON:**  While talking to my attorney.

26         **PRESIDING COMMISSIONER BIGGERS:**  When -- and that

27   was recent?

84

1        INMATE TYSON:  Yes, sir, it was.

2        PRESIDING COMMISSIONER BIGGERS:  Okay.

3        INMATE TYSON:  It was recent.

4        PRESIDING COMMISSIONER BIGGERS:  Move on, please.

5        DEPUTY DISTRICT ATTORNEY KLINGE:  Was that -- one

6    last question on that area.  Was that before or after you

7    talked to the psychologist for this current report?

8        INMATE TYSON:  That was before I -- I talked to the

9    psychologist on -- psychologist on this report.  Yes,

10   ma'am.

11       DEPUTY DISTRICT ATTORNEY KLINGE:  And then you

12   mentioned when we were speaking of the victim, Janet

13   Charles, whom you stabbed in the head and chest, that

14   this was the result of feeling rejected because she

15   refused your request for a cigarette.  I'm a little

16   confused on whether the attack was because you were

17   feeling rejected or as part of a robbery.  Could you --

18   could the inmate expand on that a little bit?

19       INMATE TYSON:  Yes, ma'am.  Yes, sir.

20       PRESIDING COMMISSIONER BIGGERS:  Don't matter.  Just

21   go ahead and deal with the question.

22       INMATE TYSON:  Part rejection and also I -- I did

23   intend to rob her and -- what was her question, please,

24   sir?

25       PRESIDING COMMISSIONER BIGGERS:  She just wanted you

26   to clarify were your intentions to rob her?

27       INMATE TYSON:  Yes, they were.  My intentions were

85

1    to rob her.

2        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

3        **INMATE TYSON:**  Yes, ma'am.

4        **DEPUTY DISTRICT ATTORNEY KLINGE:**  The attack on

5    Karen Kline where the inmate grabbed her and tried to

6    pull her up the street as she resisted and begged him to

7    let her go, what was the in -- inmate's intent when he

8    was trying to drag her up the street?

9        **INMATE TYSON:**  I intended to rob her, too.  But I

10   remember the incident and it was right in front of the

11   hospital or back of the hospital, I don't know whether it

12   was the front or back, but it was -- it was a well-lit

13   area, and I didn't want anybody to see me, you know,

14   committing my crime.

15       **PRESIDING COMMISSIONER BIGGERS:**  Okay.

16       **DEPUTY DISTRICT ATTORNEY KLINGE:**  Okay, and in 2001

17   when the Commission asked the inmate what the reason was

18   for trying to pull her down the street, he couldn't

19   remember and didn't know what was going through his mind

20   at the time.  So what has jogged his memory between 2001

21   and today?

22       **INMATE TYSON:**  Well, during that time, I did refuse

23   to -- to answer those questions because I felt ashamed of

24   what I had done and I didn't want people to look down on

25   me and -- and say well, you didn't commit no robbery like

26   Jesse James or someone by doing -- doing something that,

27   you know, gangsters do and I was ashamed of what I had

86

1    done.

2        **DEPUTY DISTRICT ATTORNEY KLINGE:**  The discharge you

3    received from the Navy was honorable, but was it for

4    possession of marijuana?

5        **INMATE TYSON:**  The discharge that I received from

6    the Navy it was -- it was honorable and -- but the

7    marijuana charge was -- was -- was civil -- civilian.  It

8    didn't have anything to do with the military.

9        **DEPUTY DISTRICT ATTORNEY KLINGE:**  The discharge --

10   let me clarify that.  The possession of marijuana offense

11   occurred while you -- the inmate was in the service?

12       **INMATE TYSON:**  Yes, ma'am, it occurred while I was

13   in the service.

14       **DEPUTY DISTRICT ATTORNEY KLINGE:**  And the military

15   was made aware of that offense?

16       **INMATE TYSON:**  Yes, ma'am, they were.  As a matter

17   of fact the -- they were there when I was arrested that

18   night.  The military police and the British police they -

19   - they came to -- to my place that I had and arrested me.

20   Yes, ma'am, they did.  They were made aware.

21       **DEPUTY DISTRICT ATTORNEY KLINGE:**  The parole plans,

22   has the inmate contacted any of the individual businesses

23   listed in the pamphlet he brought from the businesses

24   that hire ex-felons?

25       **INMATE TYSON:**  No, ma'am, I -- I didn't contact --

26   oh, I'm sorry.  No.  No, sir, I didn't contact any of

27   these people, per se.

1    **DEPUTY DISTRICT ATTORNEY KLINGE:**  The three place --

2    temporary employment agencies listed in the inmate's

3    parole plan letter submitted, has he contacted any of

4    them to see what kind of temporary work is available?

5    **INMATE TYSON:**  No, sir, I haven't, but if I can

6    explain.

7    **PRESIDING COMMISSIONER BIGGERS:**  You'll get your

8    chance on that.

9    **INMATE TYSON:**  Oh, all right.

10    **DEPUTY DISTRICT ATTORNEY KLINGE:**  And then the --

11    the idea about being a tailor, has the inmate researched

12    how much a tailor can make in the Oakland or Bay area?

13    **INMATE TYSON:**  I put in a quest -- excuse me, I put

14    in a request with the Trust Fellows, the group -- the --

15    one of the self-help groups that I have, but they didn't

16    have the -- the information on it but they did have

17    information on -- as for a chef and they gave me the

18    information for California Culinary Academy on 16 -- was

19    it 1625 Polk Street in San Francisco, and they just

20    didn't have the information for that.

21    **DEPUTY DISTRICT ATTORNEY KLINGE:**  And if I may just

22    have one minute.  I think that's all the questions I

23    have.

24    **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank you.

25    Mr. Carbone, you have --

26    **ATTORNEY CARBONE:**  Yeah, I just have a few.  I want

27    to go back to your military history, Mr. Tyson.  You

88

1  indicated that you were unable to weld because of prob --

2  dust problems.  Did they assign you to a different

3  position in the military?

4      INMATE TYSON:  Yes, they did.  They assigned me to

5  Deck Division which was Boatswain's Mate.

6      ATTORNEY CARBONE:  And did you perceive that to be a

7  -- a skill of lesser importance than the welding?

8      INMATE TYSON:  Yes, all it was was just painting,

9  chipping the side off the submarines and on the ship,

10  painting and --

11      ATTORNEY CARBONE:  And then --

12      INMATE TYSON:  -- other jobs.

13      ATTORNEY CARBONE:  -- after -- after you were

14  reassigned you -- this is where the marijuana charge came

15  into play, is that correct?

16      INMATE TYSON:  Yes.  It did.

17      ATTORNEY CARBONE:  And so suffice it to say or is

18  it fair to state you -- you felt at the time of your

19  discharge from the military that you had essentially not

20  succeeded at what could perhaps be termed the -- the

21  straight life?

22      INMATE TYSON:  Yes, sir.

23      ATTORNEY CARBONE:  And was that one of the reasons

24  why you felt more accepted or more successful, if you

25  will, at the -- the crooked life?

26      INMATE TYSON:  Yes, sir.

27      ATTORNEY CARBONE:  And in hindsight, do you believe

89

1    that that was a -- a critical misstep or a critical

2    mistake that you made at an important part of departure

3    in your life?

4         INMATE TYSON:  Yes, it was a critical mistake

5    because it led me to be incarcerated in prison for the

6    rest of my life.

7         ATTORNEY CARBONE:  And I want to talk about the

8    causative factors a little bit because I know that's been

9    a -- a concern in terms of your ability to articulate or

10   express the causative factors.  Do you think narcotics

11   played a role in your crime?

12        INMATE TYSON:  Yes.  It -- it is hard for me to

13   articulate but -- to articulate myself because I've

14   always been a very outspoken person and, for some reason,

15   you know, it's just hard to express myself.  You know, I

16   -- I don't like to go on like I'm rambling because I know

17   what I want say.   It's just that it's -- it comes out,

18   you know --

19        ATTORNEY CARBONE:  Well, let me try to focus you.

20   You said that you thought that narcotics played a role in

21   your crime.  I know you were using narcotics prior to

22   your crime.  You were not high at the time of your crime,

23   were you?

24        INMATE TYSON:  No, sir, I -- I wasn't high at the

25   time of my crime.

26        ATTORNEY CARBONE:  Okay, so why then do you think

27   then narcotics played a role in your crime?

1    **INMATE TYSON:** Well, I had stopped using drugs, but

2    before I had stopped using drugs, I had taken a -- a lot

3    of drugs.  Not heroin or cocaine.  I had tried those two

4    drugs but mescaline, TAC, and acid.  I had taken those

5    drugs a lot and I remember -- I -- excuse me.  I remember

6    two incidences where I had taken the acid that I had to

7    leave a party because it seemed like my world had just

8    turned all the way upside down and I was -- I had lost

9    focus of everything.  I didn't know where I was.  And I -

10   - I couldn't -- I couldn't -- I couldn't function and I,

11   you know, I just knew I had to get away from where I was

12   and to go home to where I knew I was safe.

13       **ATTORNEY CARBONE:** Let me ask you some -- about some

14   of the other causative factors.  At the time of the crime

15   do -- do you feel like you were suffering from low self-

16   esteem?

17       **INMATE TYSON:** Yes, low self-esteem, yes.

18       **ATTORNEY CARBONE:** Like you were depressed at the

19   time?

20       **INMATE TYSON:** I was depressed a lot.  I was

21   depressed a lot and I didn't know it then, but the drugs

22   had -- had made me that way from taking, you know, all

23   that mescaline, TAC, and acid, and I -- I didn't know it

24   at the time that it had -- had, you know, probably

25   destroyed me somewhat on my -- my brain cells.

26       **ATTORNEY CARBONE:** Let me ask you, after you -- in

27   terms of the first crime, after you committed that crime

91

1    -- let's place you back the day after you committed the

2    crime.  You wake up, you had viciously attacked a woman.

3    How did you feel about what you had done?  Did you feel

4    empowered?  Did you feel depressed?  Did you feel

5    important?  What was your -- your feeling in relationship

6    to that first crime?

7        **INMATE TYSON:**  I felt bad for what I did.  But at

8    the same time I just said, you know, I -- I had committed

9    this crime.  What the heck, I just -- nothing is going

10   right for me, so I just might as well keep doing what I'm

11   doing.

12       **ATTORNEY CARBONE:**  And, sir, you're familiar with

13   the term fatalism?

14       **INMATE TYSON:**  No, not really.

15       **ATTORNEY CARBONE:**  You don't -- you don't -- you

16   don't know what the term fatalistic means?

17       **INMATE TYSON:**  No.

18       **ATTORNEY CARBONE:**  No.  Do you think you had passed

19   a point of no return?

20       **INMATE TYSON:**  Yes, I -- I did.  I did pass the

21   point of no return.

22       **ATTORNEY CARBONE:**  One last question, actually, two

23   -- few more.  Commissioner Biggers at one point during

24   the hearing said that you perhaps had given up hope on

25   yourself.  Do you feel like you had given up hope on

26   yourself?

27       **INMATE TYSON:**  Yes.  I did.

92

1      **ATTORNEY CARBONE:** At present do you feel like you

2    have given up hope on yourself?

3      **INMATE TYSON:** Somewhat, but I -- I do have a little

4    hope left.

5      **ATTORNEY CARBONE:** What is the single greatest

6    accomplishment of your life, Mr. Tyson?

7      **INMATE TYSON:** My two children.

8      **ATTORNEY CARBONE:** And what is the single greatest

9    failure of your life?

10      **INMATE TYSON:** What I did to come to this prison.

11      **ATTORNEY CARBONE:** No further questions.

12      **PRESIDING COMMISSIONER BIGGERS:** Okay. Thank you.

13    At this point I'm going to ask the District Attorney to

14    close, please.

15      **DEPUTY DISTRICT ATTORNEY KLINGE:** Thank you, and I

16    apologize if it's somewhat disjointed at this point. The

17    -- the Alameda County District Attorney's office is

18    opposed to parole at this time. I believe that the

19    inmate is unsuitable for parole and does currently pose a

20    risk to society if released. This is based on several

21    factors, beginning with the commitment offense. The

22    commitment offense was carried in a cruel and callous

23    manner. We -- everybody knows the facts of the victim

24    that died. Basically, was approached on the street,

25    asked a question, stabbed to death, staggered into her

26    apartment and passed away. Complete stranger attacked on

27    the street. This was conducted in a manner which

93

1    exhibited a callous disregard for human life and the

2    suffering of another.  And in this crime, multiple

3    victims were attacked and injured and one killed.  You

4    could argue that some were defiled and mutilated because

5    there were stabbings in heads and chests.  The motive for

6    the crime is very confusing at this point, if there is a

7    motive for the crime.  And I'll go into that.  But it's

8    certainly trivial in relation to what ended up happening

9    to these victims.  The inmate's previous record did

10   indicate an escalating pattern of criminal conduct.  The

11   inmate had just been released from prison serving an

12   eight-year sentence for rape.  He has a pattern of

13   violent and assaultive behavior, particularly against

14   women.  And I'd say, you know, I would say a pattern of

15   somewhat tumultuous relationships out of custody and in

16   custody.  His marriage, his interaction with women, his

17   marriage in custody unfortunately failed, I believe, due

18   to his -- alleged wife's relationship with a correctional

19   officer.  His previous grant of parole did not avoid

20   future criminality.  And institutionally, he does have

21   his vocations, which I do commend him for.  And he does

22   how that he's very proud of his skills in the mattress

23   department and I do commend for that.  In recent times he

24   has started to program with the groups he's attended.

25   Recently it seems he's started to finally concentrate on

26   groups that might begin to give him some insight into his

27   crimes.  So I do commend him for that.  The psychiatric

94

1    reports are still not favorable and I think I would like

2    to go a little bit into detail in this.  The inmate has

3    gone from complete denial of his crimes to different

4    explanations of his crimes over the years and it's kind

5    of a disjointed pattern.  At times he denies the rape,

6    then he admits the rape later, then he denies it after

7    that point in time.  There's been absolutely nothing

8    consistent throughout the transcripts and the review of

9    the psych reports that I've seen.  In 2001, he appeared

10   before the Board and did address the life commitment

11   crime and he did answer questions about the crime, but he

12   then did claim to not be able to remember certain things

13   when asked.  He was still back on 'I was trying to talk

14   to somebody, but I don't know why.'  He really didn't

15   show any insight that could give us any glean into why he

16   committed these crimes from his perspective in 2001.  In

17   2003, on advice of counsel, he de -- declined to comment

18   on the crime, but he did, on page 30 of that transcript,

19   speak about it and it -- it -- he even speaks about that

20   he knows he's supposed to give insight at line 7.  And he

21   said from his understanding -- the understanding of

22   insight is that he know -- knows he committed the crime.

23   Not why, just that he knows he did it.  Then he says,

24        "and why did I do it?  It was because I was

25        having problems, you know.  And from there,

26        you know, it just kept going on.  Other

27        things were while, you know, you can deal

95

1          with problems and stuff.  I mean, I'm a

2          human being like everyone else, you know.  I

3          can deal with some things and some things I

4          can't.  There's so much pressure I can take.

5          There's so much pressure any being can take,

6          you know.  And I was having bad times, bad

7          breaks, bad luck, you know.  And I had not -

8          - had I not been in prison and used drugs, I

9          don't think I would've done this thing I

10         did."

11   Which isn't really any kind of insight or explanation into

12   his crimes.  Counsel speaks about his drug use and cause -

13   - as being a causative factor today in questions.  He says

14   he last used drugs in December of 1977.  And these crimes

15   are committed some five years later.  So I'm not clear on

16   the causative factor that that has -- it wasn't explained

17   thoroughly.  He does seem to today try to explain some

18   causative factors.  Now, the psychiatrists over the years

19   have never been able to glean the causative factors from

20   him and we should thank counsel because he -- based on his

21   interaction he seems to now be coming up with some

22   causative factors.  And maybe if these are truly the

23   causative factors that are coming from the inmate, this is

24   a starting point for him to finally be able to address

25   them and deal with them.  It's the first time I've ever

26   seen anything articulated as to a causative factor.  In --

27   the psych report in 2000 the inmate said he lied to

1    psychiatrist before about his past psychiatric history.

2    If he's going to admit lying to the psychiatrist it's

3    really hard for me to determine when we believe him and

4    when we don't.  There's no history, there's nothing base -

5    - that we can -- [phone ringing]

6         **PRESIDING COMMISSIONER BIGGERS:**  Go ahead.

7         **DEPUTY DISTRICT ATTORNEY KLINGE:**   -- base a

8    consistent pattern on.  He's -- it's also quoted in the

9    2002 report that the inmate is not an accurate historian.

10   And then in 2000 he was still denying the rape offense.

11   He stated today several times that he didn't have a

12   problem with women, but he did state that he had a problem

13   with himself, which I will commend him for that part of

14   it.  I think there's a step missing here clearly still.

15   That -- I don't see the true insight as to that his crimes

16   did in -- indicate a severe problem with women.  Plus a

17   problem with himself, I'm sure.  In the current

18   psychiatric report, the psychiatrist stated there seems to

19   be little true -- oh; speaking of remorse.  "He's now

20   willing to acknowledge his responsibility for the crimes

21   but has no understanding of why he took such action.  He

22   expressed remorse for his crimes.  There seems to be

23   little true feeling behind his statements."  And while she

24   did have some complimentary things to say about the inmate

25   it's clearly not a favorable report for release.  Counsel

26   did submit his parole packet and on the bullet point

27   number two he stated that the 2003 psychological report

1    put the inmate at a low degree of threat to public safety.

2    And I apologize if I missed it but I don't see that

3    anywhere in the report.  I just wanted to point that out.

4    In 2003, he also did not talk to the psychiatrist

5    thoroughly about the crime itself.  And if you bear with

6    me, I am almost finished.

7        **PRESIDING COMMISSIONER BIGGERS:**  I thought you were

8    talking about parole plans.

9        **DEPUTY DISTRICT ATTORNEY KLINGE:**  I am now.  His

10    parole plans are headed in the right direction, because I

11    believe that he does need transitional housing.  The

12    letters from his relatives are supportive, but not

13    specific as to 'we can give him $300 a month.  I, this

14    brother, can rent him an apartment and I, his sister, can

15    give him a car.'  They are extremely supportive but

16    they're not specific.  The concerns that the psychiatrist

17    indicated about the veteran's program I also have how

18    structured is it?  What kind of support do they beyond the

19    housing and helping him get jobs?  That would be

20    information that would be very beneficial.  And the jobs

21    themselves, he does have some marketable skills, but he

22    has not presented anything about how he could get a job

23    with mattress work.  He has dreams and hopes which are

24    good.  Own your own business, be a tailor.  But it's

25    extremely hard to start your own business.  It's extremely

26    hard to support yourself.  People that are in alterations

27    businesses, it's extremely hard to support yourself.  So

1    there isn't anything concrete for his job and supporting

2    himself in the community which would then cause stresses

3    and rejections from employers and rejections from people

4    which, if we're to believe him today, are part of the

5    causative factors of his crimes.  So based on all those

6    factors, I feel that the inmate needs significant time to

7    finally address what he's starting to say today in a

8    coherent manner as to what caused him to commit the

9    crimes, how he's going to prevent that in the future, and

10   to solidify his parole plans a little bit kind of more for

11   the job end of it.  I know that a lot of the programs the

12   living situations won't give you a firm commitment until

13   you're out.  Some will.  There are some in the Bay area

14   that will and maybe he could find some of those and get

15   some more information on the Veteran's program.  And with

16   that, I'll submit it.

17        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

18   Mr. Carbone?

19        **ATTORNEY CARBONE:**  Thank you, Commissioners and thank

20   you again for your thoughtful and thorough consideration

21   of this case.  Let me start of by just addressing the

22   somewhat incoherence at times of Mr. Tyson which I think

23   we've all been sort of dancing around, but in terms of

24   pinpointing and I -- I think it really stems from three

25   things.  First and foremost I think it comes from shame

26   that these crimes perhaps no one of the victims and the

27   victim's family hates these crimes more than Mr. Tyson.

99

1    And I think that is prod -- one of the products of that is
2    his inability to be as articulate as he would like because
3    of some of the shame, and then thirdly, I think some of
4    the nervousness that he has disables him from presenting
5    as well as he would like.  The important thing I want to
6    say about that, however, is that I don't think that should
7    be mistaken for his -- for Mr. Tyson not having a
8    significant degree of insight into the crime and I'll be
9    specific about that in -- in -- as I go one but I just
10   wanted to point out that I don't want the Panel to mistake
11   his inability to articulate at times for lack of insight.
12   I want to say four things about the crime.  One, that he
13   obviously terrorized these women who were particularly
14   vulnerable.  I think some of the women were even
15   caretakers that were related to the hospital.  And so
16   these were particularly vulnerable people in our community
17   and that is entirely reprehensible.  Secondly, I think at
18   the time, if you go back and look at the history involving
19   these crimes, he also placed an entire community in fear
20   and I think that's something that he has also owned up
21   that it wasn't simply how it affected these four victims
22   but it was an entire community in Oakland at one time,
23   naturally so, that was placed in fear as a consequence of
24   his actions.  Thirdly, that the -- the robberies did not
25   need to result in any assaults, much less a murder.  And I
26   think he also realizes that.  And, fourth, this was a man
27   many years ago, over 25 years ago now, that at the time

1    did not learn his lesson. And, unfortunately, coming out

2    of the Georgia rape conviction, talk about a wake up call.

3    He should've had one of the biggest wake up calls and, in

4    fact, it might have cemented his return to a criminal

5    lifestyle after his disengagement from the military. In

6    fact, the District Attorney commented that narcotics

7    didn't play a role in this crime and his -- and Mr.

8    Tyson's discussion of that doesn't -- indicates he doesn't

9    have insight. In fact, it does. It's just the opposite.

10   He was not high at the crime. In fact, he was sober, but

11   it's the old adage of people, places and things. And he

12   was still attached to the criminal lifestyle as a

13   consequence of being involved in -- in narcotics, and so I

14   think it -- it actually demonstrates his greater insight

15   in the fact that even though he wasn't using drugs, drugs

16   still had an influence over him and an influence in his

17   life because he was part of a -- a criminal lifestyle. So

18   there is no hiding, masking or denying the four elements

19   that I've talked about in relation to the crime and, as I

20   said, I think Mr. Tyson is deeply disgraceful and

21   resentful about that. I looked at the record, the

22   earliest discussion of remorse I could find was in 1991

23   where he discusses with the psychiatrist that he expresses

24   deeply deep remorse and that he regrets it. And that's

25   over 15 years now in terms of a showing, at least on the

26   record, that he has remorse and I think contrary to what

27   the District Attorney says that those are true feelings.

1    He's not -- doesn't recognize the Board wants to hear that
2    and so he's simply giving lip service to that.  In fact,
3    in our parole supplemental packet we have two letters of
4    remorse that he authored back in 1999 and so, obviously,
5    it was important enough to him to put on the record a
6    direct apology to the -- the victims.  In terms of his
7    psych reports, I think the psych reports can best be
8    described as -- what was -- what Dr. Frances referred in
9    2003 as an information gap.  And what keeps on with Mr.
10   Tyson is that when given an opportunity to discuss the
11   crime, because of shame, because of distrust that,
12   unfortunately, he has about those types of encounters he
13   ends up being per -- perceived as not being completely
14   forthcoming and honest.  But I will submit this to you.
15   For all his inarticulateness, there isn't a taboo subject
16   for Mr. Tyson in relation to these crimes.  There isn't
17   anything today that you asked of him or the District
18   Attorney asked of him that he essentially said oh, no, I'm
19   not willing to discuss that or I'm, you know, I'm -- I'm
20   suddenly getting fuzzy in my memory.  He was very candid
21   and he has accepted responsibility for the crimes and I
22   think that speaks to his insight and I think it also
23   speaks to him understanding the magnitude of the offense.
24   Quite simply there are five reasons why this crime
25   occurred in terms of the causative factors.  And I've
26   spelled them out in my points, so I'll very brief on them.
27   One is the narcotic issue.  I think I've already addressed

102

1    that.  Two is the -- the -- the, excuse me, the

2    misperception that because of a lack of a skill set that

3    he had to commit crimes.  Granted that was a

4    misperception, but it still was, in fact, a causative

5    factor.  Three was the financial gain that he wanted to --

6    to get from the crimes and I think the confusion that

7    that's produced over time is they say well, there's no

8    motive because you never got any money.  Well, he didn't

9    know how much money was in the purses of these particular

10   women.  He still did the crime for financial gain.  Four,

11   he was engaging -- he doesn't know the word but it was

12   fatalistic behavior, and I wanted to -- I asked him that

13   important question about how did you feel about you

14   committing the crimes because it was clear after he

15   committed the crimes he wasn't empowered, he wasn't

16   (inaudible).  This wasn't feeding his ego.  He knew that

17   he was doing something wrong and he was then engaging in

18   that fatalistic behavior that probably started, I put it

19   at the juncture of, when he left the military.  And, in

20   fact, he -- he saw that as a causative factor in making

21   that bad decision to sort of give up, if you will, on --

22   on the straight life.  And then he was suffering from low

23   self-esteem and depression, a failed marriage, and the

24   dejection from the military, and throughout all of these,

25   those are not excuses.  He was the architect.  He -- it

26   was his choices to embrace those causative factors and act

27   upon them in such a terrible manner.  And, in fact, I

103

1    think he's tried to address his programming in a way

2    that's addressed those points.  He's been drug and alcohol

3    free I -- my calculation is for 29 years now. . And that is

4    extraordinary.  He really should be commended for that and

5    I think talk about a point of no return.  He is past the

6    point of no return of going back to a life of drug and

7    alcohol abuse.  There's no question about that.   Long-

8    standing participation in AA and NA.  And, in fact, even

9    in 2006 he was still working on the -- through the Impact

10   Program on his addiction.  In terms of, you know, this

11   question of has he given up on himself.  I think he --

12   he's thinking that, but his actions defy that, because

13   somebody who's going out and getting four vocations and

14   working hard and continuing to earn laudable chronos and

15   working overtime is not someone who has given up on

16   himself.  It's someone who absolutely still believes in

17   himself and I don't -- even though he's not mouthing it, I

18   think his -- his walk is demonstrating that he has

19   improved in terms of his self-esteem and some of his

20   depression and in terms of expanding upon his skill set.

21   And we see that I think most -- most amply by the -- the

22   laudable chronos from the staff that know him well.  The

23   COs Gladstone and Simone and Stevenson, who have no reason

24   to stick their neck out and vouch for his character, but

25   call him a law-abiding citizen, demeanor's respected and

26   quiet.  And Correctional Officer Stevenson saying he could

27   make a positive contribution to the community.  So the

1    correctional staff who work with him, know him well and

2    I'll tell you every time I'm in this institution visiting

3    Mr. Tyson it's the same thing.  I see staff go out of

4    their way consistently to greet him in -- in a -- in a

5    friendly -- in an -- almost as a -- an old friend would

6    and so it's very apparent to me that he has struck that

7    balance that's very difficult to find as an inmate by

8    being well-respected both by staff and by inmates.  I

9    think if you take that in tandem with the psych reports in

10   2003 -- and I apologize -- and -- and he was not found in

11   low degree.  The psychiatrist, Dr. Frances, simply said he

12   does not appear to present an imminent risk of violence to

13   himself and in others.  In 2000 he was said that his

14   violence potential was only slightly above a person of the

15   average community and I think I've addressed that

16   information gap that, unfortunately, keeps reoccurring

17   itself in the additional psych reports. [alarm sound]

18        **DEPUTY COMMISSIONER BLONIEN:**  I have one more minute.

19        **ATTORNEY CARBONE:**  I don't think I could do it in

20   one.

21        **DEPUTY COMMISSIONER BLONIEN:**  Okay.

22        **ATTORNEY CARBONE:**  Spoken like a true lawyer.

23   I'm --

24        **PRESIDING COMMISSIONER BIGGERS:**  All right, then

25   we'll switch the tape.

26        **ATTORNEY CARBONE:**  Thank you.

27             [Thereupon, the tape was changed.]

105

1        **DEPUTY COMMISSIONER BLONIEN:**    Okay, we're back on

2    record.    Tape two side two.

3        **ATTORNEY CARBONE:**    Thank you, Deputy Commissioner.

4    And I think the -- the evidentiary record demonstrates,

5    not by opinion, but by fact, that Mr. Tyson doesn't pose

6    an unreasonable risk to society.    We know he's been

7    disciplinary-free.    We know he's basically taking care of

8    any attitudinal problems that he had and is -- conforms

9    his behavior strictly to the institution's rules.    In

10    terms of his parole plans, I think he has shown some

11    insight by having both short-term, very short-term 30-day

12    plans, and a longer-term plan that he recognizes he does

13    need a structured environment.    This is a person that has

14    spent a lot of time in prison, that has a lot of issues on

15    the outside, that he is going to have difficulty getting

16    employment and so recognizing that has sought out these

17    structured environments to provide him a stable and

18    suitable residence.    It's difficult for him to find firm

19    job offers and I think he's done the best that he could in

20    getting a number of firm job leads.    He does have

21    supportive and loving family that has stuck with him

22    through all of these years and I think he does have a -- a

23    good social network on the outside that is waiting for

24    him.    And all of those things in consideration with a very

25    long prison sentence, 25 years, deservedly so.    He placed

26    an entire community in fear and committed horrible crimes

27    and so he did need to do some serious time and, in fact,

106

1  he does -- has done that time and more importantly it's

2  how he's done that time.  And I think he's tried to use

3  that time to make himself worthy of re-entry back into

4  society.  And I think we're at that point and so on it I

5  would submit that he is, in fact, suitable for parole.

6  And thank you.

7      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Now, Mr.

8  Tyson, you can -- you have the opportunity to tell this

9  Panel why you feel you are suitable or you can rest of

10  what your attorney has said.

11     **INMATE TYSON:**  Yes, sir.  May I speak now?

12     **PRESIDING COMMISSIONER BIGGERS:**  Yes, you can.  But I

13  want you to focus on why you feel are -

14     **INMATE TYSON:**  Yes, sir.

15     **PRESIDING COMMISSIONER BIGGERS:**  -- suitable

16  for parole.

17     **INMATE TYSON:**  I will.  First off, District Attorney,

18  thank you for giving me an opportunity to express my

19  feeling on why I deserve suitability.  Thank you for being

20  here and the Commissioners.  I'm not as articulate as my

21  lawyer.  My only wish was that I could be.  I know the

22  crime I committed is a horrible crime and I committed the

23  crime against women.  And I have done a lot harder time in

24  here because of my crime.  It's hard to say to people

25  inside a prison yeah, man, I killed a woman.  Yeah, I did

26  this to women.  I snatched purses.  And people look down

27  at you because they're ashamed.  They're ashamed of you.

107

1    And I'm ashamed of myself for what I done and there's no

2    explanation.  I take full responsibility for that.  And

3    like my lawyer said, had I learned my lesson in Georgia,

4    got an education and through my failed marriage and other

5    things that have occurred in my life, I wouldn't be

6    sitting here in prison.  I would be out in society right

7    now doing what I'm supposed to do.  I love working.  I

8    like working with my hands.  And I -- I don't mind

9    working.  I only wish I had had a -- a decent job before I

10   even committed these crimes.  Had it not been for my drug

11   use, and I know I can feel the effects of it now because I

12   don't the privilege to really speak as well as some people

13   do, because I am a little nervous and not only that, you

14   know, the drug use.  So it's sort of somewhat taking my

15   ability, but rest assured, I do know what I'm saying.  I

16   do know right from wrong.  I didn't have an education when

17   I came to prison.  I didn't have an education when I was

18   in the service.  But I have an education now and I -- I

19   can move forward.  I have two trades, well, three trades

20   and I can do them well.  I needed money in the street like

21   everyone else in order to survive.  Had it not been for my

22   low self-esteem and drug use and not having an education,

23   I probably would have survived a lot better than I did

24   when I was on the street.  I -- I appreciate my lawyer

25   doing what he did for me today.  And I know -- and I know

26   now that I realize I have to fight for my freedom.  I have

27   to fight and I'm going to do everything that I can to --

1    to gain my freedom again.  I know who I am now.  I know

2    I'm not the person that I was.  I wasn't born that person.

3    I just became that person.  But just like I became that

4    person, I can also become myself again.  And I pray that

5    one day I'll be completely myself and be able to live my

6    life like I used to live.  I do intend to go to my self-

7    help groups and I'm sorry that the Board may not think or

8    the District Attorney may not think I have insight on my

9    crime, but I do.  I realize I did it.  And trying to

10   explain it is hard, but I don't have a problem trying to

11   explain it no more and I don't have a problem with talking

12   about it anymore.  It did hurt.  And it's like walking

13   around with a -- a burden on your shoulder for awhile.

14        PRESIDING COMMISSIONER BIGGERS:  Okay, but I want you

15   to tell us why you feel you're suitable for parole.  I've

16   heard one thing.

17        INMATE TYSON:  All right.  Oh, yes, sir.  I will.

18        PRESIDING COMMISSIONER BIGGERS:  Anything else on the

19   --

20        INMATE TYSON:  Yes, yes, yes, it is.

21        PRESIDING COMMISSIONER BIGGERS:  All right, go

22   on.

23        INMATE TYSON:  I have -- I have -- I have completed

24   trades.  I have gone to self-help groups.  I have gained

25   insight in things that I -- that -- in the criminal things

26   that I've done and I've tried everything that I can that I

27   know how possibly to avoid those things.  It may not seem

109

1    like it to the Board or to the District Attorney, but

2    believe me, and I pray that you will, that I do know that

3    I -- I deserve to be found suitable today.  I pray that

4    you do find me suitable and I know you don't have to find

5    me suitable.  You don't have to give me a parole date.  I

6    understand that.  And also that I do understand that, you

7    know, there's no explanation and -- and at all times the

8    victims -- the victims are more important.  But I've done

9    all that I can that I know how and if there is something

10   else that I have to do just let me know and I'll -- I'll

11   try to achieve it.

12          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  All

13   right.  We will go into deliberations at this time.

14                          **R E C E S S**

15                            --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

110

| | |
|---|---|
| 1 | **CALIFORNIA BOARD OF PAROLE HEARINGS** |
| 2 | **D E C I S I O N** |
| 3 | **DEPUTY COMMISSIONER BLONIEN:**  We are back on record. |
| 4 | **PRESIDING COMMISSIONER BIGGERS:**  Okay, let the |
| 5 | record reflect that everyone that was in the room when we |
| 6 | went into deliberations are now back in the room.  In the |
| 7 | matter of Morgan Tyson, T-Y-S-O-N.  The Panel has |
| 8 | reviewed all information received from the public and |
| 9 | relied on the following circumstances in concluding that |
| 10 | the prisoner is not suitable for parole and would pose an |
| 11 | unreasonable risk of danger to society or a threat to |
| 12 | public safety if released from prison.  Mr. Tyson, the -- |
| 13 | the Panel looked at, number one, the crime -- the crimes. |
| 14 | The crimes were done is such a cruel manner -- in a |
| 15 | callous manner as brought out by the District Attorney in |
| 16 | that on -- you had a pattern of assaulting women as they |
| 17 | were walking down the street for whatever reason.  The |
| 18 | motive could've been robbery; the motive could've been |
| 19 | something else.  However, you were found guilty of |
| 20 | attempted robbery on a couple occasions and also with |
| 21 | weapons and in the course of that crime spree, if you |
| 22 | would, one person lost their life.  But the -- although |
| 23 | multiple victims were involved, one lost their life and |
| 24 | the others were, in fact, injured.  Cause you did, in |
| 25 | fact, cut them with -- with -- with a weapon.  The -- the |
| 26 | offense itself was carried out in a manner that |
| 27 | **MORGAN TYSON    C-81713    DECISION PAGE 1    7/25/06** |

111

1  demonstrated an exceptional callous disregard for human

2  suffering because you -- those victims that are still

3  living will have a traumatic experience based on what you

4  did to them to the point that who -- we will never know.

5  They are scarred.  You did, in fact, cut them or hit them

6  on the head, I forget right now, my mind's a little full

7  end of the day, but it did show a pattern of callous

8  disregard for human suffering and it was always with

9  women.  Single women.  They were walking, they were

10  minding their business, they were vulnerable, quite

11  vulnerable because they never expected that to be -- that

12  someone would come up like they -- like you did and do

13  what you did to them.  The crime itself -- all -- all --

14  all of the crimes involve great bodily harm, and the fact

15  that you used a weapon is also of -- of some concern to

16  the Panel.  These statements were -- before I do that,

17  the trivial -- the crimes themselves were very trivial in

18  that in reading the transcript, it's very hard to know

19  what your motive was.  At one time you said it was money.

20  Then another time when you talked to your attorney it was

21  for something else.  And I forget the -- the term.  I

22  think it was fatalistic or something like -- of that

23  nature which means that there are other fantasizing

24  things that maybe you were doing.  I don't know.  But it

25  was very trivial irregardless of which one it was.  All

26  of these were taken from the probation officer's report.

27  **MORGAN TYSON    C-81713    DECISION PAGE 2    7/25/06**

112

1   The Panel also looked at your -- looked at your
2   escalating pattern of criminal conduct for violence and
3   your failure to profit from society's previous attempts
4   in that you were in charge -- you were involved with auto
5   burglary.  You were accused and convicted of a rape down
6   in Georgia which sent you to the penitentiary for eight
7   years, so you had a prior criminal -- prior prison term,
8   as well.  You have programmed exceptionally well.  You
9   have four vocations.  Those four vocations are -- I want
10  to get them into the record, Auto Painting, Dry Cleaning,
11  Tile Layering and Cutting, and Mattress, Being a
12  seamstress in the PIA mattress shop.  You -- you have
13  upgraded yourself extremely well vocationally.  And from
14  listening to you talk, I get the sense that -- that you
15  have upgraded yourself educationally, as well, because
16  judging from what I've read in the past, as compared to
17  what you're doing right now, you have upgraded yourself
18  somewhat educationally, too.  However, there's one thing
19  that I want to caution you at this point is that I think
20  some time that you need to organize your thought process
21  before you speak, and the reason I'm saying that is
22  because sometime you'll answer a question or say
23  something that's very positive and you turn around and
24  turn it into a negative, which is causing you to come
25  across as you don't know what the -- you don't know which
26  way you want to go so I would ask you, you know, take a
27  **MORGAN TYSON    C-81713    DECISION PAGE 3    7/25/06**

113

1    minute, step back and then speak before you say something

2    and that may help you even in the institution.    You --

3    you had 20 128s and the last one being in '98.    You had

4    three serious 115s, the last one being in 1993.    So you

5    haven't been totally disciplinary-free.    But, again, I

6    think it's a matter of you not thinking because some of

7    those that you had back there was had to do with the

8    mouth, okay.    The psychological report I think has been

9    covered very well, but I just want to read a couple of

10   things to you.    And it was by Dr. Inaba and it was dated

11   7/21/2006.    And I realize you just got this today and I

12   admire you for going forward even though it was somewhat

13   unfavorable.    She indicated you had little insight into

14   the motivation behind the crime and this Panel does agree

15   with that.    When we say insight, we're not talking about

16   taking responsibility.    We're talking about the causative

17   factors that led you to do this.    And also, as I

18   mentioned earlier, that I felt that it was necessary for

19   you to understand deeply why you had this either fixation

20   or this dislike for women.    Although you say you didn't

21   have it.    Something had to happen to you to -- to go

22   after these women to include the rape that you did back

23   in Georgia.    There's got to be a -- an underlying cause

24   that you may not even be aware of, and I would encourage

25   you to seek out help, even from this psychiatrist that

26   you just went to see.    Since you said you got a chance to

27   **MORGAN TYSON    C-81713    DECISION PAGE 4    7/25/06**

114

1    see her and you talked to her. You know, tell her feel

2    you may need therapy. I don't know. In addition, she

3    said that you do not have a severe mental disorder, but

4    she did say that you even denied that you committed the

5    rape for which you had been convicted of. So, again,

6    those factors keep coming up. That you -- you don't

7    understand why you did what you did. And he -- she did

8    mention, though, that you would also benefit from

9    counseling with regard to the motivation of this crime as

10   attached to attitude toward women. It's just -- and

11   also, finally, you lack insight into the reason for the

12   crime other than financial pressure of some kind and

13   wanting to impress family members. Again, causative

14   factors. Not only in this report, but even so stuff that

15   we talked about tonight -- today. You really need to --

16   to get down to the brass knuckles of what transpired.

17   Finally, your parole plans, you've done some research on

18   your parole plans, but the problem that I see with those

19   is you write these letters to these different people and

20   they tell you things like they will be able to assist you

21   in getting this, assist you in getting that, yeah, we'll

22   give you a bed when you get a parole date. You need to

23   firm them up a little bit. You need to -- they're --

24   they're not -- they're all over the place. And, yeah,

25   they send you brochures and you get them, you read

26   something, but things change every year. Sometimes they

27   **MORGAN TYSON   C-81713   DECISION PAGE 5   7/25/06**

115

1   may not have the funding to be able to get you a bed.  So

2   you need to firm that up, and what I would encourage you

3   to do is you got family support outside, have them go to

4   different places so that you can identify exactly where

5   you're going to go, let them know what your situation is.

6   You had a -- a -- a short-term goal a few minutes ago.

7   Well, short-term goal to stay with your mother, but

8   that's only for 30 days.  And, you know, again letters of

9   support to support that.  Even your letters that you have

10  in your files were, you know, we would help you this, we

11  would help you do that, but they're not specific enough.

12  to say he could stay with me until such time as he got a

13  job.  We will help him get a job.  Four vocations.  You -

14  - you -- you're not going to have a problem.  You've got

15  marketable skills that can help you get a job.  Have them

16  look for those types of places that you have -- you have

17  dreams.  There's nothing wrong with having dreams.  If

18  you want to be a cook -- not -- I'm -- a chef, excuse me.

19  There's a difference between a chef and a cook.  You want

20  to be a chef that's fine.  But then see if there's

21  anything in apprentice programs out there.  Something --

22  of the -- the restaurants and see what they will do to

23  assist you in that.  Maybe try to get yourself in the

24  kitchen here and work with people who can identify people

25  out there that you need.  The same thing holds true with

26  you wanted to be a tailor.  There's a lot of tailor shops

27  **MORGAN TYSON    C-81713    DECISION PAGE 6    7/25/06**

116

1    out there that, you know, may be able to assist you. But

2    don't rely on just when you get the brochure. That's all

3    propaganda and marketable stuff. Okay? We know there

4    were no 3042 responses, but the District Attorney of

5    Alameda County indicated her opposition to a finding of

6    parole suitability. The Panel also feels that your gains

7    are recent. You are beginning to show -- and I think the

8    District Attorney brought that out very well, that you're

9    now beginning to make that turn, which is good for you

10   because all this time you say you've been incarcerated

11   for 20-some years, you really haven't accepted the fact

12   of what took place because you've been rambling all over

13   the place. But you're beginning to make the turn and I

14   think that's going to be in your best interests now that

15   you've begin it. But I still -- the Panel still feels

16   that you need to go back to the underlying causes.

17   Nevertheless, you should be commended for obtained four -

18   - four vocations, you have excellent work history, the

19   Trust and Impact program, and your involvement in AA,

20   which has been continuous. However, these positive

21   aspects do not outweigh the factors of unsuitability. In

22   a separate decision, the Panel finds it is not necessary

23   to expect that parole would be granted at a hearing

24   during the following two years. The reason for that

25   again was the multiple victims were attacked and

26   assaulted, one was killed. And all these in separate

27   **MORGAN TYSON   C-81713   DECISION PAGE 7   7/25/06**

117

1    acts, but they still have the same M.O.  The offenses

2    were carried out in a manner which demonstrated callous

3    disregard for human suffering.  The psychological

4    evaluation by Dr. Inaba basically indicated, as I

5    mentioned before, you still have not come to grips with

6    the fact that -- what were the causative factors of you

7    doing this.  And until you do that, you still can be

8    considered to be dangerous to be outside.  And you really

9    just need to get a hold of that.  Also, the Panel wants

10    to recommend that you, you know, remain disciplinary-

11    free.  And I will pass it over to -- let me pass it over

12    to the Deputy -- Deputy before I get into the

13    recommendations.

14        **DEPUTY COMMISSIONER BLONIEN:**  Yeah, I think at the

15    end of the hearing when you were talking about your

16    suitability, you said in essence that you were going to

17    take charge and fight for yourself, so you have to give

18    yourself the tools to do that.  And the first tool you

19    need is the information.  So you have to read everything

20    and then your excellent attorney -- see how he outlined

21    the strategy and the points he wanted to make?

22        **INMATE TYSON:**  Yes, ma'am.

23        **DEPUTY COMMISSIONER BLONIEN:**  You do that and then

24    you make the goals to get you where -- where you want to

25    be, how you're going to do it.  And you -- you -- so you

26    get this plan and then you implement the plan and you're

27    **MORGAN TYSON    C-81713    DECISION PAGE 8    7/25/06**

118

1    heading for success.  You have an idea of where you're

2    going.  You're thinking that -- you're thinking it all

3    the time, because I'm sorry you didn't come to this

4    realization of where you are 15 years ago, but you

5    didn't, but you're still a -- a -- a young person and you

6    still have the ability to get out of here and be

7    successful.  So I hope you do it.

8        **INMATE TYSON:**  Yes, ma'am.

9        **DEPUTY COMMISSIONER BLONIEN:**  You have the ability.

10   So good luck.

11       **INMATE TYSON:**  Yes, ma'am.

12       **PRESIDING COMMISSIONER BIGGERS:**  In addition to

13   that, the -- you also have family out there waiting for

14   you.  So you need to keep that in mind.  Don't be down on

15   yourself.  All right, the Panel's going to recommend that

16   you remain disciplinary-free, continue to get those

17   positive chronos in working with -- that you're doing in

18   your work assignments, continue to upgrade yourself both

19   educationally and vocationally.  You know you got four

20   vocations.  Don't stop there.  And just continue to

21   participate in self-help.  If you do that I think you'll

22   be fine.  But you turned the corner, now you just got to

23   keep it going.  The time is now 2:10.  That concludes the

24   hearing.  Good luck to you, sir.

25   ///

26   ///

27   **MORGAN TYSON    C-81713    DECISION PAGE 9    7/25/06**

119

1    **INMATE TYSON:**  Thank you.

2    **ATTORNEY CARBONE:**   Thank you.

3    **DEPUTY COMMISSIONER BLONIEN:**   Good luck.

4    **INMATE TYSON:**   Yes, ma'am.

5                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON: Nov 22,2006.

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   MORGAN TYSON   C-81713   DECISION PAGE 10   7/25/06

120

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TRACY RICHARDSON, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 119, and which recording was duly recorded at SAN QUENTIN STATE PRISON at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of MORGAN TYSON, CDC No. C-81713, on JULY 25, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 17, 2006, at Sacramento County, California.

TRACY RICHARDSON
Transcriber
**VINE, MCKINNON & HALL**